IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

        vs.                  Case No. 11-1098-JTM

ANGEL DILLARD,

        Defendant.

MEMORANDUM AND ORDER

Dr. Mila Means, a family practitioner in Wichita, Kansas, has publicly announced that she is receiving the training required for her to perform abortion services. Means had been a friend of Dr. George Tiller, a prominent provider of abortion services, until his murder on May 31, 2009, by Scott Roeder. On or around January 19, 2011, defendant Angel Dillard wrote a letter to Means urging her to drop her plans. Invoking consequences ranging from a loss of sleep to intense public scrutiny to eternal damnation, Dillard also wrote that Means "will be checking under your car everyday — because maybe today is the day someone places an explosive under it." Means' office manager referred the letter to the police, and the United States subsequently commenced this action, seeking an award of damages on behalf of Means, and a civil monetary penalty against Dillard.[1]

---

[1] The government also sought to enjoin Dillard from additional communications with Dr. Means, or approaching within 250 feet of herself, her agents, workplace or residence. (Dkt. 4, at 9). The court denied the government's motion for a preliminary injunction following a hearing

Dillard's letter, which was sent in an envelope bearing her name and return address, states in full:

Dr. Means,

It has come to our attention that you are planning to do abortions at your Harry St. location. I am stunned that you would take your career in this direction. Fewer people than ever before are pro-abortion, quality physicians wouldn't even consider associating themselves with it, and more Americans than ever before are unwilling to turn a blind eye to the killing of a baby when the ratio for adoption is 36 couples to 1 baby.

Maybe you don't realize the consequences of killing the innocent. If Tiller could speak from hell, he would tell you what a soulless existence you are purposefully considering, all in the name of greed. Thousands of people are already looking into your background, not just in Wichita, but from all over the U.S. They will know your habits and routines. They know where you shop, who your friends are, what you drive, where you live. You will be checking under your car everyday — because maybe today is the day someone places an explosive under it. People will be picketing your home, your office. You will come under greater scrutiny than you've ever known, legally and professionally. Much worse than the disciplinary actions and ethical concerns that you've been facing. You will become a pariah — no physician will want to associate with you. You will be seen like all the other hacks that have stooped to doing abortions when they weren't good enough to maintain a real practice. You will lose your legitimate clientele, as no one bringing a baby into this world wants to be in the same facility where you are also killing them. You will have trouble keeping staff who are willing to participate in innocent blood-shedding and won't be able to keep the sanitary conditions necessary to maintain a healthy medical facility. You will end up having the same kind of rat-infested, dirty facility that they have in north-eastern Kansas. Anyone who partners with you will experience the same headaches. Not to mention the fact that you will be haunted by bloody, squirming, dismembered babies in your sleep. You can't do what is morally reprehensible and enjoy peace of mind. The Bible says, "There are six things the Lord hates ... hands that shed innocent blood, a heart that devises evil schemes, feet that are quick to rush into evil..." Proverbs 6:16-18. Abortion kills human life-it matters not if you kill it at 6 weeks or at 26 weeks, it's still the unnatural, violent death of a human baby for the sake of convenience. You are doing what the Humane Society wouldn't allow to happen to a pregnant dog or cat.

conducted April 20, 2011. (Dkt. 22).

2

I urge you to think very carefully about the choices you are making. There are 3 churches within 1 block of your practice, and many others who must take a stand. We will not let this abomination continue without doing everything we can to stop it. We pray you will either make the right choice and use your medical practice to heal instead of kill, or that God will bring judgment on you, the likes of which you cannot imagine. We don't want you killing our children in our community. Good people are tired of this rampant evil, and will stand against you every step of the way. Do the world a favor and ABORT this stupid plan of yours. It's not too late to change your mind.

Angel Dillard

The government brought this action under the Freedom of Access to Clinic Entrances Act (FACE), 18 U.S.C. § 248(a)(1) which provides criminal and civil liability for any person who

by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services.

FACE authorizes civil actions both by persons aggrieved by a violation of the Act, and by the Attorney General of the United States. In the case of the latter, the Act provides in subsection (c)(2):

(A)  In general. — If the Attorney General of the United States has reasonable cause to believe that any person or group of persons is being, has been, or may be injured by conduct constituting a violation of this section, the Attorney General may commence a civil action in any appropriate United States District Court.

