IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

United States of America,

        Plaintiff,

        vs.                       Case No. 11-1098-JTM

Angel Dillard,

        Defendant.

MEMORANDUM AND ORDER

The government alleges in this civil action under 18 U.S.C. § 248(a)(1) that the defendant Angel Dillard sent a threatening letter to Dr. Mila Means, a provider of abortion services. The general background of the case has been fully discussed by the court in its prior Order denying Dillard's Motion to Dismiss, in which it found that a rational recipient of the one-page letter could deem it a threat. (Dkt. 30). But the court has also denied the government's request for a preliminary injunction, finding that such an interpretation is possible but not compulsory, given actual text of the letter. (Dkt. 16).

The matter is now before the court on the defendant's appeal from certain evidentiary rulings by the Magistrate Judge. Specifically, Dillard challenges the Magistrate Judge's determination that she may not invoke the clergy-penitent privilege to shield the content of her prison ministry communications with Scott Roeder because she is not a

formally ordained minister.

The court finds that the Objection should be sustained in part, because the modern federal clergy-penitent privilege is not restricted to persons with formal ordination. The policies underlying the privilege apply with equal force to lay persons who regularly conduct religious counseling sessions, and the uncontroverted facts establish that Dillard's prison ministry visits were religious in nature.

*Facts*

The following facts were presented to the Magistrate Judge. The underlying documents are uncontroverted, although the parties dispute the relevance and weight of the facts asserted by their opponent.

The facts establish that the chaplaincy at the Sedgwick County jail is operated by Christian Ministries to Offenders, Inc. (CMO). CMO is a ministry which has been recognized by the government as a § 501(c)(3) non-profit organization that has served inmates in the Sedgwick County Jail for more than thirty years. In Wichita, CMO operates under the authority of the Sedgwick County Sheriff's Office and the detention facility, and is the approved ministry for all religious and spiritual programming at the jail.

The mission of CMO is to minister to inmates as they deal with emotional, physical, and spiritual needs. The vision of CMO includes visiting with each person being detained and sharing with them the love of God. According to CMO, its goal is "to touch the spiritual lives of as many inmates as possible with the 'born-again' message of Jesus

Christ." CMO currently seeks to achieve that goal by supplying prisoners with chapel services, group bible studies, one-on-one biblical counseling, and an array of Christian study materials.

Angel Dillard and her husband, Dr. Robert Dillard, acted as ministerial agents of CMO, having been granted ministerial privileges at the Sedgwick County Jail. In conjunction with those ministerial privileges, each of the Dillards was issued a badge with photo ID which permitted them to conduct ministry work within the jail under the auspices of CMO and the Sedgwick County Sheriff's Office.

To receive their ministerial privileges at the jail, the Dillards, like other applicants, were required to complete a seven-page application form. CMO expects all applicants (including the Dillards) to maintain the confidentiality of inmates and inmate communications conducted during jail ministry, and the applicants (including the Dillards) were required by the Sedgwick County Sheriff's Office to sign an agreement, within the application form, to honor the confidentiality of inmates who came into contact with jail chaplains or ministry workers. The Dillards, and all other applicants, were also required to (a) provide references, to include an ordained religious leader from a faith-based organization; (b) demonstrate prior ministry or counseling experience; (c) complete an interview process; (d) demonstrate and affirm their adherence to core Christian beliefs; and (e) successfully pass a background check. Applicants were also required to comply with all rules and regulations of the jail.

All applicants, including Angel and Rob Dillard, were required to complete a

"Ministerial Privilege Affidavit." The ministers listed as references by the applicants were interviewed by CMO. When CMO reviewed the applications of potential ministry workers such as the Dillards, CMO sought to determine the home church of the applicant and obtain a letter of validation from that church.

The chaplain's office, through CMO, conducts services twice a day, five days a week, with an additional chapel service on Sundays. CMO also provides one-on-one counseling with inmates, often using Angel Dillard to conduct that ministry. During the application process, and later while on the job, Angel Dillard demonstrated to her CMO supervisor the previous experience which CMO looked for in the areas of both general ministry and the "one-on-one" counseling format used at the jail. Angel Dillard and Dr. Dillard were regarded as having done an outstanding job in the jail ministry, and their presence is missed by CMO.

In order to qualify for ministerial privileges, applicants such as the Dillards were required to demonstrate that they subscribed to basic tenets of the Christian faith and complied with the CMO "Statement of Faith." Dr. and Mrs. Dillard demonstrated commitment to these principles during the application process and interviews, and maintained commitment to these principles while serving as ministers working out of the chaplain's office and serving the jail population.

In addition, ministry applicants were provided training which emphasized the fact that inmates and ministers expected counseling sessions to be confidential, that such confidentiality is essential to maintain the effectiveness of the ministry, and that jail

ministry workers are expected to strictly honor inmate confidentiality.

CMO operates in partnership with, and under the authority of, the Sedgwick County Sheriff's Office. Not only does CMO observe and honor the confidentiality of the inmates, but the sheriff's office expects and requires jail ministers to maintain such communications as confidential. The inmates also expect counseling communications with spiritual advisors to be confidential.

According to the evidence from CMO, the guarantee of confidentiality is absolutely necessary for inmate evangelistic efforts and ministry work to be successful. Such ministry often focuses on repentance, forgiveness, and grace. These goals require that inmates be able to discuss their past behavior freely with the ministers, without fear of legal consequences, embarrassment, public ridicule or recrimination. Thus, CMO trains all ministry workers in the chaplain's office that communications with inmates must be kept confidential. Accordingly, both the inmates and the ministers have an expectation of confidentiality. That is, the content of meetings between inmates and ministers is to be held strictly confidential. If inmates were to become fearful that their communications to ministers might be divulged to law enforcement authorities, the ministry would be rendered ineffective and little meaningful inmate contact would occur. Without the guarantee of confidentiality, the ministry of spiritual advisors and religious counselors would be rendered largely useless. Evangelistic and rehabilitation efforts would be far less successful.

Before Angel Dillard met Scott Roeder for the first time, at the Sedgwick County Jail,

she and her husband, Dr. Robert Dillard, already had an established ministry.

In 2001, Angel Dillard's severely handicapped son, Deacon, died at the age of twelve. She had devoted her time to providing care to him twenty-four hours a day, and after his death she was able to spend more time on Christian ministry to others. That year, she and her husband began serving in the worship ministry at Immanuel Baptist Church, of the Southern Baptist denomination. In 2004, she assisted her husband in an officially recognized position of youth ministry at Immanuel Baptist. In August 2006 or thereabouts, The Dillards began serving as youth pastors and worship ministers at Summit Church, also affiliated with the Southern Baptist denomination. In her ministry at both churches, Angel Dillard provided spiritual counseling, advice, and instruction to youth and adults.

Sometime in 2007, Angel and Rob Dillard established their own ministry, Mustard Seed Ministries, a ministry of broad scope in which they ministered in a variety of capacities, whatever they felt God calling them do. This included opening their home as a shelter to abused women and their children, as well as to traveling missionaries and others, including a pastor who could not find housing. They also provided a wide range of Christian counseling, including counseling for teenagers, pre- and post-abortion counseling, and substantial counseling and spiritual mentoring to abused women and victims of domestic violence. The Dillards also filled pulpits at various churches and home fellowships when the regular pastors were absent. The Dillards frequently provided music and worship ministry at churches. Over the years, they received formal training at ministry seminars and training sessions for ministries, including multi-denominational seminars

and week-long ministry camps.

Before becoming involved in ministry counseling to inmates at the Sedgwick County jail, Angel Dillard obtained a Bachelor's Degree in psychology at Wichita State University. In the course of earning her degree, she obtained substantial experience, including counseling victims of domestic abuse and counseling related to abortion. These counseling efforts continued after she obtained her degree. Her internship for her degree was conducted at a detention facility, where she provided trained counseling, including spiritual counseling, to detainees. Dillard completed approximately eight to ten hours in the Religious Studies Department while earning her psychology degree.

Angel Dillard first learned about Scott Roeder after he was jailed. Dillard felt spiritually called to minister to him because it appeared no one else would help him. She wrote him offering to minister to him at the jail with spiritual advice, counsel, and Bible study if he desired. In reply, he invited her to minister to him at the jail.

Dillard signed in as a ministry visitor before her first meeting with Mr. Roeder, and she maintained that role thereafter. Eventually, she became a friend to Roeder, as she did with many inmates to whom she ministered. Nevertheless, the first and foremost purpose of her every visit, letter, or phone call with Roeder was to minister as a Christian counselor and spiritual advisor, typically including prayer and Bible study. Roeder always seemed eager to talk with her about the Bible or to pray. It was her understanding that he regarded their discussions as confidential ministerial visits, as did she. She understood that confidentiality was especially important to inmates who had not yet been to trial, such as

Roeder at that time. Dillard obtained official ministerial privileges at the Sedgwick County jail through CMO. She subsequently ministered to over a hundred inmates in chapel meetings and during the one-on-one counseling. Throughout this ministry, she applied basic principles of Christian doctrine and complied with the CMO "Statement of Faith."

As a minister to inmates, Angel Dillard was trained to follow all rules of the facility and not to engage in unlawful conduct. As a Christian counselor, her goal was to follow the principles of Christ. According to Dillard, at no time in her jail ministry did she engage in or plan unlawful criminal acts, nor did she communicate with inmates to that end.

In its Responses to Dillard's Motion for Protective Order and her Objection to the Order of the Magistrate Judge, the government argues that the facts demonstrate that Dillard did not provide ministerial services to Roeder. First, it notes that in a print-out of Dillard's prison visits to Roeder and other prisoners, which includes a column apparently referencing the "Type" of visit, the visits to Roeder are listed as "F" for "friend," while her subsequent visits to other prisoners are identified as "M," for "minister." It is unclear who supplied this description to the visits, but it is also notable that all of the approximately 50 visits to other prisoners (including the "M" for minister visits) happened after Dillard stopped visiting Roeder. The most natural inference is simply that, as Dillard continued her CMO ministry, she learned to fill out the prison forms differently, rather than, as the government would have it and in the face of the overwhelming weight of the other evidence, her visits to Roeder were secular rather than ministerial in nature.

The next argument advanced by the government is similar, observing that in some

of the actual logs recording individual visits by Dillard, the term "friend" appears in handwriting. The logs, however, merely permit a visitor to self-identify a "Relationship to Inmate," without requiring or suggesting that the visitor select from mutually-exclusive categories of "minister" or "friend." To the contrary, in the forms submitted by the government, every other visitor supplies a specific family relationship, such as "Mom," or "Sister." The government's negative inference might have some weight if Dillard had described herself as a "friend," while other visitors on the same page had listed themselves as "minister," or otherwise indicated a clerical relationship. But, on the forms submitted by the government, none have done so; all list family relations.

Certainly nothing in the equivocal evidence cited by the government indicates these subsequent "M" visits to other prisoners were different in any substantial way from her earlier visits to Roeder. And nothing in the evidence contradicts the clear evidence that Dillard—who was participating in the CMO ministry program, having received CMO training, and indeed wore a CMO visitor badge during her visits—visited Roeder as a part of the CMO ministry. The overwhelming weight of the evidence is that the Roeder visits were a part of a regular prison ministry by a recognized religious organization.

Next, the government argues that Dillard herself did not think her visits were privileged, citing a May 17, 2010 letter to Roeder. It makes this argument by noting that Dillard acknowledged in the letter that she was not ordained. But, read in context, Dillard was *not* indicating in the letter that she did not believe the ministry was not religiously based—indeed, the opposite is true. In the letter, Dillard indicated only that she knew she

had not complied with any "paperwork" requirements for ordination. But Dillard specifically proceeds to state that she had been doing ministerial work "for years," and, more importantly, that she believed ordination to be a regulation of man rather than God. As the court finds below, the federal clergy-penitent privilege does *not* require "paper-work" ordination.

The other factual arguments advanced by the government are even less substantial. Thus, it notes that the CMO volunteer forms that Dillard submitted in support of her claim of ministerial privilege are blank, including the provision for the submission of a reference by another minister. But this is simply because the exhibit is explicitly presented as a *form*. The form was submitted as attachment to an affidavit, the truthfulness of which the government has not challenged, which directly and explicitly avers that "[a]ll applicants, including Angel and Robert Dillard, were required to complete" the attached forms. (Dkt. 141-1, ¶ 7). Pastor Gilmore Williams further avers specifically that Dillard not only supplied such information, but that "[t]he ministers which the applicants listed as references were also interviewed." (*Id.*)

Finally, the government argues that the communications cannot be privileged because in two letters Dillard herself contemplated the possibility that the communications might become public. Read in context, however, neither letter suggests that Dillard believed her communications with Roeder fell outside the ministerial privilege. In the first letter, Dillard mentions that she was visited by the FBI and tells Roeder "[t]hey are scrutinizing everyone who writes to you and to whom you write, so don't say anything

you don't want to be public knowledge!" The clear import of the letter is that Roeder should not write anything incriminating to her. Similarly, in the second letter, she simply advised Roeder not to divulge potentially privileged matters until their next visit, which would the following month.

Finally, the government cites the paragraph in the CMO Volunteer Application Form in which prospective prison volunteers promise to "HONOR CONFIDENTIALITY OF OFFENDERS." The text of the paragraph provides that the volunteers would not "use any information concerning persons in the custody or under the Supervision of the Sedgwick County Sheriff's Office for any reason without prior written approval from the Sedgwick County Sheriff's Office."

The government takes the last clause to suggest that the Sheriff's office has to power to *unilaterally* waive the ministerial privilege. This reads the provision too broadly. Read in context, the provision simply informs would-be volunteers that disclosure cannot occur without official Sedgwick County approval—that is, that written approval is a necessary, but not sufficient, condition for the voiding of the otherwise explicit requirement of confidentiality. Finally, it should be noted also that it is not the Sedgwick County Sheriff's Office which seeks to void the privilege here, but the United States.

### Ruling of the Magistrate Judge

The Magistrate Judge rejected Dillard's claim of privilege, on the grounds that Dillard herself is not an ordained minister. The Magistrate Judge rejected Dillard's reliance

on *In re Verplank*, 329 F.Supp. 433 (D.C. Cal. 1971), where the court held that ordination was not a prerequisite to the clergy-penitent privilege, observing that in *Verplank* the communication, while routed through church staff, was ultimately directed at an ordained minister. In addition, the court in *Verplank* compared the staff (who were advising draft resisters) to the staff of a law firm, 329 F.Supp. at 436, a consideration which would not be relevant here.

The Magistrate Judge also expressed the concern that granting the privilege to Dillard could embroil the courts in difficult line drawing with respect to the application of the privilege. Requiring formal ordination

> keeps the Court out of the church's affairs. Extending the privilege to "counselors" and other lay members would require the Court to undertake the constitutionally-hazardous task of analyzing whether counseling was or was not "religious" – and possibly even balancing whether the religious component of a communication is substantial enough to require protection. The only other alternative would be to simply accept as unassailable any claim of qualification, thus hobbling the Court's power to control the application of its own rules.

(Dkt. 155, at 6).

To the defendant's argument that the privilege should nonetheless apply because Dillard reasonably believed the prison ministry's communications were privileged, a position taken by the Third Circuit in *In re Grand Jury Investigation*, 918 F.2d 374, 385, n. 13 (3rd Cir. 1990), the Magistrate Judge made two observations. First, that *In re Grand Jury Investigation* was decided under proposed–but never adopted–Federal Rules governing the scope of various privileges. Second, he determined that Dillard could not reasonably have

believed her communications with Roeder were privileged because the relevant Kansas statute, K.S.A. 60-429, provides for privilege only where the clergy is ordained. (Dkt. 155, at 5).

### Conclusions of Law

The court finds that the determination of the Magistrate Judge cannot be sustained as to the core of the present dispute, the content of direct communications between Dillard and Roeder in prison. Contrary to the conclusion of the Magistrate Judge, K.S.A. 60-429 does *not* require formal ordination as an absolute prerequisite. Indeed, the Kansas statute has been singled out as a model by one leading commentator precisely because it does not require formal ordination. Under "the Kansas scheme ... ordination is a sufficient, *but not a necessary*, condition for qualification as a 'clergyman.'" Wright & Graham, FED. PRAC. & PROCEDURE: EVIDENCE, § 5613, 104-105 (1992) (emphasis added). The same authority describes the Kansas statute as "elaborate," in that it "contains one definition for ordained clerics and another for those who lack ordination." *Id.* at 5611, at 71; § 5613 at 104-105 n. 91.[1]

Specifically, the Kansas statute recognizes a privilege for "penitential

---

[1] Notably, the government's Response brief makes no effort whatsoever to support the Magistrate Judge's conclusion that a lack of ordination is fatal to Dillard's privilege claim. (Dkt. 78, at 4). Rather, as noted above, the government makes the factual argument that the Magistrate Judge *could* have denied the motion for protective order on the grounds that Dillard was not really visiting Roeder as a minister. As the court mentioned previously, this argument rests on a highly selective reading of equivocal evidence from prison records. The uncontradicted evidence clearly establishes that Dillard visited Roeder as a part of the independent, pre-existing CMO prison ministry program.

communication" which is defined as

> any communication between a penitent and *a regular* or duly ordained *minister of religion* which the penitent intends shall be kept secret and confidential and which pertains to advice or assistance in determining or discharging the penitent's moral obligations, or to obtaining God's mercy or forgiveness for past culpable conduct.

K.S.A. 60-429(a)(5) (emphasis added). In turn the statute carefully defines both "regular" and "ordained" ministers who may invoke the privilege:

> As used in this section, (1) the term "duly ordained minister of religion" means a person who has been ordained, in accordance with the ceremonial ritual, or discipline of a church, religious sect, or organization established on the basis of a community of faith and belief, doctrines and practices of a religious character, to preach and to teach the doctrines of such church, sect, or organization and to administer the rites and ceremonies thereof in public worship, and who as his or her regular and customary vocation preaches and teaches the principles of religion and administers the ordinances of public worship as embodied in the creed or principles of such church, sect, or organization; (2) the term "regular minister of religion" means one who as his or her customary vocation preaches and teaches the principles of religion of a church, a religious sect, or organization of which he or she is a member, without having been formally ordained as a minister of religion, and who is recognized by such church, sect, or organization as a regular minister.

The Kansas statute thus explicitly contemplates that the privilege may be invoked by an nonordained "regular" minister. The requirements of regularity and organizational recognition further supply the answer to the concern posed by the Magistrate Judge, that the courts might otherwise be forced to answer difficult line-drawing questions as to the religious practices of given sects. The Kansas statue is a model precisely because it strikes a middle ground between formal ordination (which is unwise and could lead to technical issues of its own, *see* Wright & Graham, § 5613 at 104) and the sort of completely *ad hoc*

analysis rightly feared by the Magistrate Judge. The statute creates independent and objective standards for "regular ministers," and so relieves the courts from having to decide on a case by case basis whether a given invocation of the privilege is valid.

And here there can be no question but that Dillard's prison visits were part of a *regular* prison ministry program. She conducted over 50 visits to numerous prisoners. These visits were part of a recognized and long-standing prison ministry conducted by CMO. In order to participate in the CMO program, Dillard had to undergo careful scrutiny and review, and had to explicitly agree to keep prison communications confidential. While conducting her visits, she was required to wear a CMO identification badge. The government's contention, based upon the equivocal evidence from prison sign-in logs, that Dillard's prison visits were not ministerial in nature simply flies in the face of the overwhelming evidence that the visits were a part of an existing program by a recognized prison ministry.

This conclusion is also consistent with the outlook taken by the proposed Federal Rule of Evidence 506, which explicitly broadened the application of the privilege to persons who may lack formal ordination. As the court noted in *Verplank*, proposed Rule 506

> does not require such an attainment [ordination] in order for the privilege to apply. The Advisory Committee note states that '(a) fair construction of the language requires that the person to whom the status is sought to be attached be regularly engaged in activities conforming at least in a general way with those of [a Catholic priest, Jewish rabbi, or minister of] an established Protestant denomination, though not necessarily on a full-time basis.' 51 F.R.D. [315,] 372 [(1971)]. Under the circumstances here concerned, it would appear that the activities of the other counselors at the McAlister Center conform 'at least in a general way' with a significant portion of the activities

of a minister of an established Protestant denomination, to the extent necessary to bring them within the privilege covering communications to clergymen.

329 F.Supp. at 436. *See also In re Grand Jury Investigation*, 918 F.2d 374, 385 n. 14 (3rd Cir. 1990) (adopting the broader view of proposed Rule 506, and citing possible First Amendment problems that would arise were it to limit the privilege to Roman Catholic penitential communications). Further, the proposed Rule 506 not only eliminates any requirement of ordination, the Advisory Committee notes explicitly states that the privilege may apply even if the minister performs his duties on a part-time basis, so long as his activity is regular in nature. *See also Cox v. Miller*, 296 F.3d 89, 108 (2d Cir. 2002) (noting under Establishment Clause analysis that the clergy-penitent privilege in some cases may apply to part-time Alcoholics Anonymous members).

Of course, as the Magistrate Judge noted, proposed Rule 506 (like other rules governing specific evidentiary privileges) has not been formally adopted. But it would be a mistake to read into this lack of adoption a rejection of those proposals. Rather than explicitly codifying the proposed evidentiary privilege rules, Congress chose to adopt Rule 501, which provides that privileges in federal court "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reasons and experience." But Congress explicitly cautioned that this preference for a common law approach should not be used to infer disapproval of the proposed rules:

> It should be clearly understood that, in approving this general rule as to privileges, the action of Congress should not be understood as disapproving any recognition of a psychiatrist-patient, or husband-wife, or any other of the

enumerated privileges contained in the Supreme Court rules. Rather, our action should be understood as reflecting the view that the recognition of a privilege based on a confidential relationship and other privileges should be determined on a case-by-case basis.

S. Rep. No. 93-1277, 93rd Cong., 2d Sess. 4, *reprinted in* 1974 U.S.CODE CONG. AND ADMIN.

NEWS, 7051, 7059. Accordingly,

in many instances, the proposed rules, [used as] [s]tandards, remain a convenient and useful starting point for examining questions of privilege. The [s]tandards are the culmination of three drafts prepared by an Advisory Committee consisting of judges, practicing lawyers and academicians [and] were adopted by the Supreme Court....

... [T]he Advisory Committee in drafting the Standards was for the most part restating the law currently applied in the federal courts.

J. Weinstein & M. Berger, WEINSTEIN'S EVIDENCE, at ¶ 501[03].

In particular, proposed Rule 506 – with its broad view of the clergy-penitent privilege, remains "an appropriate starting point for discerning the existence and scope of the clergy-communicant privilege." *In re Grand Jury*, 918 F.2d at 379. As that court recognized, the proposed Rule 506 was firmly grounded in a long historical tradition.

The history of the proposed Rules of Evidence reflects that the clergy-communicant rule was one of the least controversial of the enumerated privileges, merely defining a long-recognized principle of American law. Although most of the nine privileges set forth in the proposed rules were vigorously attacked in Congress, the privilege covering communications to members of the clergy was not. Indeed, virtually every state has recognized some form of clergy-communicant privilege. The inclusion of the clergy-communicant privilege in the proposed rules, taken together with its uncontroversial nature, strongly suggests that the privilege is, in the words of the Supreme Court indelibly ensconced in the American common law.

*Id.* at 380-81 (internal quotations and citations omitted). *See also Cox v. Miller*, 296 F.3d 89,

102 (2d Cir. 2002). The Supreme Court has observed that "[t]he priest-penitent privilege recognizes the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return." *Trammel v. United States*, 445 U.S. 40, 45 (1980).

Applying the standards of proposed Rule 506 to the present action renders the same result as the Kansas privilege statute. As noted earlier, proposed Rule 506 does not require formal ordination, and applies to any "minister, priest, rabbi, or other similar functionary of a religious organization, or an individual reasonably believed so to be by the person consulting him." The facts are uncontroverted that Dillard was acting as a functionary of CMO, which is an explicitly religious organization. Moreover, regardless of her actual status with CMO, it also is uncontroverted that Dillard visited Roeder as a part of the CMO program and while wearing a CMO identification badge. Accordingly, Roeder would have "reasonably believed" that Dillard had this status, and thus the privilege would apply.

This broader view of the privilege is also taken by a leading commentator:

> A number of hierarchical evangelical Protestant churches allow confession to be made to any member of the church. An early [1818] case held that no privilege attached to such confessions, though it is not clear that the court would have upheld a privilege even to a clergyman.... Religious writers have long argued that the privilege should apply to the laity as well as the clergy, and this argument will probably be heard in the courts as more and more churches adopt a participatory mode of governance and liturgy, and involve lay members in spiritual counseling.... Since [contrary] opinions do not rest on any strong claim of policy, when courts realize that there is no good reason for denying the privilege to non-hierarchical churches, they will extend the privilege to lay members who undertake clerical functions in otherwise hierarchical churches.

Wright & Graham, FED. PRAC. & PROCEDURE: EVIDENCE, § 5613, at 115-16 (footnotes omitted).

This is the appropriate result here. The uncontroverted facts establish that Dillard visited Roeder as a part of a prison ministry program. The visits to Roeder were for the purpose of spiritual guidance, were conducted after Dillard received training in counseling, and where she was required to sign an oath to uphold the confidentiality of the communications. These communications clearly would be privileged had they been conducted by a Roman Catholic priest or a formally-ordained Protestant minister.

The lack of formal ordination should not eliminate the privilege, as, in the words of the commentator, there is "no good reason for denying the privilege" merely because Dillard was acting as a lay minister. The Magistrate Judge's natural and understandable caution about intruding or inquiry into the religious affairs of particular sects does not constitute a good reason. Proposed Rule 506 eliminates the need for any such inquiry, by turning the court's focus to objective indicia of the regularity of the ministry activity. Here, the evidence establishes that Dillard's prison visits with Roeder were a part of a regularly-conducted, explicitly Christian ministry program, and the privilege thus applies.

Two additional concerns guide the court's decision. First, restricting the privilege to formally ordained clergy raises distinct constitutional concerns. Several courts have expressed concern that such a restriction may violate the Establishment Clause. *See In re Grand Jury Investigation*, 918 F.2d at 374, 385 n. 14; *Waters v. O'Connor*, 209 Ariz. 380, 103 P.3d 292, 296–97 (Ct. App. Div. 1 2004), *cert. denied*, 546 U.S. 905 (2005) (observing that

restriction of the evidentiary privilege to ordained clergy "would raise serious concerns under the Establishment Clause of the First Amendment to the United States Constitution"). Following the broader requirements of proposed Rule 506 or statutes such as K.S.A. 60-429 eliminates the need to address such constitutional issues.

Second, the court notes the adverse effect of a contrary ruling. Limiting the federal clergy-penitent privilege to formally ordinated ministers would have the inescapable effect of shutting down prison ministry programs not only in Kansas, but throughout the nation. Programs such as CMO depend on the volunteer services of lay ministers, and could not survive if the private communications between prisoners and ministry volunteers were unprotected from government scrutiny. As a consequence, ministry programs serving thousands of inmates would be directly imperilled. Notably, the government has failed to challenge the affidavit testimony of Pastor Gilmore Williams showing that, in the absence of confidentiality, such prison ministries would fail.

The only remaining question with respect to Dillard's prison ministry communications with Roeder is whether the content of their letters are privileged. The court finds that they are. These letters arose in direct connection with the prison ministry program. While much of the defendant's evidence centers on the actual counseling sessions, some of it is broader in nature. Thus, there is evidence from Pastor Williams that "inmates also expect counseling communications with spiritual advisors to be confidential." (Aff. ¶ 11). The government has failed to controvert this evidence.

The clergy-penitent privilege is not restricted to face-to-face communications.

Proposed Rule 506 applies to any "communication" which is generally germane to the recipients role as "spiritual advisor." There is no requirement that the actual writing be penitential or sacramental in nature. Wright & Graham, FED. PRAC. & PROCEDURE: EVIDENCE, § 5615, at 138.

> [U]nder modern forms of spiritual direction and religious counselling where the cleric or para-cleric enters into a continuing relationship with many persons, there is a need to keep records of communications to and from the penitent if the cleric is to give the sort of ongoing guidance that these new cleric-penitent relationships are supposed to provide. The analogy to the psychotherapist suggested in the Advisory Committee's Note is some evidence that the drafters of Rejected Rule 506 would likely agree with those who have said that the modern penitent's privilege should apply to writings, including church records.

*Id.*


### Other Discovery

The defendant's Objections are broad, seeking review of the Magistrate Judge's rulings (Dkt. 155) "in their entirety," including the denial of her requested Protective Order (Dkt. 141), and the granting of government's Motion to Compel (Dkt. 128). These rulings address evidentiary matters well beyond the actual content of Dillard's communications with Roeder.

Specifically, the government by interrogatories asked Dillard to:

- Please identify by date and time every communication you have had with Scott Roeder, either in person, by phone, by letter, by email, by text message, or by any other means.

- Please describe the contents of each communication [with Roeder].

- Please explain the nature and purpose of your prison ministry.

- Please list all individuals you have visited in the last three years through your prison ministry.

- Please list all prisons or jails you have entered in the last three years through your prison ministry.

- Please describe how often you enter prisons or jails as part of your prison ministry.

- Please identify by date and time every communication you have had with Robert Campbell, either in person, by phone, by letter, by email, by text message, or by any other means.

- Please list all payments you have made or offered to make to Robert Campbell in the last three years, and explain why you made those payments.

By Requests for Admission, the government asked Dillard to

8. Admit that you have had contact with Scott Roeder after May 31, 2009.

9. Admit that you have had written communications with Scott Roeder after May 31, 2009.

10. Admit that you have had telephone conversations with Scott Roeder after May 31, 2009.

11. Admit that you have visited Scott Roeder while Scott Roeder was in jail.

12. Admit that you have visited Scott Roeder while he has been in prison.

13. Admit that you have deposited funds into Scott Roeder's jail and/or prison inmate account.

Finally, the government asked Dillard to produce "All letters, electronically stored information. and other communication exchanged with Scott Roeder."

The Magistrate Judge's opinion not only rejected Dillard's claim of privilege as a

general matter, the opinion also found that Dillard had essentially waived her objections to anything other than "Interrogatories 2, 9, 2[3], and 24." (Dkt. 155, at 2). While Dillard broadly argued in her Motion for Protective Order that "[t]he information sought by the government ... in depositions, interrogatories, or request for production," (Dkt. 141, at 35), the Magistrate Judge found she had waived any specific objection to anything other than the four interrogatories specifically mentioned in her Response to the Motion to Compel (Dkt. 136).

Assuming that Dillard now challenges the determination of waiver in her broad attack on the Magistrate Judge's ruling "in its entirety," the court finds no error.

First, Dillard's current Objections to the Magistrate Judge's rulings only discusses the application of the clergy-penitent privilege. The Objections make no mention of the word "waiver," or any discussion of the reasons the Magistrate Judge may have deemed these issues waived.

Second, even if the additional interrogatories and requests for admission or production were addressed on the merits, the information is proper discovery, except as otherwise expressly stated in the present order. As noted above, the court finds that the contents of Dillard's direct communications with Roeder are privileged information. The other information is not privileged. Rather, information such as the date and number of prison visits simply provide a necessary threshold for the court to examine the claim of privilege. As the burden is on Dillard to establish her right to the privilege, supplying this necessary information under seal cannot infringe on the privilege itself. *See Motley v.*

*Marathon Oil*, 71 F.3d 1547, 1550 (10th Cir. 1995) ("The party seeking to assert a privilege has the burden of establishing its applicability"). *See also In re The City of New York*, 607 F.3d 923, 947 (2d Cir. 2010) ("To assess both the applicability of the privilege and the need for the documents, the district court must ordinarily review the documents in question").

With respect to information surrounding Dillard's communications with Campbell, the information is discoverable on several grounds. First, Dillard has the burden to show why these communications would be subject to privilege, but in the course of three extensive briefs—her Response to the Motion to Compel (Dkt. 136), her Motion for Protective Order (Dkt. 141), and her Objections to the Magistrate Judge's rulings (Dkt. 164)—Dillard mentions Campbell by name only once,[2] and never discusses the issues surrounding her communications with him.

There are substantial reasons to doubt that the clergy-penitent privilege applies to Campbell. According to the government, Campbell is a former prison inmate who has claimed that Dillard tried to hire him to stalk Dr. Means. Campbell wrote to the court on March 26, 2012, stating, "I personally know and did some things for Angel." (Dkt. 128-5).

While never addressing Campbell in any of her briefs to the court, Dillard has stated in supplemental answers to interrogatories that she has never met Campbell. She states that he began to contact her in April of 2010, after hearing of her prison ministry, and included

---

[2] The exception is a tangential reference in the Response to the Motion to Compel, in which Dillard, in the course of an argument that discovery is unnecessary because the government could obtain much of the information from the prison itself, includes the payments made to Campbell as an example.

a request for money for medication and toiletries. She contributed $25 to his prison account. Afterwards, according to Dillard, Campbell repeatedly attempted to contact the Dillards with requests for money. After Campbell was released from prison, and after the government commenced the present action based on the letter to Dr. Means, Dillard states that Campbell again contacted her, essentially trying to blackmail her by stating that she had hired him to stalk Dr. Means. She represents that she has never visited Campbell in prison, that Campbell has again contacted the Dillards to demand a payment of $2000, that Campbell has left a threatening message on the Dillards' answering machine, and that an investigating officer told the Dillards that Campbell has a history of violent behavior. (Dkt. 148-1, at 9).

Campbell may well be a crackpot and blackmailer, and all of this may eventually supply a valid ground for the ultimate exclusion *in limine* of evidence relating to Campbell. Such a result may be appropriate given the inherently suspect nature of the evidence, its prejudicial impact, and distance from the central issue in the case — whether the January 19, 2011 letter sent to Dr. Means was threatening to a reasonable person in her position, with the knowledge then available to her. (Dkt. 30, at 4-6).

For present purposes, however, Dillard's factual contentions are fatal to any present claim of privilege. According to Dillard, she has never met Campbell, a dangerous blackmailer who sought to victimize her by making escalating demands for money after she initially made a small contribution to his prison account. Whether Dillard or Campbell is telling the truth is irrelevant; both versions of the relationship are incompatible with a

claim of clergy-penitent privilege. Moreover, even if such a relationship existed, the modern view reflected in proposed Rules 506 and 511 is that the penitent is the holder of any privilege, and has the right to waive it. Thus, even if the privilege were otherwise available, Dillard cannot invoke it over Campbell's apparent resistance.

In summary, the court finds that Dillard's the content of the communications between Dillard and Roeder are privileged. The other information sought by the government is not privileged.

IT IS ACCORDINGLY ORDERED this 19th day of April, 2013, that the defendant's Objections (Dkt. 164) are sustained in part and denied in part; the Order of the Magistrate Judge (Dkt. 155) is vacated in part; the government's Motion to Compel (Dkt. 128) is granted in part and denied in part; the defendant's Motion for Protective Order (Dkt. 141) is granted in part and denied in part, all as consistent with the present Order.

 s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE