IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

United States of America,

          Plaintiff,

          vs.                        Case No. 11-1098-JTM

Angel Dillard,

          Defendant.

MEMORANDUM AND ORDER

On January 19, 2011, Angel Dillard wrote a letter to Dr. Mila Means, who had publicly announced plans to open an abortion services clinic in Wichita, Kansas. Most of the letter centers on arguments from Scripture, appeals to conscience, and the practical disadvantages and difficulties associated with such a clinic. But in the body of the letter, Dillard also wrote that "You will be checking under your car everyday—because maybe today is the day someone places an explosive under it."[1]  The United States instituted this civil action against Dillard alleging a violation of the Freedom of Access to Clinic Entrances Act (FACE), 18 U.S.C. § 248(a)(1).

The court has previously denied Dillard's motion to dismiss, accepting the government's contention that additional discovery could supply additional context establishing that Dillard's letter was a "true threat" which may be sanctioned under FACE, rather than constitutionally protected speech. With the completion of discovery, Dillard has

---

[1] The full text of the letter is set forth in the court's Order of December 21, 2011, which denied Dillard's motion to dismiss. *United States v. Dillard*, 835 F.Supp.2d 1120, 1121-22 (D. Kan. 2011). *See also United States v. Dillard*, 884 F.Supp.2d 1177 (D. Kan. 2012).

moved for summary judgment, arguing that the communication cannot be deemed a true threat under existing law.[2] The court reviews the evidence and finds that in two essential respects, the government has failed to demonstrate the existence of a true threat, and so grants the motion for summary judgment.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *Bertsch v. Overstock.com*, 684 F.3d 1023, 1027 (10th Cir. 2012). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that

---

[2]Alternatively, Dillard has moved for partial summary judgment on the government's request for permanent injunctive relief, given Dr. Means' decision to discontinue her clinic plans.

there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*).   One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

### *Findings of Fact*

The court made initial findings of fact as to the background of the action in its Order of December 21, 2011. 835 F.Supp.2d at 1126-1128. The facts reflect the initial sending of Dillard's letter, its text, and Dr. Means' reaction to it. Neither party challenges or seeks modification of these findings, and they are adopted herein. Rather, the parties supplement these determinations with the results of the discovery conducted since the court's hearing on the preliminary injunction and the motion to dismiss.

During cross-examination at the preliminary injunction hearing, Dr. Means was asked to agree that Dillard did not write in the letter that she would personally place a bomb under Dr. Means' car. Dr. Means agreed that the writer "carefully didn't say she was going to do anything," and instead spoke to "[w]hat some unknown entities" would do. She was asked if the letter spoke about "a possibility that somebody in the future might put a bomb under your car?" and she agreed, "Right, but that's pretty threatening."

She stated she did not know Dillard's actual intentions from the text of the letter, and stressed the lack of clarity in the letter as to who would perform certain acts:

> She did not make a specific reference that, "I am going to shoot you." She made references that she was part of a "they" group and this "we" group, so I don't know what her intentions in her brain were.

She stated that "a particular person wrote this [letter] to me, and there's not a way to know if it's her or her cronies that feel like they would do anything to prevent ... prevent abortions from returning to Wichita, Kansas."

3

Dr. Means was asked about whether she inferred a risk of violence on the part of Dillard due to the acts of other anti-abortion activists. She responded:

> I'm not – I'm not sure that I know Angel Dillard's propensity but because there was implication of others in two places above thousands of people looking into your background, et cetera, and down here, many others who must take a stand, it's quite possible that she is a spokesperson that would incite others to violence.

Dr. Means was not aware of any ongoing plans by Dillard that would constitute a threat to her, and had no evidence of such a threat at time of the hearing. Dr. Means has explicitly acknowledged that she knows nothing of Dillard's current or ongoing plans, does not know that she has any propensity to violence, and does not know that she is the spokesperson for any group.

The Wichita Police Department was given a copy of the letter on January 19, 2011. The officer receiving the letter noted in his report that some person (the report is illegible) "states that she does perceive the letter to be a threat," but that the officer's inspection found "there was not a direct threat against ... Dr. Means."

The defendant further asserts as a proposed finding of fact that"[t]here is no evidence that the Wichita Police Department took any further action," about the letter other than filing the report. However, at summary judgment, the burden is on the movant to supply evidence in support of each factual contention. Accordingly, the requested finding, which fails to actually prove no further action was taken,  is denied.

After the letter had been forwarded to the FBI, Agent Sean Fitzgerald called Dillard. Dillard told Fitzgerald that "she was not threatening Doctor Means," but only "trying to educate [her] on how her life will change once she begins to provide abortions." Agent Fitzgerald was asked what he would have done, after the telephone call, if he believed that Dillard was "an active threat." He testified there were:

> probably a host of things we would have done if we determined Mrs. Dillard to be a threat. There would have had to have been many notifications go up through the Attorney General's Office and DOJ, but I don't know what we would have done, to be honest.

4

Fitzgerald agreed that the FBI took none of the actions he described.

In addition, the defendant cites Fitzgerald's affirmative response to whether he agreed with court's ruling that "the letter did not portray a true threat." The evidence fails to support the defendant, because it both misstates Fitzgerald's answer,[3] and relies on a question which was itself a misstatement of the court's ruling. The court did not find that the letter could not constitute a true threat, only that the government had not met its heavy burden of showing that it would likely succeed on the merits.

Dillard testified that she initially thought the call from Agent Fitzgerald, which occurred on April 1, 2011, was an April Fools Day joke. According to Dillard, after Fitzgerald told her about the contents of the letter, she told him that it was "a little vague," and Fitzgerald (allegedly) told her, "It really is no big deal, there isn't anything criminal, all they're wanting is a C.Y.A." She further testified Fitzgerald

> said the D.O.J. was pursuing this, that he had recommended that they not do it because it was counterproductive to what they were doing in Wichita and that it would ruin the relationship that they had with the community and would be counterproductive to their mission.
>
> ....
>
> He said, "There was nothing there, it's not a threat. The D.O.J. is wanting to pursue it and I recommended they not do that, but they're doing it anyway."

The defendant's husband, Dr. Robert Dillard, testified similarly as to the April 1 call by Agent Fitzgerald. According to Dr. Dillard:

> I can't remember the exact phrase that he used, but I think it was something to the effect of that no derogatory findings were found on his investigation and that he had recommended against the suit itself but the Department of Justice was deciding to continue with that and so he had been asked to contact us.
>
> ....
>
> He told us that he personally and the F.B.I. in general were frustrated by the suit because they felt – and he told me that he had told the representative

---

[3] Fitzgerald responded: "You changed it up for me now, I think. Personally I did not disagree. Did I say that right? You're trying to get a double negative in on me."

from the D.O.J. – that they felt this was undermining the trust and the relationships that they were trying to develop with people who were not extremists but were still pro-life.

Agent Fitzgerald was asked about this conversation, and he did not directly deny making such comments. He testified that he was "trying to build rapport [with the Dillards] and I probably did play into that a little bit more."

Dillard also cites Agent Fitzgerald's testimony about a prior F.B.I. threat assessment investigation two years earlier, which began after Dillard wrote to Scott Roder, who was imprisoned for the murder of Dr. George Tiller. The 2009 assessment reported:

> Investigation to date has revealed no indication that Dillard is involved in violations of criminal law.... She has cooperated fully with the assessment, she has continued communication with Roeder with full knowledge that his communications are monitored, and she has spoken openly to the press (and favorably) about being contacted by the FBI.

The assessment had also concluded no reason to continue investigation of Dillard. The investigation reported that Dillard felt that Scott Roeder had made a mistake.

Much of Dillard's motion rests on her own deposition testimony. She explains her own state of mind in writing the passage in the letter about Dr. Means having to check under her car:

> I was speaking to her state of mind at the point. Anybody who's passed fifth grade English knows that the way I worded that it can only mean one of two things, either I was forcing her to do it, which obviously wasn't the case, or I was predicting that that's what she will be thinking, that's what will be her mind set at the time.
>
> ....
>
> I was just telling her that she will be checking under her car because she is going to be in that state of mind. Abortionists tend to be paranoid, that people are after them all the time.

Dillard also states that she told the F.B.I. when they came to interview her that, while she was glad Dr. Tiller was no longer performing abortions, she had not wished for any harm to him. She believes that "we should do within the law whatever we can do to stop abortion." She believes that Christians opposed to abortion should do more than "just pray

about it," but this means engaging in the political process, performing sidewalk counseling, and other activities "within the bounds of the law." Asked if she believes Roeder's actions were "good and right," Dillard responded that "the consequences of what he did was good, saving children [but] I can't make that leap to where violence is a good thing, no."

Dillard has never engaged in any illegal violence, and did not intend any threat against Dr. Means. Asked about specific passages in the letter, she has stated that these refer purely to the public and professional opprobrium directed at abortion providers, and to actions of prayer and protest, or "whatever other legal means we [opponents of abortion] have at our disposal."

Dillard notes that Dr. Means was also in Wichita during the "Summer of Mercy," and knew that abortion clinics had been the target of numerous protestors in the past. She had seen protestors in Kansas City during her training, and knew that protestors had obtained her car registration. Dr. Means also knew that Dr. Tiller had driven an armored vehicle. She had also read an article about Operation Rescue in which the organization stated it would do everything it could to prevent the opening of an abortion clinic in Wichita. She did not view this as particularly threatening because it didn't sound like a specific threat.

The defendant also cites evidence which she suggests shows that Dr. Means did not take the letter as a serious threat. Thus, a July, 2011 story in the *New York Times* reported that, following the Dillard letter, "rather than lower her profile, Dr. Means raised it by buying a car that nobody could miss, a bright yellow Mini Cooper" with red lighting bolts. Dr. Means told the reporter: "'It's partly an in-your-face response,' she explained. 'You're looking for me, I'm here.'" Dr. Means has also spoken with other reporters since that time. She does not know anything of the likelihood of Dillard contacting her in the future.

Dr. Means has affirmatively testified that when she received the letter, she felt anxious and concerned. After receiving the letter, she took several security measures,

including parking her car in sight of her office; taking her car to the mechanic; installing door alarms; and staying away from her home. Andrea Hamel, Dr. Means' office manager at the time she received Defendant's letter, found the letter to be threatening. She testified that she could not "even feel safe at [her] home or anywhere" she went, because she had to "wonder if [she was] going to walk outside and if there was going to be someone out there following [her] or if there was an explosive under [her] car."

At some point, Dr. Means experienced difficulty with her vehicle and took it to a mechanic. She asked him if it was natural wear and tear of if it could have been some kind of sabotage or otherwise related to Dillard's letter. He told her that it was wear and tear. Dr. Means also testified at the preliminary injunction hearing that Dillard's warning letter is similar in content to what she had heard from family and friends. Such warnings did not bother her, she has testified, because of the clear intent behind them, since if the communication "is made out of concern for you, then your're not that — you're not scared about it."

Dillard stresses that Dr. Means did not receive any psychological or emotional counseling directly due to Dillard's letter, although she has discussed it in counseling sessions that were already ongoing. Since the 1990s, Dr. Means has taken an anti-depressant medication. Dillard also cites testimony from Hamel, who is no longer Dr. Means' office manager, that Dr. Means was not credible or trustworthy, and that her perception of reality is "a bit skewed."

In its response to Dillard's summary judgment motions, the government stresses that Dillard began corresponding to Scott Roeder while he was in prison for the murder of Dr. Tiller. There is no evidence, however, that the fact of that correspondence was public information at the time that the letter was sent. Nor does it appear that Dr. Means has ever learned the content of that correspondence. While Dr. Means learned from some reports that Dillard admired Roeder's convictions, the very same sources explain that Dillard has

publicly deplored his violent actions. There is nothing in the evidence before the court showing that Dillard ever supported Roeder's violent action.

Thus, Dillard has been quoted in a newspaper to the effect that "[w]ith one move [Scott Roeder] was able ... to accomplish what we had not been able to do.... So he followed his convictions and I admire that." But the article is also explicit: Dillard admired Roeder's "convictions," but she did not advocate the use of violence.

The government contends that Dillard sought by her letter to prevent Dr. Means from providing abortions in Wichita. The plaintiff agrees that she sought to dissuade Dr. Means from her announced course of action, but that she never indicated any intent to "prevent" such a course of action, with its implication that she block Dr. Means' will by force or threat. Asked if she intended "to stop Dr. Means from performing abortions," Dillard testified, "I didn't plan on doing anything to stop her from doing abortions. I wrote her a letter." The letter would "give her something to think about and hopefully influence her." Asked about the effect she wanted for the letter, Dillard testified, "I wanted her to thoughtfully consider it."

The government suggests that much of the letter — with its representations that Dillard would work with the Christian community in general and the local community in particular through legislation and picketing — was simply false. According to the government, in her deposition Dillard "admits that she has had no contact with any church or member of any congregation concerning Dr. Means." (Dkt. 188, at 6). Thus, according to the government, Dillard is not credible and the letter can only be seen "only as a threat." (*Id.*, at 11).

As a preliminary matter, it is hard to see how the government's evidence discredits Dillard, where the letter never indicates that Dillard would personally act in concert with *all three* of the local churches. Instead, the letter refers to collective action on the part of the anti-abortion movement in general, and never states that Dillard was going to personally

engage in any particular activity.[4]

Second, the letter simply indicated that the local Christian community would stand against Dr. Means "every step of the way," if she continued with her announced plans. Standing in the way, in this context, meant that the local anti-abortion community would "[p]ray, protest, [or use] whatever other legal means we have at our disposal." However, as will be discussed further in connection with Dillard's partial summary judgment motion, Dr. Means has not continued with her plans to open the planned abortion facilities in Wichita; she has abandoned them, largely due to recent changes in Kansas law. Accordingly, there was neither reason or place to picket.

Third, Dillard's decision to refrain from vigorous anti-abortion picketing or lobbying may be due to a chilling effect of calls and visits from the FBI, and the filing of the present action by the Department of Justice. Almost immediately after the sending the letter, Dillard became the target of investigations by the Wichita police and the F.B.I., followed by the present civil prosecution. Faced with such investigation and litigation, it is utterly unsurprising that Dillard has ceased political activity she might have otherwise undertaken. The government's contention that Dillard *never* intended to follow through with such activities is simply speculation.

More importantly, the government's underlying premise — that Dillard "admits" she has not engaged in any anti-abortion activity other than sending the letter to Dr. Means — is false. The evidence cited by the government does not support its claims. In her deposition, Dillard stated that she had no contact with two of the three local churches identified in the letter (Maranatha Church and Revelation Ministries). But Dillard expressly

---

[4] The evidence from Dillard's deposition is that the "we" in the letter are "[p]eople who are concerned about child killing in our community." In her Reply to the government's Response, Dillard also offers an affidavit further identifying various additional actions she has undertaken in her anti-abortion efforts, including engaging in political campaigns. As this affidavit is offered only in Dillard's Reply, it forms no part of the court's opinion.

states that she has attended the third local church (The Journey) as "member, worship leader, [and] youth worker." She has spoken to church groups about abortion generally, without mentioning Dr. Means by name. The evidence shows that Dillard did participate in religious meetings advocating against abortions, as she had previously engaged in a letter-writing campaign conducted by Kansans for Life.

The government asserts that Dillard does not regret writing the letter, and would do it again. In support of this contention, the government notes Dillard's testimony that "I did what the Lord asked me to do. He impressed upon me that I needed to write the letter and I did." This response, however, came in response to an inquiry as to whether she would send the "same" letter again. In the context of the deposition, it appears that Dillard would send the same letter again in 2010, not that she would send similar letters in the future.

The government also cites a Reuters news article from May 16, 2013, that Roeder, who is serving a life sentence, was facing additional administrative charges for his comments in a telephone interview with an abortion opponent in Des Moines, Iowa. Roeder reportedly called the plans of Julie Burkhart to open an abortion clinic in Wichita a "shame and a disgrace." Roeder told the interviewer: "To walk in there and reopen a clinic, a murder mill where a man was stopped, is almost like putting a target on your back – saying, 'Well, let's see if you can shoot me.'" The same article states that Burkhart (the director of the non-profit Trust Women Foundation, which owns Dr. Tiller's former clinic) has had her home picketed, and that "she has been called a killer in some anti-abortion procedures."

But there is absolutely nothing in the article which would tie Roeder's comments to Dillard. There is also nothing to show that these events were ever known to Dr. Means, or that they occurred prior to her decision to abandon her planned clinic. There is nothing indicating that Burkhart has been the target of any actual or threatened violence. To the

extent the article suggests any threat, it is solely on the part of a person already serving a life sentence, incarcerated in a maximum security prison.

Finally, the government cites Dr. Means subsequent deposition in which she was asked if she had "come across" additional evidence of violent action by Dillard, and responded, "Not specifically," but that she has been shown:

> evidence that she seems to have no qualms about threatening harm. There was a letter that I was able to read in some of the evidence to Mr. Grissom about caches of weapons around her house and how she intended to be ready against the – she's saying against the government.

The government has cited absolutely nothing which would corroborate the allegations in the anonymous letter. This anonymous tip letter is plainly inadmissible, and the government cannot indirectly achieve its introduction by getting Dr. Means to speculate about it. More importantly, even after being shown the anonymous letter, Dr. Means still testified that she has seen nothing after the April 2011 preliminary injunction hearing which makes her think an injunction is necessary, and further stated she has no evidence that Dillard intends to contact her in the future.

### Conclusions of Law

In Dillard's motion for summary judgment, she first argues that no true threat exists because there is no evidence showing that she had "a determination, design, purpose, goal, or intention to inflict harm on Dr. Means." (Dkt. 182, at 30). Thus, she contends that she lacked any subjective intent to threaten, one of the essential components of a true threat as set forth in *Virginia v. Black*, 538 U.S. 343 (2003). She argues that this is fatal because no true threat exists unless the facts show "the intention of the speaker to inflict bodily harm." (*Id*. at 31). But even in the subjective intent cases cited by the defendant, an intent to inflict *actual* physical harm is not essential to a true threat. Indeed, the Supreme Court explicitly held that such an intent—to directly and personally cause *actual* harm or inflict physical violence—is not a requirement. *Black*, 538 U.S. at 360.  Even if the sender has no intent to

carry out the threat, the state may lawfully punish such speech to "'protect ... individuals from the fear of violence' and 'from the disruption that fear engenders.'" *Id.* (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992)).What is required is simply the intentional sending of a communication, which the sender knows a reasonable recipient will take as a serious expression of violence. *See United States v. Viefhaus*, 168 F.3d 392, 395-96 (10th Cir. 1999).

Dillard relies on two Ninth Circuit decisions to support her contention that subjective intent is a separate component of true threat analysis. *See United States v. Cassel*, 408 F.3d 622 (9th Cir. 2005); *Fogel v. Collins*, 531 F.3d 824 (9th Cir. 2008). But other courts have recently rejected this approach. *See United States v. Jeffries*, 692 F.3d 473, 479-80 (6th Cir. 2012) (because the Virginia statute contained its own specific intent requirement, "*Black* thus did not turn on subjective versus objective standards for construing threats"); *United States v. Nicklas*, 713 F.3d 435, 440 (8th Cir. 2013) (same, holding that true threat analysis does not inherently require the subjective intent to threaten). *See also United States v. Turner*, ___ F.3d ___, 2013 WL 3111139, n. 4 (2d Cir. June 21, 2013) (noting split of authority).

The Tenth Circuit has not explicitly addressed the objective and subjective intent as separate components of true threat analysis. In *United States v. Magleby*, 420 F.3d 1136, 1139 (10th Cir. 2005), the court rejected a collateral attack on the defendant's conviction of conspiracy to violate civil rights after burning a cross outside a house. Following *Black*, the court observed:

> Unprotected by the Constitution are threats that communicate the speaker's intent to commit an act of unlawful violence against identifiable individuals. The threat must be made with the intent of placing the victim in fear of bodily harm or death. An intent to threaten is enough; the further intent to carry out the threat is unnecessary.

*Id.* (citations and internal quotation omitted). The defendant cites this language as a requirement that the sender must indeed intend to cause the recipient the "fear of bodily harm or death." The government does not argue the issue, and agrees in its response that

"[t]o demonstrate liability under FACE, the United States must show that Defendant intended to intimidate Dr. Means." (Dkt. 189, at 21).

The government argues that Dillard's arguments about her intent are largely about credibility. It correctly argues that much of Dillard's evidence takes the form of the opinions of a local law enforcement officer and the F.B.I., who found Dillard's letter not a threat, and that such opinions are not dispositive.

As noted in the court's factual findings, much of the government's evidence on the issue of intent is simply inadmissible or based on impermissible speculation — an anonymous tip letter, the (erroneous) suggestion that Dillard has not participated in other anti-abortion activities, hearsay evidence of the prison communications by the murderer Roeder which have not been linked in any way to Dillard. As before, the government offers the testimony of Dr. Means, who concedes that she has no direct knowledge of Dillard's intent, explicitly acknowledging she has no knowledge of any propensity to violence by Dillard.

Accordingly, the additional discovery has apparently produced nothing in the way of usable evidence on the issue of the defendant's intent, and the sole basis for inferring an intent to threaten is from the text of the letter itself. However, the court need not decide whether that language by itself would justify disregarding the substantial evidence showing that Dillard intended to dissuade rather than threaten. Even if there were a triable question as to plaintiff's subjective intent, the government's claim is fatally flawed because it lacks any proof as to two essential components of the objective portion of the true threat analysis.

First, the threat cannot be hypothetical or conditional or predictional; the threat must be imminent, likely, and unconditional. A threat is not a true threat if it is "expressly conditional in nature." *Watts v. United States*, 394 U.S. 705, 708 (1969). A communication with "equivocal language" remains protected speech. *United States v. Barcley*, 452 F.2d 930,

934 (8th Cir. 1971). Where a communication is "equally susceptible of two interpretations, one threatening and the other nonthreatening, the government carries the burden of presenting evidence serving to remove that ambiguity. Absent such proof, the trial must direct a verdict of acquittal." *Id.* at 933.

In its response, the government makes no attempt to show Dillard's letter threatened any imminent violence. Instead, it misconstrues this court's prior Order as a determination that imminence is not required. (Dkt. 189, at 13). It accomplishes this by citing that portion of the court's Order which agreed that a threat of future violence could constitute a true threat. 835 F.Supp.2d at 1125 (observing that in some cases "a statement that a listener will suffer future violence may be a true threat"). But nothing in the cited passage, or anywhere else in the court's Order, suggests that imminence is not a requirement of a true threat.

To the contrary, the court explicitly noted the controlling authority holding a true threat is one which "'conveys a gravity of purpose and likelihood of execution so as to constitute speech beyond the pale of protected vehement, caustic unpleasantly sharp attacks on government and public officials.'" *Nielander v. Board of County Com'rs*, 582 F.3d 1155, 1168 (10th Cir. 2009) (quoting *United States v. Crews*, 781 F.2d 826, 832 (10th Cir.1986) (alterations and internal quotations omitted)). See 835 F.Supp.2d at 1124. Similarly, the court quoted with approval the observation of the Second Circuit in *New York ex rel. Spitzer v. Operation Rescue*, 273 F.3d 184, 197 (2nd Cir.2001):

> When determining whether a statement qualifies as a threat for First Amendment purposes, a district court must ask whether the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution.

*See* 835 F.Supp.2d at 1130.  Similarly, the court stressed that the bomb threats which were the subject in *United States v. Viefhaus*, 168 F.3d 392, 396 (10th Cir.1999) were true threats because of "specific information suggesting that [the sender] was a participant in the bomb plot, that the bombs were real, and *their detonation imminent*." *Id.* (emphasis added).

This passage also highlights a second key component an illegal true threat – the communication must reasonably suggest that *the sender* is a participant in the proposed violence. As noted earlier, a true threat may exist even if the sender does not subjectively intend to commit the violence proposed. But the communication must be "reasonably interpreted as communicating the defendant's *own* intent, purpose, or goal" of engaging in violence. *Viefhaus*, 835 F.Supp.2d at 396 (emphasis in original).

There must be context linking the sender to the prospective violence. *See Magleby*, 420 F.3d at 1139 (citing *Black*, 538 U.S. at 359 in holding that true threats are those "that communicate the speaker's intent to commit an act of violence against identifiable individuals"). "A communication rises to the level of an unprotected threat … only if in its context it would have a reasonable tendency to create apprehension that its originator will act according to its tenor." *United States v. Dwyer*, 443 Fed.Appx. 18, 2011 WL 448739, *2 (5th Cir. 2011). Thus, communications which are predictions of violence by others are not true threats. *United States v. Bagdasarian*, 652 F.3d 1113, 1119 (9th Cir. 2011).

The court previously denied Dillard's motion to dismiss in light of the preference for trial by jury, coupled with the government's representation "there may well be other facts that provide further context, but which are unknown and unknowable to the United States at this time, when discovery has yet to be conducted." 835 F.Supp.2d at 1120 (quoting Dkt. 21, at 6 n. 4).

After the completion of extensive discovery, the government has failed to supply such further context. Rather, the evidence before the court, together with controlling precedent, establishes that Dillard's letter falls short of a true threat, and that summary judgment is therefore warranted. Ordinarily the existence of a true threat is a matter for the finder of fact. *Id.* at 1132. However, where the evidence fails to show an objective threat of imminent violence by the sender, the matter is appropriately resolved by the court. *See Corales v. Bennett*, 567 F.3d 554, 563-64 (9th Cir. 2009) (summary judgment may be

appropriate if the evidence ultimately fails to show that the defendant "did not express any intent to commit any act of unlawful violence or to inflict bodily harm"). *See also United States v. Lincoln*, 403 F.3d 703 (9th Cir. 2005) (reversing defendant's conviction for threatening the President, where defendant sent a single letter which simply predicted potential violence by third parties).

Turning to Dillard's letter to Dr. Means, it is clear that the threat is predictive and contingent, and addresses a danger which is not imminent in nature. Dillard wrote Dr. Means: "You will be checking under your car everyday — because maybe today is the day someone places an explosive under it." The letter makes no reference to any imminent danger, such as in *Viefhaus*, where the sender alleged that bombs in 15 major cities would detonate within a week of the communication. To the contrary, Dillard's letter not only lacks any specific time frame, it is doubly conditional. First, the danger is intendant on the establishment of the planned clinic (which could take months or years). Second, and even then, the letter proposes only a possibility, that "maybe" such a bomb will be placed.

Despite its energetic pursuit of discovery, the government has supplied no additional context which would objectively support the determination that actual violence against Dr. Means was likely and imminent. Of course, as it did at the time of the preliminary injunction hearing, the government stresses the letter's reference to the murder of Dr. Tiller by Scott Roeder. But the government has supplied nothing in the way of additional evidence which would show that Dillard supports Roeder's methods as well as his general goal. As the court explicitly cautioned, the letter itself supplied little in the way of an objective threat, as defined by controlling authority such as *Nieland* and *Viefhaus*. Dillard's letter, the court wrote:

> has not been linked to any recent anti-abortion violence, nor is there any suggestion that such bomb warnings have acquired any specific "currency as a death threat for abortion providers," as the "wanted" posters had in [*Planned Parenthood of*] *Columbia/Willamette*, [290 F.3d 1059 (9th Cir. 2002]. There is no evidence directly linking Dillard to any acts of clinic obstruction or violence. There is no evidence of repeated communications directed at Dr.

Means, only a single passage in a single letter, and this sent openly under her own name.

835 F.Supp.2d at 1131. All of these observations have apparently been confirmed by discovery, and the government supplies neither evidence nor argument to show that the threat of a car bomb may be objectively viewed as imminent, likely, and unconditional. [5]

The same result is equally true as to the second element of the objective element of true threat analysis, the defendant's personal participation in such a car bombing. Again, the court's earlier observations are applicable here:

> Dr. Means was subsequently to learn that Dillard explicitly denied any plans to engage in violence, and that the FBI had interviewed Dillard and concluded she was not a threat. Dr. Means's conclusions that might have later developed a propensity to violence is purely speculative. Means testified that she has received similar warnings as to her safety from family and friends, but distinguished those warnings as being "caring" and free from the language of damnation. She testified that she had no knowledge that Dillard would become violent, but she "couldn't rule it out." Certainly there is no direct evidence or allegation of any bomb plot currently in motion, or that Dillard is a part of such a conspiracy.

835 F.Supp.2d at 1131.

The evidence produced by discovery has confirmed these observations. As noted earlier, Dillard's letter suggests that at some indefinite, future time, "someone" may act violently against Dr. Means. The government can offer nothing more than Dr. Mean's admitted speculation that it is "quite possible" that Dillard may be "a spokesperson that would incite others to violence." Dr. Means acknowledges that she knows nothing of Dillard's propensity to violence, and indeed that she has received the same sort of warnings from her own family.

Dillard sent a single letter to Dr. Means, under her own name, in an envelope bearing her return address. The letter makes no reference to any violent action by Dillard,

---

[5] As noted earlier, the government asserts the Order of December 11, 2011 concluded that *any* sort of future threat may be a true threat, even if distant, uncertain, or hypothetical. The claim is erroneous in itself, but is compounded by the fact that the government makes no attempt in the alternative to show that the letter does contain any suggestion of direct or imminent violence.

and is largely devoted to pragmatic and religious arguments against providing abortion services. The only witness presented by the government, Dr. Means, admits that the letter says nothing about what Dillard will do, only what other entities might do.

It is not enough for the government, when presented with defendant's motion for summary judgment, simply to point to witness speculation that violence is "quite possible," or that the witness "couldn't rule it out." There is simply nothing to show, in the words of *Viefhaus*, that Dillard intended to convey her *"own* intent, purpose, or goal" of engaging in violence.

Dillard's letter to Dr. Means is much less vivid than the defendant's letter to the President in *United States v. Lincoln*, 403 F.3d 703 (9th Cir. 2005). The defendant wrote:

> you think cause [sic] you go over There and Blow Them up that The killing will Stop in you [sic] Dream They got over 275,800 or more since, Never mind that this is only the Beging [sic] of the Badass war To come Just think Their army is over here already hiding They have more Posion gas Then [sic] you know. ha ha. Too bad you don't think Like Them. You will see a good Job Done agin [sic] may [sic] 2 week's, [sic] maybe 2 months, 3, who know's [sic]. You Will Die too George W Bush real Soon They Promissed [sic] That you would Long Live BIN LADEN.

403 F.3d at 705. The Ninth Circuit concluded that the defendant's letter was "crude[,] offensive [and] disturbing," but not a true threat:

> In this case, there is no pattern of letters written by Lincoln, followed by murder or any other act [as in *Planned Parenthood*, 290 F.3d at 1085-86]. There was only one letter written by Lincoln. Unlike the single letter in this case, the "wanted" posters were publicly posted on the internet, and thus could be reasonably interpreted as a signal to unknown third parties to target those who appeared on the posters. In contrast, Lincoln's letter was sent only to President Bush. In no way could the letter be reasonably viewed as a signal to Al Qaeda or anyone else to carry out an attack upon President Bush.

*Id*. at 707. The court also rejected the government's argument that the defendant's prior writings in a private workbook could be used to supply a violent context to the letter, because the evidence showed that Lincoln had "disassociated himself from any violent action" by crossing out the writings. Here, the evidence shows that Dillard has never advocated violence, and has publicly rejected violent action. She had nothing to

disassociate herself from.

Similarly, in *United States v. Bagadasarian*, 652 F.3d 1113, 1115 (9th Cir. 2011), the defendant wrote in an internet posting that the President "will have a 50 cal in the head soon." The court reversed Bagdasarian's conviction, stressing that the posting "conveys no explicit or implicit threat on the part of Bagdasarian that *he himself* will kill or injure" the President. *Id.* at 1119 (emphasis added). The court agreed that Bagdasarian's comment was "alarming and dangerous," but cited the Supreme Court's observation in *Watts v. United States*, 394 U.S. 705, 708 (1969) that

> we must interpret the language Congress chose 'against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.' *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964). The language of the political arena, like the language used in labor disputes, *see Linn v. United Plant Guard Workers of America*, 383 U.S. 53, 58, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), is often vituperative, abusive, and inexact.

*Id.* at 1120.

Dillard's letter, which is far less alarming that the communications in *Bagdasarian* or *Lincoln*, is not a true threat. It suggests neither likely and imminent violence, nor does it suggest that Dillard herself will engage in violence against Dr. Means. After full discovery, the government has supplied no additional evidence of any threatening context which would add to the language of the letter itself. Accordingly, summary judgment in favor of the plaintiff is warranted.

***Motion for Partial Summary Judgment***

As indicated earlier, Dr. Means has discontinued her plans to open an abortion services clinic in Wichita. The decision occurred after, and in response to, recent changes in Kansas law increasing the regulation of such clinics. She stated that she finalized this decision in the fall of 2011, "because of [Kansas state] law changes." While Dr. Means has

testified that the financial costs of providing security were one part of her decision, and that she would feel more secure if an injunction were entered, she does not state that this would change were decision. Her decision is apparently final and conclusive.

After discontinuing her plans, protest activity against her has dropped off. The last protest at her office ended before the preliminary injunction hearing, the last at her home occurred a few months later. As noted earlier, Dr. Means knows of no propensity to violence on Dillard's part, and that she has no additional reason for thinking that Dillard, or any group acting in concert with her, plans any direct violence against her. More generally, Dr. Means simply "feels as though all of that group [the pro-life community] is still against me."

Dillard has filed a separate motion for summary judgment seeking the dismissal of the government's requested relief in the form of a request for a permanent injunction. Here, the defendant stresses that Dr. Means no longer intends to provide abortions services in Kansas. In its Response to the motion, the government stresses that fact questions exists as to both the intent of Dillard in sending the letter, and the credibility of Dr. Means in her reaction to the letter. Otherwise, the government offers very little to support any finding of a likelihood that Dillard will ever send any further communications to Dr. Means. As Dillard points out, she would not have any reason to do so, since Dr. Means has abandoned her plans for opening any clinic in Wichita.

Given the court's finding that the letter was not a true threat, and hence that no underlying FACE violation occurred, the defendant's additional motion for partial summary judgment will be denied as moot. The court notes, however, that in light of the evidence before it, Dillard's motion would appear to have substantial merit, as the balance of factors necessary for injunctive relief does not weigh in the government's favor where it has shown nothing but speculation as to any future FACE violations by the defendant.

The government stresses that Dr. Means was in part dissuaded from opening any

clinic because of the cost of security. Her actual deposition answer is more equivocal, indicating that "there are a lot of things that go into" a big decision, and security costs were "one of those things."

Dr. Means' testimony fails to provide support for prospective injunctive relief for three reasons. First, she explicitly ascribes security costs as but one of "a lot" of factors which caused her to change her plans.[6] Second, Dr. Means does not identify any separate costs for additional security due to Dillard's 2011 letter, over and above the security which is unfortunately a prudent precaution for all abortions services providers. Third and decisively, Dr. Means' change of plans is apparently final, and an injunction will not alter her plans. Thus, Dillard could have no motive for future communications with Dr. Means.

The government explains Dillard's failure to engage in any other communications with Dr. Means (other than the original letter) as a simple ruse, writing that "it is not surprising that Defendant has refrained from communicating with or coming near Dr. Means, and from violating FACE, during the pendency of this case, for she has been aware that such action could be used in this proceeding." (Dkt. 188, at 14). But future violations of FACE would in themselves be actionable, and likely bring a governmental response against Dillard equally as heavy as the present action. If the glare of publicity and the prospect of additional government legal action are sufficient by themselves to prevent further communications by Dillard, they would remain even in the absence of separate injunctive relief. That is, the government effectively concedes that Dillard is a rational person, at least in the sensing the folly of additional communications with Dr. Means.

Beyond this, the government offers primarily generalized arguments that fact questions exist as to Dillard's actual intent in sending the letter, and the extent and credibility of Dr. Means' explanation of her subjective response to that letter. Even if this

---

[6] In addition to recent changes in Kansas legislation, Dr. Means has also attributed her change in plans to a lack of hospital privileges and the fact that she is not good at the fund-raising required for the project.

were true, the focus here is whether permanent injunctive relief would serve any purpose to deter future illegal acts by Dillard, given that Dr. Means will not be opening her clinic.

As to this, the government's response relies heavily on a single passage in Dillard's deposition, in which Dillard indicated she would send the same letter again. But, as noted earlier, in the context of the deposition it is clear Dillard was being asked about her regrets or feelings about the 2011 letter, and if she would send "the same letter" if she had to chance to do so again. The deposition testimony was clearly about the 2011 letter; Dillard was not directly asked about future communications towards Dr. Means.

Dr. Means has explicitly acknowledged that, after the court denied the requested preliminary injunction in April, 2011, she has acquired no new evidence which she believes shows the need for an injunction. She does not know that Dillard has ever come near her, other than at the preliminary injunction hearing. She knows that Dillard has publicly stated that she opposes violence, and that she has no intention of committing acts of violence.

As a party seeking injunctive relief, the plaintiff "must show more than past harm or speculative future harm." *Lippoldt v. Cole*, 468 F.3d 1204, 1217 (10th Cir. 2006). *See also Riggs v. City of Albuquerque*, 916 F.2d 582, 586 (10th Cir.1990). The government must show some "current and ongoing plans or activities" by Dillard, or persons with whom she is acting in concert, "are currently engaged in the plans or activities that constitute a threat of violating F.A.C.E." *New York ex rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d 184, 200 (2d Cir. 2001).

The government has failed to do so. After much discovery, the government has failed to point to specific, non-speculative evidence showing such ongoing plans or threats. Given that Dr. Means will not be offering abortion services in Wichita, there is no need for such permanent injunctive relief. In its response, the government suggests that injunctive relief might after all be appropriate in case Dillard writes to *other* abortion services providers. (Dkt. 188, at 13). But the Amended Complaint premises the entire case,

23

including the request for injunctive relief, on the 2011 letter to Dr. Means. (Dkt. 19, ¶¶ 21, 24). The Pretrial Order asks for similar relief, adding that "[t]his damage can be alleviated by assurances that Defendant will not attempt to contact or approach *Dr. Means* in the future." (Dkt. 178, at 14) (emphasis added).

Wholly apart from the legitimate and inevitable constitutional challenges which accompany any attempt at the restraint of speech, it is too late for the government to suddenly assert that, notwithstanding all the pleadings and discovery in the last two years, it now seeks injunctive relief, not on behalf of Dr. Means, but on behalf of some other, unidentified health care providers. Even if that were the case, the result would be the same: the plaintiff has failed to provide supporting probative evidence of an ongoing plan on the part of the defendant to make true threats violating FACE. As noted earlier, the evidence of future threats against Dr. Means is purely speculative — the suggestion of future threats against additional persons is speculation piled on top of speculation.

Finally, the government cites to one of Dillard's prison letters, which the court has previously and explicitly held to be a privileged communication. The government justifies this remarkable action by asserting (Dkt. 189, at 23 n. 5) that Dillard referenced the letter in her motion, thereby effectively waiving the privilege. But the fact asserted by the plaintiff (Dkt. 182, ¶ 47) is a recitation of Dillard's deposition responses. Those answers were questions posed by government's counsel. It was thus the *government's counsel who quoted from the privileged letter* before asking a *generic* question about Dillard's religious beliefs. Dillard's response does not focus in any way on the letter, but her beliefs in general:

> I don't believe we should just pray about [abortion]. I think God has told us that we need to be involved in the political process and we need to -- we need to be serving others. When we help a woman that's coming to the clinic and give her some options, when we take her over to get a sonogram at a pregnancy crisis center, when we offer her help with finding abortion -- or finding adoption alternatives, we're helping others. That's doing what Christ asked us to do.

Dillard was asked generally about her religious beliefs, and her general answer was the

evidence cited in the plaintiff's brief. There was no waiver.

IT IS ACCORDINGLY ORDERED this 15th day of August, 2013, that the defendant's Motion for Summary Judgment (Dkt. 182) is hereby granted; defendant's Motion for Partial Summary Judgment (Dkt. 181) is denied as moot. The government's Motion to Unseal (Dkt. 161), predicated on determination of the United States Magistrate Judge (Dkt. 160) is denied in light of the court's subsequent order of April 19, 2013 (Dkt. 175). The government's Motion for Leave (Dkt. 183), seeking to partially unseal certain exhibits, is denied in light of the explicit provisions in the Privacy Act Protective Order (Dkt. 140) entered in the action, as well as the findings of the court herein.

s/ J. Thomas Marten

J. THOMAS MARTEN, JUDGE