UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,    )
         )
     Plaintiff,    )
         )    CIVIL ACTION
VS.       )    NO. 6:11-CV-1098-JTM-KGG
         )
ANGEL DILLARD,    )
         )
     Defendant.    )

---

## DEFENDANT'S MOTION IN LIMINE

---

Angel Dillard, through undersigned counsel, submits her Motion in Limine, and in support of this motion, states as follows.

## I. LEGAL ANALYSIS

"The purpose of a motion in limine is to aid the trial process by enabling the Court 'to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial.'" *Mendelsohn v. Sprint/United Mgmt. Co.*, 587 F. Supp. 2d 1201, 1208 (D. Kan. 2008) (quoting *United States v. Cline*, 188 F. Supp. 2d 1287, 1291 (D. Kan. 2002)). "The movant has the burden of demonstrating that the evidence is inadmissible on any relevant ground." *Koch v. Koch Indus., Inc.*, 2 F. Supp. 2d 1385, 1388 (D. Kan. 1998). This Court "may deny a motion in limine when it lacks the necessary specificity with respect to the evidence to be excluded." *Id.* (internal citation and quotation marks omitted). Often times, a court will deny a motion in limine and later alter its

1

ruling based on developments at trial—"[d]enial only means that the court cannot decide admissibility outside the context of trial." *Id.*

Throughout this case, the Government, having little else to go on, has proceeded on a theory that relies on guilt by association. Though some aspects of Dillard's relationships and beliefs will be part of the trial, Dillard challenges the admissibility of two main categories of evidence that are likely to be introduced at trial: (1) certain aspects of Dillard's relationship with Scott Roeder; and (2) Scott Roeder's jailhouse statements and threats. Each of these has been referenced by the Government in depositions and previous motions, for the most part improperly. These pieces of evidence should be excluded from the jury's consideration for several reasons and Dillard addresses each in turn.

**A. Certain Aspects of Dillard's Relationship with Scott Roeder**

As the Court is well-aware, through her prison ministry, Dillard had maintained a relationship with Scott Roeder, the man who was convicted of murdering Dr. George Tiller, a provider of late-term abortions in Wichita. Dillard is not seeking to exclude all evidence of the existence of this relationship, but requests to exclude certain inadmissible aspects of it: (1) communications between Dillard and Roeder subject to the clergy-penitent privilege; (2) "public" statements Dillard made about Roeder and her relationship with him disclosed after this case was filed; and (3) the fact that Dillard's children met Roeder in jail at one point.

***Communications between Dillard and Roeder are Inadmissible under this Court's Prior Ruling***

The mention of Dillard's ministerial relationship with Roeder will likely be unavoidable, given the Government's determination to make this case turn on Roeder. But the Court has already ruled in this case that the content of the communications between Dillard and Roeder,

both face-to-face and written, are privileged under the clergy-penitent privilege. *United States v. Dillard*, 989 F. Supp. 2d. 1155, 1169 (D. Kan. 2013). This ruling was not challenged or substantively addressed during the appeal to the Tenth Circuit Court of Appeals, and remains the law of the case. Accordingly, no evidence of the content of communications between Dillard and Roeder should be introduced during trial. There are, however, other aspects of this relationship that do not strictly fall under this Court's prior ruling that should also be excluded from the jury's consideration, as detailed next.

*Dillard's Public Statements about Roeder*

Dillard does not seek to exclude all mention of her relationship with Roeder, however, she contends that certain evidence of her "public statements" regarding Roeder should be considered by the jury only for a limited purpose. In order to prove that Dillard is liable under FACE, the Government must prove that the letter sent to Dr. Means contained a true threat. *See United States v. Dillard*, 795 F.3d 1191, 1199 (10th Cir. 2015). The jury, in determining whether a true threat was made, will use an objective test, focusing on whether a reasonable person would find that a threat existed. "This objective test requires 'a fact-intensive inquiry, in which the language, the context in which the statements are made, as well as the recipients' responses are all relevant.'" *Id.* (quoting *Nielander v. Bd. of Cnty. Comm'rs of Cnty. of Republic, Kan.*, 582 F.3d 1155, 1167-68 (10th Cir. 2009)). In other words, "the central issue in the case [is] whether the January 19, 2011 letter sent to Dr. Means was threatening to a reasonable person in her position, with the knowledge then available to her." *Dillard*, 989 F. Supp. 2d at 1169 (emphasis added).

Dillard anticipates that the Government will use her public statements regarding Roeder as proof of, among other things, both the context and the recipient reaction prongs of the true threat inquiry. Not all of Dillard's statements about Roeder, however, are relevant to these factors because some of these statements were not public at the time the letter was sent. And given the timing of when these statements were made public, some of the statements were not within the knowledge then available to Dr. Means. A brief timeline is illustrative.

- July 3, 2009: The Associated Press publishes an article entitled "Suspect in Abortion Doctor George Tiller Slaying Says Such Killings Justifiable." *See* July 3, 2009 AP Article. Dillard was interviewed for this article, and the article published only the following facts related to Dillard at that time:
  - Angel Dillard, a Christian music songwriter from Valley Center, Kan., said she's been questioned several times since striking up a friendship with Roeder after the Tiller shooting.
  - "They just wanted to check us out and make sure we weren't some nuts that were planning to pick up where Roeder left off," Dillard said. "We have no plans to do anything of violence to anyone. We are reaching out to someone who we know is totally alone right now."
  - Dillard and her husband have exchanged several letters with Roeder and spoken to him by phone, and she plans to visit him next week. She said Roeder has not spoken about Tiller's killing, and has only shared Biblical scripture and asked her to pray for an end to abortion.
- January 19, 2011: Dr. Means receives Dillard's letter.
- April 7, 2011: The Government files its Complaint against Dillard.
- April 7, 2011: The Associated Press publishes an article entitled "Complaint alleges threat to Kansas abortion doctor," *see* April 7, 2011 AP Article, in which the following information is shared about Dillard:
  - Dillard, a Christian songwriter, did not immediately return a message left Thursday at her home.
  - But Dillard told The Associated Press in a July 2009 Interview that she reached out to Roeder while he was in awaiting trial for Tiller's killing and developed a friendship with him.
  - "Quite honestly, as soon as I heard about it, I realized that he was able to accomplish what those of us in the pro-life movement had not been able to accomplish—we put millions of man hours in, protested, millions of dollars, attempts at legislation—and we were butting our heads up against the wall. We were not getting anywhere."
  - She told AP she believed Tiller would never be convicted of any crimes.

4

- o "With one move, (Roeder) was able . . . to accomplish what we had not been able to do," Dillard said. "So he followed his convictions and I admire that."
- o She said at the time that she had been questioned several times by the FBI since striking up a friendship with Roeder following Tiller's death, but that she and her husband have no plans to "do anything of violence to anyone."

As the Government has continually argued through this litigation, the only relevant information for the jury to consider in deciding the objective inquiry is that which was known by a reasonable person in Dr. Means's position at the time the letter was actually sent. To this end, the only public statements about Roeder that are relevant to these determinations are those in the July 2009 article. The fact of Dillard's association with Roeder was known by Dr. Means around the time the letter was sent, but Dillard's statement "With one move [Roeder] was able . . . to accomplish what we had not been able to do . . . So he followed his convictions and I admire that," was not available at the time the case was filed. This language was not made public until after the Complaint was filed in April 2011 and thus, could not have been known to Dr. Means at the time the letter was received three months earlier. No evidence produced in discovery indicates the contrary. Indeed, all evidence points to the April 2011 article as the public source of this information.  *See* Dillard Dep. Excerpts, 312:22-315:8.

Yet in Means' testimony at the April 20, 2011 hearing for injunctive relief, she refers continually to the April 2011 article, saying Dillard "admired and felt like he was one of the people that actually did something to stop abortions in our country." *See* Tr. Hr'g Mot. Prelim. Inj. Excerpts, 24:13-15. Dr. Means stated that this affected how she felt. *See* Tr. Hr'g Mot. Prelim. Inj. 24:16-21. She continued to testify about her opinions and feelings based on the April 2011 article, going on to say, "if somebody has admired violence, that's how people get from protester to murderer." Tr. Hr'g Mot. Prelim. Inj. 35:11-12. She explained that she sees Dillard's

letter as threatening violence in light of the fact that Dillard "has publicly stated she admired that action," Tr. Hr'g Mot. Prelim. Inj. 38:5-6, and that the context of Dillard's letter included that Dillard "already talked about admiring the breaking of the law," Tr. Hr'g Mot. Prelim. Inj. 48:23-25; *see also* Tr. Hr'g Mot. Prelim. Inj. 39, 54, 55. She interpreted the position of "admiring Scott Roeder" as going towards a "tendency to move towards violence" over time. Tr. Hr'g Mot. Prelim. Inj. 38:13-17.

Given that the only relevant context is what Dr. Means knew at the time of the letter, information that Dillard may have told a reporter in July 2009, but that was not actually published or otherwise made public until after the Complaint was filed in April 2011, is simply not relevant to the jury's determination of the reasonableness of the recipient reaction or the context in which the letter was sent in January 2011. Dr. Means has previously testified under oath that there was only one article that made her feel intimidated. *See* Means Dep. Excerpts, 123:6-8. Yet it is undisputed, even if somewhat confusing, that there are two articles at issue here.[1] And the article quoting Dillard as "admiring" Roeder's convictions was not published until after the Complaint was filed. Evidence of later-publicized statements cannot, under the legal standards for evaluating a true threat, retroactively provide support for the reasonableness of Dr. Mean's alleged feelings of intimidation or the context in which the letter was sent.

Dillard does not suggest that the statements published in the April 2011 article are wholly inadmissible. But statements about which Dr. Means could not have possibly known at the time

---

[1] The Government failed to make this fact clear before the Tenth Circuit, referring only to an "article," and implying that all this information was what Means found immediately after receiving the letter. The Tenth Circuit, relying only on Dr. Means's testimony about the "article," suggests a reasonable jury could consider the fact that Dillard had publicly stated she admired Roeder's convictions in determining whether the letter was a true threat. This statement is not a finding of fact, or a conclusion of law, but an observation about what would be relevant given the information before it. It does not limit this Court's ability to rule on this evidence.

the letter was sent in January 2011 are irrelevant to the jury's determination of whether a reasonable person would have felt intimidated by the letter, or to explain the context in which the letter was sent. *See* Fed. R. Evid. 402. Dr. Means's testimony, both during discovery and at the hearing on the Government's motion for a preliminary injunction, continually emphasizes that one of the reasons—if not the only reason—why she viewed Dillard's letter as threatening was because of Dillard's public "admiration" of Roeder. *See* Tr. Hr'g Mot. Prelim. Inj. Excerpts 34:1-10; 35:9-12; 37:24-38:23; 39:20-40:10; 54:2-16; 54:21-55:15; 71:6-11; 87:1-16; 101:1-24; *see also* Means Dep. Excerpts, 119:4-122:2. This testimony is misleading to the extent it is presented to demonstrate the context in which the letter was sent, or to demonstrate how a reasonable recipient in Dr. Means' position would have reacted to the letter at the time. Dillard asks that Dr. Means be instructed to testify only to knowledge relevant to her evaluation of the letter at the time it was sent. If the second article is permitted into evidence at all, a limiting instruction should be provided to ensure the jury is not misled by this evidence and considers it only for its proper purpose, if any.

### *Fact that Dillard's Children met Roeder in Jail*

Next, Dillard contends that this Court should exclude any evidence that, on one occasion, she took her children with her to jail where they met Roeder prior to Dillard's ministerial visit with him. For the reasons stated below, this evidence is irrelevant to any issue of consequence in the case, and even if relevant, would be substantially outweighed by the danger of unfair prejudice.

This evidence, and any evidence of this character, is inadmissible first because it is irrelevant under Rule 401. It is well established that evidence is considered relevant if "it has any

tendency to make a fact more or less probable than it would be without the evidence," and that

fact "is of consequence in determining the action." Fed. R. Evid. 401. The fact that Dillard's

children had some interaction with Roeder has nothing to do with whether the letter sent to Dr.

Means in January 2011 was a true threat—the ultimate fact of consequence in the action. These

facts were never made public, and there is no evidence suggesting that Dr. Means—or any other

reasonable person in her position—was or would have been aware of these facts. So it does not

have any relevance to the jury's determination of whether a reasonable person would find that a

threat existed—either in the sense of the context or the recipient reaction. *See United States v.*

*Dillard*, 795 F.3d 1191, 1199 (10th Cir. 2015). This evidence is also not relevant to Dillard's

subjective intent and should be excluded under Rule 402.

Also, any probative value it may have is substantially outweighed by the danger of unfair

prejudice. Fed. R. Evid. 403. "[A] 403 inquiry focuses on whether the evidence results in 'unfair

prejudice,' that is, does the evidence have 'an undue tendency to suggest decision on an

improper basis, commonly, though not necessarily, an emotional one.'" *Koch*, 2 F. Supp. 2d at

1389 (quoting Fed. R. Evid. 403 adv. comm. note). Introducing evidence that Dillard brought her

children to meet Roeder while he was at the Sedgwick County Jail, which is anticipated to occur

through the Government's cross-examination of Dillard, could be used only for the purpose of

suggesting to the jury that Dillard has somehow inappropriately exposed her children to a

negative environment. It suggests the jury decide the case on an emotional reaction to that

choice, rather than by applying the law in the case. Given the sensitive nature of the decision to

expose one's own children to the topic of jail, crimes, and those who commit them, the only

apparent purpose for such evidence would be to encourage the jury to decide the case on an improper basis. *See* Fed. R. Evid. 403.

While Dillard has always been candid about her ministerial relationship with Roeder, there is no evidence that she ever personally advocated for violent action in the course of the pro-life movement or somehow shared his beliefs about the use of violence to effect change. The fact that the Dillard children met Roeder does not suggest otherwise, but instead, entices the jury to be emotionally swayed to decide against Dillard for an improper reason. This evidence should be excluded either as irrelevant under Rule 402, or as unduly prejudicial under Rule 403.

Finally, to the extent Dillard testifies at trial and the Government attempts to offer this evidence as character evidence, it is impermissible for that purpose as well. *See* Fed. R. Evid. 608(b). This evidence is not probative of Dillard's character for truthfulness and thus, is not permissible for any purpose.

### B. Roeder's Jailhouse Statements

Next, Dillard requests this Court exclude evidence of Roeder's own jailhouse statements and threats. As the Government has already done in previous briefing, Dillard anticipates that the Government will seek to introduce evidence of Roeder's public statements and positions on violence toward abortion providers in an attempt to argue that Dillard either shared those beliefs or to suggest guilt by association.

Specifically, where this evidence is likely to arise is through newspaper articles, recordings of interviews, or other similar publications of Roeder's jailhouse statements. One article, previously cited by the Government prior to the appeal in this case, is illustrative. *See* Dkt. 188-5: Kevin Murphy, *Kansas abortion doctor's killer threatens new clinic owner*, (May

16, 2013). This newspaper article, published years after this action was initiated, describes how

Roeder was facing administrative charges based on comments he made in a telephone interview

with an abortion opponent that were posted on YouTube. Among other things, the article

reported:

- "Roeder had testified that he killed Tiller, 67, to stop abortions."
- "Roeder said reopening the clinic would put [Dr. Julie Burkhart] at risk."
- "'To walk in there and reopen a clinic, a murder mill where a man was stopped, is almost like putting a target on your back – saying "Well, let's see if you can shoot me,"' Roeder said in the interview."
- "Roeder said reopening the clinic was a 'shame and a disgrace.'"

*Id.* These statements, and statements of this character, are inadmissible for several reasons.

As previously noted, the main issue for the jury to decide in this case is whether the letter

Dillard sent to Dr. Means in January 2011 was a true threat, and thus, could be considered a

threat of force within the meaning of FACE. In order to do that, the jury will have to make

credibility determinations and may appropriately be presented with facts surrounding (1) the

letter itself; (2) how a reasonable person in Dr. Means's position would react to receiving

Dillard's letter; (3) the context in which the letter was sent, and (4) evidence relevant to Dillard's

subjective intent in sending the letter. As has been apparent from the litigation thus far, the

Government's theory of why a jury should conclude Dillard's letter was a true threat rests

heavily on Dillard's relationship with Roeder. The Tenth Circuit Court of Appeals' opinion has

suggested that her relationship with Roeder may be relevant to this determination; however, this

would be the ministerial relationship as it existed in January of 2011.

Much of the evidence that the Government references cannot be relevant because it was

not known to Dr. Means at the time, or, even if it was known, it goes too far toward swaying the

jury on an impermissible basis. The Government's argument has been that Dillard should be

liable, not because her letter was actually a true threat, but because she is the type of person who would associate with a murderer who continues to advocate violent action against abortion providers, and thus, more likely to have sent a true threat herself.

Before turning to a discussion about the unduly prejudicial nature of the evidence, as a preliminary matter, it is important to note that any jailhouse statements or threats made by Roeder are first and foremost inadmissible hearsay. *See* Fed. R. Evid. 802. This Court has already recognized the hearsay nature of this evidence in its prior order ruling on Defendant's motion for summary judgment. *See United States v. Dillard*, 989 F. Supp. 2d 1169, 1178-79 (D. Kan. 2013) (describing evidence of the prison communications by the murderer Roeder which have not been linked in any way to Dillard, as "hearsay"). Though this Court did not substantively rule on the admissibility of Roeder's prison communications there, a careful examination of the rules on hearsay demonstrates that no exception would permit presentation of Roeder's statements—or other witnesses' testimony about them—to the jury in this case. *See* Fed. R. Evid. 803, 804.

Turning now to the relevance of this evidence, as this Court has already recognized, no evidence produced in discovery has tied Dillard to statements made by Roeder from his jail cell. Although Dillard may have some association with Roeder—as she has testified, through prison ministry to him in a ministerial capacity—there is no evidence this association extends to Roeder's advocacy of violence toward abortion providers. Without evidence to show a connection between Dillard and Roeder that extends to Roeder's views and statements about abortion related violence, evidence that Roeder continues to make jailhouse threats against abortion providers is simply irrelevant to determining whether Dillard's letter demonstrates a

11

serious statement to threaten Dr. Means or that she subjectively intended it as such. The evidence is wholly irrelevant to the jury's determination of the real issues in the case and should be excluded under Rule 402.

Next, evidence of Roeder's jailhouse advocacy should be excluded under Rule 403 because it is classic evidence of guilt by association. Evidence of this character "is prohibited because '[t]hat one is married to, associated with, or in the company of a criminal does not support the inference that that person is a criminal or shares the criminal's guilty knowledge.'" *United States v. Polasek*, 162 F.3d 878, 883 (5th Cir. 1998) (quoting *United States v. Forrest*, 620 F.2d 446, 451 (5th Cir. 1980)). From a technical standpoint, arguments about guilt by association are evaluated under Federal Rules of Evidence 401 and 403 for relevance and prejudice. *Tadlock v. Marshall Cnty. HMA, LLC*, 603 Fed. Appx. 693, 706 (10th Cir. 2015) (citing *United States v. Espinoza*, 244 F.3d 1234, 1240 (10th Cir. 2011)). Under either rule, this evidence should be excluded for the precise reason that its presentation is intended to lead the jury to infer that it is more likely that Dillard threatened Dr. Means with her letter because someone with whom she was associated had previously murdered another abortion provider and was continuing to make further threats.

The probative value of the evidence is substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403; *see, e.g.*, *United States v. Espinoza*, 244 F.3d 1234 (10th Cir. 2001). Rather than proving that Dillard's letter was a true threat and that she violated FACE herself, the Government's introduction of Roeder's advocacy urges the jury to make the impermissible leap that Dillard should be liable because she is associated with someone who would make that kind of threat. Introducing evidence of this character could only serve to

confuse the issues and inflame the passions of the jury to decide the case through guilt by association and should be excluded under Rule 403.

## II. CONCLUSION

The facts of consequence in this action involve the factors for determining whether Dillard's letter was a true threat: (1) the language of the letter; (2) the context in which it was sent; (3) a reasonable recipient's reaction; and (4) Dillard's subjective intent. For the reasons stated, the evidence Dillard seeks to exclude is for the most part irrelevant to these factors, and to the extent relevant, is either otherwise inadmissible or unfairly prejudicial. This Court should grant Dillard's motion in limine and exclude the evidence for the reasons stated in this motion.

Respectfully submitted this 6th day of April, 2016.

  /s/ Craig Shultz
Craig Shultz, KS #09731
SHULTZ LAW OFFICE, P.A.
445 North Waco
Wichita, KS 67202
TELEPHONE: (316) 269-2284
FACSIMILE: (316) 269-2011
craig@shultzlaw.net

   /s/ Theresa L. Sidebotham
Theresa L. Sidebotham,* CO # 36713
TELIOS LAW, PLLC
1840 Deer Creek Rd, Suite 101
Monument, CO  80132
TELEPHONE: (855) 748-4201
FACSIMILE: (775) 248-8147
tls@telioslaw.com

*Appearing Pro Hac Vice

## CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2016, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record in this case.

I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: None.

 /s/ Craig Shultz
Craig Shultz