(B)  Relief. — In any action under subparagraph (A), the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief, and compensatory damages to persons aggrieved as described in paragraph (1)(B). The court, to vindicate the public interest, may also assess a civil penalty against each respondent —

(I)  in an amount not exceeding $10,000 for a nonviolent physical obstruction and $15,000 for other first violations; and

3

      (ii)    in an amount not exceeding $15,000 for a nonviolent physical obstruction and $25,000 for any other subsequent violation.

FACE explicitly defines "intimidate" as "to place a person in reasonable apprehension of bodily harm to him- or herself or another." § 248(e)(3).

Dillard has moved to dismiss the action, arguing that her letter was constitutionally protected speech, cited the Supreme Court's recent decision in *Snyder v. Phelps*, 131 S.Ct. 1207, 1215 (2011). In *Snyder*, the Court reiterated that "'speech on public issues occupies the highest rung of the hierarchy of First Amendment values'" 131 S.Ct. at 1215 (*quoting Dun & Bradstreet, Inc. v. Greenmoss Builders*, 472 U.S. 749, 760 (1985). Dillard contends that the court's finding, at the conclusion of the hearing on the government's motion for injunctive relief, that the letter was not a true threat, is the law of the case and is dispositive as to her motion to dismiss. (Dkt. 28, at 3, 22).

The First Amendment's prohibition of laws limiting the freedom of speech does not include "true threat[s]." *Virginia v. Black*, 538 U.S. 343, 359 (2003). Prosecution under FACE, therefore, has been interpreted to require the existence of a true threat, that is, a "threat where a reasonable person would foresee that the listener will believe he will be subjected to physical violence, with the intent to intimidate physicians." *Planned Parenthood of Columbia/Williamette v. American Colation of Life Activists*, 499 F.3d 949, 958 (9th Cir. 2005). *See also Planned Parenthood of the Columbia/Willamette v. American Coalition of Life Activists*, 290 F.3d 1058 (9th Cir.2002) (upholding FACE against First Amendment challenge).

In the context of a state criminal prosecution for cross-burning, the Supreme Court has emphasized the intent of the accused:

"True threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular

4

individual or group of individuals. The speaker need not actually intend to carry out the threat.... Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.

*Virginia v. Black*, 538 U.S. at 359-60 (2003) (citations omitted).

The determination of whether a given communication is a true threat is "a fact-intensive inquiry, in which the language, the context in which the statements were made, as well as the recipients' responses are all relevant." *Nielander v. Bd. of County Commissioners*, 582 F.3d 1155, 1167-68 (10th Cir. 2009) (discussing true threats in context of 42 U.S.C. § 1983 action for malicious prosecution). In determining whether communications constitute an unprotected true threat, they "should be considered in light of their entire factual context, including the surrounding events and reaction of the listeners." *United States v. Orozco-Santillan*, 903 F.2d 1262 1265; (9th Cir. 1990), *overruled in part on other gds*., *United States v. Hanna*, 293 F.3d 1080 (9th Cir. 2002). The Eight Circuit has specifically applied this standard to prosecutions under FACE, holding that "[t]he court must analyze an alleged threat in the light of [its] entire factual context and decide whether the recipient of the alleged threat could reasonably conclude that it expresses a determination or intent to injury presently or in the future." *United States v. Dinwiddie*, 76 F.3d 913, 925 (8th Cir. 1996) (internal quotations and citations omitted). It is not necessary that a speaker actually intend to commit violence. *Virginia v. Black*, 538 U.S. at 360. The touchstone is whether "an ordinary, reasonable person who is familiar with the context of the communication would interpret it as a threat of injury." *United States v. Spring*, 305 F.3d 276, 280 (4th Cir. 2002) (alterations and internal quotations omitted).

"A true threat 'conveys a gravity of purpose and likelihood of execution so as to constitute speech beyond the pale of protected vehement, caustic unpleasantly sharp attacks on government

and public officials.'" *Nielander*, 582 F.3d at 1168 (quoting *United States v. Crews*, 781 F.2d 826, 832 (10th Cir. 1986) (alterations and internal quotations omitted). In *Didwiddie*, the court recognized that numerous factors are relevant to this inquiry, including

> the reaction of the recipient of the threat and of other listeners, whether the threat was conditional, whether the threat was communicated directly to its victim, whether the maker of the threat had made similar statements to the victim in the past, and whether the victim had reason to believe that the maker of the threat had a propensity to engage in violence. This list is not exhaustive, and the presence or absence of any one of its elements need not be dispositive.

76 F.3d at 925.

Statements which are "made in jest, [or] communicated to a large audience, or political in nature, or conditioned on an event that would never happen" are statements more likely to be found to be protected speech rather than a true threat. *United States v. McDonald*, 2011 WL 3805759 (4th Cir. Aug. 30, 2011). Whether a statement is made anonymously may, depending on the circumstances of the case, increase or decrease the likelihood that an reasonable listener would infer the existence of a true threat. *See United States v. Bagdasarian*, 652 F.3d 1113, 1120-21 n. 20 (9th Cir. 2011). "The fact that a threat is subtle does not make it less of a threat." *United States v. Gilbert*, 884 F.3d 454, 455-56 (9th Cir. 1989).

The context of a statement may also establish, in some cases, that a prediction of violence by third parties may be reasonably taken as a true threat. In *United States v. Viefhaus*, 168 F.3d 392, 396 (10th Cir. 1999), the defendant was charged transmitting a bomb threat by telephone, in violation of 18 U.S.C. § 844(e), based upon his use of an answering machine message urging a white supremacist revolution. The message then stated

> a letter from a high ranking revolutionary commander has been written and received demanding that action be taken against the government by all white warriors by

> December 15th and if this action is not taken, bombs will be activated in 15 pre-selected major U.S. cities. That means December 15, 1996, one week from today. In [other] words, this war is going to start with or without you.

168 F.3d at 394. The defendant contended that the message was not a true threat, in part, because it merely reported a potential threat by a third party, rather than reflecting a direct statement of his own actions. The Tenth Circuit rejected this as a blanket defense. Given the objective nature of the true-threat inquiry, the court held,

> it is logical that a defendant who repeats a third party's threat may be subjected to criminal liability.... If a defendant's repetition of a third party's threat is reasonably interpreted as a simple disclosure of the existence of the threat for informational purposes, no illegality has occurred. If, on the other hand, a defendant's repetition of a third party's threat is reasonably interpreted as communicating the defendant's *own* intent, purpose, or goal to "kill, injure, or intimidate any individual or unlawfully to damage or destroy any building, vehicle, or other real or personal property by means of fire or an explosive," the defendant has violated 18 U.S.C. § 844(e). In the latter scenario, the defendant has effectively adopted the third party's threat as his own. There is no requirement that the defendant convey an intent to carry out the threatened conduct himself. *See United States v. Dinwiddie*, 76 F.3d 913, 925 n. 9 (8th Cir.1996) (*citing United States v. Bellrichard*, 994 F.2d 1318, 1319–24 (8th Cir.1993)).

168 F.3d at 396 (emphasis in original).

The Second Circuit has expressed a similar view in a prosecution under FACE. in *New York ex rel. Spitzer v. Operation Rescue National*, 273 F.3d 184, 196 (2nd Cir. 2001). In conducting its inquiry as to the existence of a true threat,

> a court must be sure that the recipient is fearful of the execution of the threat *by the speaker* (or the speaker's co-conspirators). Thus, generally, a person who informs someone that he or she is in danger from a third party has not made a threat, even if the statement produces fear. This may be true even where a protestor tells the objects of protest that they are in danger and further indicates political support for the violent third parties.

*Id.* at 196 (emphasis in original).

Thus, a statement that a listener will suffer future violence may be a true threat, but only if the listener reasonably understands that the violence will be perpetrated by the defendant or third parties acting in concert with him, and the context of the statement is important. This principle is also reflected in recent cases discussing the existence of a true threat in the context of prosecutions for making threats against the President.

In *United States v. Bagdasarian*, 652 F.3d 1113, 1119 (9th Cir. 2011), the Ninth Circuit held that insufficient evidence supported the presidential threat conviction of the defendant, who had posted internet messages containing racist statements relating to Barak Obama, along with two additional comments — "shoot the nig country fkd for another 4 years+" and "Obama fk the niggar, he will have a 50 cal in the head soon." The court concluded that these statements, repellent as the were, were not objectively understood as threats by the defendant.

> Neither statement constitutes a threat in the ordinary meaning of the word: "an expression of an intention to inflict ... injury ... on another." Webster's Third New International Dictionary 2382 (1976). The "Obama fk the niggar" statement is a prediction that Obama "will have a 50 cal in the head soon." It conveys no explicit or implicit threat on the part of Bagdasarian that he himself will kill or injure Obama. Nor does the second statement impart a threat. "[S]hoot the nig" is instead an imperative intended to encourage others to take violent action, if not simply an expression of rage or frustration. The threat statute, however, does not criminalize predictions or exhortations to others to injure or kill the President. It is difficult to see how a rational trier of fact could reasonably have found that either statement, on its face or taken in context, expresses a threat against Obama by Bagdasarian.

> There is no disputing that neither of Bagdasarian's statements was conditional and that both were alarming and dangerous. The first statement, which referred to Obama as a "niggar" who "will have a 50 cal in the head soon," coupled a racial slur with an assassination forecast during a highly controversial campaign that would ultimately make Obama the country's first black president. No less troubling is the defendant's second statement imploring others to "shoot the nig," lest the "country [be] fkd for another 4 years+" because "never in history" has a black person "done ANYTHING right." There are many unstable individuals in this nation to whom assault weapons and other firearms are readily available, some of whom might believe that they were doing the nation a service were they to follow Bagdasarian's

commandment. There is nevertheless insufficient evidence that either statement constituted a threat or would be construed by a reasonable person as a genuine threat by Bagdasarian against Obama.

When our law punishes words, we must examine the surrounding circumstances to discern the significance of those words' utterance, but must not distort or embellish their plain meaning so that the law may reach them. Here, the meaning of the words is absolutely plain. They do not constitute a threat and do not fall within the offense punished by the statute.

*Id.* at 1119-20 (footnotes omitted).

The same court drew a similar conclusion with respect to a predition of future violence against President George Bush in *United States v. Lincoln*, 403 F.3d 703 (9th Cir. 2005). The defendant in that action sent a letter to President Bush in opposition to Operation Desert Storm:

you think cause [sic] you go over There and Blow Them up that The killing will Stop in you [sic] Dream They got over 275,800 or more since, Never mind that this is only the Beging [sic] of the Badass war To come Just think Their army is over here already hiding They have more Posion gas Then [sic] you know. ha ha. Too bad you don't think Like Them. You will see a good Job Done agin [sic] may [sic] 2 week's, [sic] maybe 2 months, 3, who know's [sic]. You Will Die too George W Bush real Soon They Promissed [sic] That you would Long Live BIN LADEN

403 F.3d at 705.

In reaching its conclusion, the *Lincoln* court distinguished *Planned Parenthood v. American Coalition of Life Activists*, 290 F.3d 1058 (9th Cir. 2002), where it had upheld a conviction under FACE based upon defendants' posting online information about abortion doctors on "wanted posters" which included the images of both living and murdered physicians. In contrast to the "clear pattern of appearance on a poster followed by murder" of abortion doctors, the defendant in *Lincoln* had sent "single letter" which was not publicly posted, but sent only to a single recipient; there was thus "no way the letter could be reasonably viewed as a signal to Al Qaeda or anyone else to carry out an attack on President Bush." 403 F.3d at 707. The court overturned the defendant's conviction,

9

holding that the letter was the defendant's "crude and offensive method of stating political opposition to the President, [and though] disturbing, [it was] his constitutional right to endorse the violent actions of Bin Laden and Al Qaeda, which is protected speech." *Id.* Any violence referenced in the letter, the court stressed, was that of Al Qaeda rather than the defendant. Again citing its earlier decision in *Planned Parenthood*, 290 F.3d at 1072, the court stressed the observation in that case that if the abortion proponents "'had merely endorsed or encouraged the violent actions of others, its speech would be protected.'" 403 F.3d at 707.

In its Response to the Motion to Dismiss, the government first stresses that a dismissal may not be awarded so long as its complaint presents facts which present a FACE Act claim that is at least plausible on its face, citing *Bell Atl. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, __ U.S. ___, 129 S.Ct. 1937 (2009). The government also argues that the court should not take account of facts presented by Dillard in her motion, "such as her allegedly non-violent history and alleged lack of contact with, and knowledge of, Dr. Means." (Dkt. 21, at 3 n.2). The court should not consider evidence outside the pleadings, it argues, because it has not conducted discovery in the action. (*Id*. at 6 n. 4). The government invokes the general standard that the court should consider the context of an alleged true threat, but fails to specify what additional evidence it anticipates it may obtain through discovery, suggesting that "there may well be other facts that providing further context, but which are unknown and unknowable to the United States at this time." (*Id*.).

As noted above, the standard is what a reasonable person in Dr. Means's position would have thought of Dillard's letter. The court takes no account of facts presented or alleged separately by Dillard, but notes that, as to the issue of her own, personal reaction to the Dillard letter, Dr. Means has presented evidence by affidavit and by direct testimony, and there is no indication that the

10

government disavows any of the evidence supplied by her. This evidence, in conjunction with the text and other circumstances in the Dillard letter, provides a sufficient basis for ruling on the defendant's motion.

Mila Means is currently undergoing training to provide abortion services. She intends to provide those services in Wichita. She testified that she currently provides reproductive health care services for women, but not abortions. Patients now have to travel some 300 miles for those services. She testified that she cannot perform abortions in her current location due to injunction arising from a lawsuit alleging a property nuisance, so she is working on putting together a nonprofit to put up a building. Means was a good friend of George Tiller.

She testified that she will begin to provide abortion services only after the training. She has assisted some abortions during her training. She is not currently scheduled to provide any abortion services in Wichita, and has no facilities to provide abortions. Despite Dillard's letter, she still intends to provide abortion services in Wichita.

Means testified that her staff had begun to perform some increased security measures even before receiving Dillard's letter. After the letter, she and her staff began to having a mechanic check her car, traveling home by different routes and staying overnight in different locations. They also installed some door alarms at her office, and has begun looking for a more secure building in which to practice. (Dkt. 4-1, ¶ 9, 11).

Means did not directly receive Dillard's letter. The letter was opened by her office manager, Andrea Hamel. Hamel immediately notified the Wichita police, and told Means about the letter only at some later date. Means is not sure exactly when this occurred, but believes it was relatively close to the date of the letter. At some point, a copy of the letter was also given to the FBI.

Means does not read letters received by her clinic which are deemed non-threatening. She testified that they had a box which contained one or two other letters they had been concerned about.

At some point after she was shown Dillard's letter, Means conducted some internet research, and discovered an article by the Associated Press about Dillard, indicating that she had corresponded with Roeder, and stating that she admired him for his convictions. (Dkt. 24, at 55). Means testified that the article also stated that Dillard stated for herself she did not plan any violence. (*Id*. at 38). During cross-examination, Means testified that "I'm sure she didn't" have any plans for violence at the time of the article, but that "people's tendency to move toward violence happens over time." (*Id*.) She also testified that, after her initial research, she found an article indicating that the FBI had met with Dillard and concluded that she was not a threat. (*Id*. at 50).

Means testified that the letter's references to scrutiny by "[t]housands of persons," and that local groups "must take a stand" meant that "[i]t's quite possible she is spokesperson that would incite others to violence." (Dkt. 24, at 37). She testified, "I didn't know that she specifically would be the violent one, but I couldn't rule it out." (*Id*.) Means agrees that the "a relatively small number" part of the pro-life community has engaged in violence. (*Id*. at 39).

Means does not know that Dillard has ever met her or been to her office or home, has no knowledge that Dillard has any criminal record. The only communication from Dillard that Means considers threatening is the January 29, 2011 letter. (Id. at 43).

Means agrees that other people have warned her about the risk of violence, but testified that those "are friendly people that talk about possible issues." (*Id*. at 46). But the "people who warn [her] don't talk about hell [or] soulless existence. (*Id*.) She testified that the warnings about security

issues from her family and friends are different, because "it's from people who are caring for you." (*Id*. at 99).

The government also attempts to expand the case beyond the single reference to potential car bomb by noting that the letter also states that Dillard would "do everything" to stop Means, and referenced the murdered Dr. Tiller. But the context of the letter fails to support any inference that these comments represent true threats. The "we will do everything" language is clearly prefaced by language about three local churches, and contains no suggestion that the churches would engage in any violent conduct against Means. Similarly, the letter does not refer to the historical violence against Dr. Tiller, but presents a religious argument: "If Tiller could speak from hell, he would tell you what a soulless existence you are purposefully considering, all in the name of greed." These statements are insufficient in themselves to create any belief by a reasonable recipient that the writer was threatening violence.

As to the substance of that motion, the government relies primarily on four cases finding the existence of a true threat in the context of abortion protests, *United States v. Dinwiddie*, 76 F.3d 913 (8th Cir. 1996), *United States v. McMillan*, 53 F.Supp.2d 895 (S.D. Miss. 1999), *United States v. Hart*, 212 F.3d 1067 (8th Cir. 2000), and *Planned Parenthood of the Columbia/Willamette v. American Coalition of Life Activists*, 290 F.3d 1058 (9th Cir.2002).

In *Columbia/Willamette*, the Ninth Circuit upheld the judgment that defendants violated the FACE Act by their publication of "wanted" posters featuring doctors who performed abortions, given evidence showing that three doctors had been previously murdered following the publication of similar posters. Given this context, the court held, "the poster format itself had acquired currency

as a death threat for abortion providers" at the time the defendants publicized their posters. 290 F.3d at 1058.

In *Dinwiddie*, the defendant pro-life activist protested outside an abortion clinic over a six to eight month period. During this period she used a bullhorn to shout over 50 comments to clinic doctor Robert Crist, including, "Robert, remember Dr. Gunn [a doctor providing abortion services who was killed in 1993] ... This could happen to you ... He is not in the world anymore. Whoever sheds man's blood, by man his blood shall be shed." 76 F.3d at 917. But in addition to such general comments of future violence, she also made specific threats of physical force and directly associated herself with that violence, telling a clinic director that "you have not seen violence yet until you see what *we* do to you." *Id*. (emphasis added). She had, in addition, physically obstructed patients from entering the clinic, and had signed a petition stating that "lethal force was justifiable [in a prior killing of a doctor providing abortion services] provided it was carried out for defending the lives of unborn children." *Id*. at 917 n. 2, The court concluded that "[a]lthough Mrs. Dinwiddie did not specifically say to Dr. Crist, 'I am going to injure you,' the manner in which Mrs. Dinwiddie made her statements, the context in which they were made, and Dr. Crist's reaction to them [wearing a bullet-proof vest]" supported the finding that the comments were true threats. *Id*. at 925-26.

In *United States v. McMillan*, 53 F.Supp.2d 895, the court found an abortion clinic protestor in contempt for violating a consent decree arising from a FACE Act case. The protestor, over the course of several weeks, had repeatedly asked, "Where's a pipebomber when you need him?" 53 F.Supp.2d at 896. He had made these comments every time one of the clinic's doctors arrived for work. The doctor testified that the protestor originally made other comments, but changed his message to include references to pipebombers "when the Unibomber [sic] was in the newspapers."

*Id*. at 898. In finding the protestor in contempt, the court stressed that the comments were both repetitive and resonant with other cases involving similar acts of violence. The respondent, the court stated, had not been lured into

> blurting out statements which might be instantly regretted. Instead, the testimony presented to this court shows that McMillan, acting alone or in the presence of other more passive demonstrators, chooses to shout his pipebomber comments at the very time Dr. Stoppel arrives at the clinic. This comment was shouted not once or twice, but many times over a period of time spanning six to eight weeks according the best estimate of Dr. Stoppel. No one contends that this was a "one-time" utterance. According to Dr. Stoppel, McMillan began shouting about the need for a pipebomber at approximately the same time as the news media was carrying stories about the "Unibomber" and the Olympic pipe-bomb incident, and that he continued to do so until this civil contempt action was filed.

*Id*. at 905.

Finally, in *United States v. Hart*, 212 F.3d 1067 (8th Cir. 2000), the court upheld the defendant's FACE Act conviction, based on his parking of two Ryder trucks outside of two abortion clinics in Little Rock. Workers at each clinic discovered, on September 25, 1997, a truck "unattended and [with] no indication as to its purpose for being there, parked in the clinic driveway rather than the parking lot. 212 F.3d at 1070.

> First, Hart targeted abortion clinics, which are often sites of protests and violence. In particular, Hart regularly protested outside the two clinics at which he parked the Ryder trucks. He also placed the trucks in the driveways, near the entrances, rather than in the parking lot. The trucks actually blocked the entrance to each clinic building. In fact, an employee at one clinic testified that the truck had been parked "as close to [the clinic] as it could possibly be." Furthermore, the placement of the trucks at the clinics coincided with a visit to Little Rock from President Clinton, whose presence in the area further heightened concerns about potential violence. It was reasonable for the jury to conclude that Hart, by placing a Ryder truck directly in the entranceway of each clinic, sought to take advantage of the heightened level of security concerns in the Little Rock area to create a threat of violence on that particular day. Moreover, Hart offered no legitimate reason for leaving the trucks early that morning, and he provided no notice or explanation for his actions. These circumstances, coupled with the similarity to the well-known events of the Oklahoma City bombing, were reasonably interpreted by clinic staff and police officers as a

15

threat to injure. Furthermore, the reaction of clinic staff indicates that they did in fact perceive the Ryder trucks as a threat of force. Several clinic employees testified that they believed that the trucks contained bombs, and they immediately contacted the police, who evacuated the clinics and nearby homes and businesses and called in bomb squads.

212 F.3d at 1072.

The relevance of the cases cited by the government is limited. In *Dinwiddie* and *McMillan*, the courts stressed the sheer volume of the invective directed at the abortion providers. In *Dinwiddie*, *Hart*, and *Columbia/Willamette*, the courts stressed the communications used of a distinctive type of violence which resonated with current events (pipebombs and Ryder trucks) or a particularized form of communication (wanted posters) which was so distinctive as to "acquire[] currency as a death threat for abortion providers." In the present case, by contrast, the government has alleged a single communication from Dillard, which advances potential violence ("maybe today") as but one of the of the many consequences of providing abortion services, which, Dillard suggests, include damnation, public scrutiny, professional and public opprobrium, and the loss of staff, clientele, and sleep. In *Dinwiddie*, the defendant publicly associated herself with the killing of abortion providers, stating that such actions were legally justified. Means testified that the article she read about Dillard indicated that she admired Roeder, but that Dillard expressly disavowed any interest in violence herself.

Similarly, the evidence cited in *Viefhaus* which served to link the defendant to the prospective violence by third parties is not present here. In that case, as noted earlier, the defendant ostensibly related a message from a "high ranking revolutionary commander," that "bombs will be activated in 15 pre-selected major U.S. cities," and that these bombs would be activated "by December 15, 1996," one week after his recorded message. Thus, in *Viefhaus*, the existence of a true

threat was corroborated by specific information suggesting that he was a participant in the bomb plot, that the bombs were real, and their detonation imminent.

The case cited in particular by the defendant, *New York ex rel. Spitzer v. Operation Rescue*, 273 F.3d 184, 197 (2nd Cir. 2001), is also factually distinct.  In that case,  the Second Circuit upheld a FACE Act injunction against a defendant, but did so based upon evidence that the defendant had physical access to a clinic. With respect to additional findings that the defendant had violated FACE by making true threats, the court stated that it was

> troubled by the District Court's willingness to characterize a broad range of protestor statements as "threats" without giving them the full analysis required by the First Amendment. When determining whether a statement qualifies as a threat for First Amendment purposes, a district court must ask whether the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution.

273 F.3d at 196 (quotation omitted). This led to the court's previously-noted observation that, as a general rule, a warning of third party violence is not a true threat - even if the warning provokes fear - in the absence of evidence indicating that "the recipient is fearful of the execution of the threat *by the speaker* (or the speaker's co-conspirators)." *Id*. (emphasis in original).

But while the Spitzer court disapproved the district court's blanket assessment of the communications as threatening, and expressed  itself "skeptical as to whether any of [the defendant]'s statements constitute true threats," this was, of course, a conclusion rendered in the context of that particular case. In a footnote, the court cited one instance of such a doubtful threat, in which the defendant told a group of clinic workers, "You won't be laughing when the bomb goes off." 273 F.3d at 196 n. 5. But critical to this skepticism was the court's observation that it did not strike alarm in the workers: "The clinic worker who testified to this statement, waited two weeks

before reporting the comment to the police. Were it not for the fact that the recipient of this alleged threat reacted without apparent alarm, we would be more likely to conclude that this statement constituted a true threat." *Id.* In the present case, by contrast, there is evidence from which a jury might conclude that that Dillard's letter provoked a prompt reaction and sincere concern.

The grounds for finding the existence of a true threat in the present action are shakier than those presented in the cases cited by the government. In a single passage within the letter, Dillard observes that Means will need to daily check her car for explosives "because maybe today is the day someone places an explosive under it." Unlike the cases cited by the government, this reference to a specific type of threat has not been linked to any recent anti-abortion violence, nor is there any suggestion that such bomb warnings have acquired any specific "currency as a death threat for abortion providers," as the "wanted" posters had in *Columbia/Willamette*. There is no evidence directly linking Dillard to any acts of clinic obstruction or violence. There is no evidence of repeated communications directed at Dr. Means, only a single passage in a single letter, and this sent openly under her own name. Dr. Means was subsequently to learn that Dillard explicitly denied any plans to engage in violence, and that the FBI had interviewed Dillard and concluded she was not a threat. Dr. Means's conclusions that might have later developed a propensity to violence is purely speculative. Means testified that she has received similar warnings as to her safety from family and friends, but distinguished those warnings as being "caring" and free from the language of damnation. She testified that she had no knowledge that Dillard would become violent, but she "couldn't rule it out." Certainly there is no direct evidence or allegation of any bomb plot currently in motion, or that Dillard is a part of such a conspiracy.

Against this, the present case includes evidence showing that Dillard wrote her letter less than two years after the murder of Dr. Tiller, that she sent the letter specifically to Dr. Means, that she included a reference to a car bomb, and that after being shown the letter (it is unclear exactly how soon afterwards), Dr. Means conducted an internet search of Dillard and discovered that Dillard had corresponded with Dr. Tiller's assassin in prison and expressed admiration for his convictions.

The court cannot grant Dillard's motion given the controlling standard of review.

> We consistently have held that whether a defendant's statement is a true threat or mere political speech is a question for the jury. *See* [*United States v.*] *Leaverton*, 835 F.2d [254,] 257 [10th Cir. (1987)]; [*United States v.*] *Crews*, 781 F.2d [826,] 832 [(10th Cir. 1986)]. If there is no question that a defendant's speech is protected by the First Amendment, the court may dismiss the charge as a matter of law. *See United States v. Malik*, 16 F.3d 45, 51 (2d Cir.1994).

*Viefhaus*, 168 F.3d at 397. Other circuits are in agreement. *See United States v. Voneida*, 337 Fed. Appx. 246, 249 (3d Cir.2009) (the existence of a true threat is a question best left to a jury); *Planned Parenthood of Columbia/Willamette*, 290 F.3d at 1069 ("'it is a jury question whether actions and communications are clearly outside the ambit of first amendment protection,'"(quoting *United States v. Gilbert*, 813 F.2d 1523, 1530 (9th Cir. 1987))*; United States v. Roberts*, 915 F.2d 889, 891 (4th Cir.1990) (whether or not a threat is true is a jury question) *United States v. Whiffen*, 121 F.3d 18, 22 (1st Cir. 1997) ("[t]he proper interpretation of Whiffen's remarks, however, is a question of fact and, therefore, appropriately left for the jury" and that "[w]e cannot conclude that the interpretation preferred by Whiffen is, as a matter of law, the correct one"); *United States v. Howell*, 719 F.2d 1258, 1260 (5th Cir.1983)*; United States v. Carrier*, 672 F.2d 300 (2d Cir.1982).

This very heavy burden, that the court may find Dillard's speech was protected and not a true threat only if there is "no question" as to the issue, has not been met. The burden effectively requires

19

Dillard to demonstrate that no reasonable recipient of her letter could view it as a threat. Given the clear emphasis by the cases on reasonableness and context, this issue must be resolved by the jury.

The court's prior findings with respect to the government's motion for injunctive relief, which were rendered under a different standard of review, are not controlling here. In its request for injunctive relief, the government had the burden of proving that it would likely prevail on the merits of the case. *Westar Energy v. Lake*, 552 F.3d 1215, 1224 (10th Cir.2009). In contrast, Dillard now has the burden to show "beyond doubt that the [government] could prove no set of facts entitling it to relief." *Ash Creek Mining v. Lujan*, 969 F.2d 868, 870 (10th Cir. 1992).

Because the purpose of a preliminary injunction is simply to preserve the positions of the parties, the Supreme Court has emphasized that the resolution a motion for preliminary injunction is inherently provisional. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits"). Because of the different burdens of proof, the doctrine of the law of the case has no application here. *See United States v. Cen-Car Agency/C.C.A.C.*, 724 F.Supp. 313, 316 (D.N.J. 1989) (rejecting argument that law of the case arose from the court's prior resolution of motion for preliminary injunction). "Courts repeatedly have emphasized that a decision as to the likelihood of success is tentative in nature and not binding at a subsequent trial on the merits. Were the opposite true, an unacceptable conflation of the merits decision and the preliminary inquiry would result." *Homans v. City of Albuquerque*, 366 F.3d 900, 904-905 (10th Cir. 2004) (citations omitted).

IT IS ACCORDINGLY ORDERED this 21st day of December, 2011, that the defendant's

Motion to Dismiss (Dkt. 14) is hereby denied.


s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE