IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

Plaintiff,

vs.                                     Case No. 11-1098-JTM

ANGEL DILLARD,

Defendant.

MEMORANDUM AND ORDER

The United States brought this civil action against defendant Angel Dillard under the Freedom of Access to Clinic Entrances Act (FACE), 18 U.S.C. § 248 (1994). Dillard has moved to dismiss the action, arguing that FACE exceeds Congress's power under the Commerce Clause. In addition, the parties have filed several motions in limine. For the reasons provided herein, the court denies the Motion to Dismiss, and renders various rulings as to the admissibility of the evidence identified in the other motions before the court.

***Motion to Dismiss***

Dillard acknowledges the great weight of authority[1] holding that FACE is

---

[1] *See United States v. Weslin*, 156 F.3d 292, 296 (2d Cir. 1998), *cert. denied*, 525 U.S. 1071 (1999), *United States v. Bird*, 124 F.3d 667, 672-82 (5th Cir.1997), *cert. denied*, 523 U.S. 1006 (1998); *Terry v. Reno*, 101 F.3d 1412, 1415-18 (D.C.Cir. 1996), *cert. denied*, 520 U.S. 1264 (1997); *United States v. Soderna*, 82 F.3d 1370, 1373-74 (7th Cir.), *cert. denied*, 519 U.S. 1006 398 (1996); *United States v. Dinwiddie*, 76 F.3d 913, 920 (8th Cir.), *cert. denied*, 519 U.S. 1043 (1996); *Cheffer v. Reno*, 55 F.3d 1517, 1521–22 (11th Cir.1995);

constitutional, but contends that most of these decisions are no longer sound because they were rendered prior to the Supreme Court's decision in *United States v. Morrison*, 529 U.S. 598, 621-624 (2000), upholding a Commerce Clause challenge to the Violence against Women Act (VAWA). Earlier, in *United States v. Lopez*, 514 U.S. 549 (1995), the Court upheld a similar challenge to a federal statue criminalizing the possession of firearms in proximity to schools.

However, three circuits have explicitly upheld FACE after *Morrison*. *See United States v. Bird*, 401 F.3d 633, 634 (5th Cir. 2005) (vacating district court decision "[w]e do not find that the Supreme Court's decision in *Morrison* materially affects our holding in *Bird I*"); *Norton v. Ashcroft*, 298 F.3d 547 (6th Cir. 2002), *cert. denied*, 537 U.S. 1172 (2003); *United States v. Gregg*, 226 F.3d 253, 262-63 (3d Cir. 2000), *cert. denied*, 532 U.S. 971 (2001). No court has found FACE unconstitutional, and this court finds no basis for doing so.

In resolving a Commerce Clause challenge to a statute addressing activity which substantially affects interstate commerce, the court looks to  (1) whether "the activity at which the statute is directed is commercial or economic in nature;" (2) whether "the statute contains an express jurisdictional element involving interstate activity that might limit its reach;" (3) whether "Congress has made specific findings regarding the effects of the prohibited activity on interstate commerce;" and (4) whether "the link between the prohibited conduct and a substantial effect on interstate commerce is attenuated." *United States v. Patton*, 451 F.3d 615, 623 (10th Cir. 2006) (quoting *United States v. Grimmett*, 439 F.3d 1263, 1272 (10th Cir. 2006)).

These factors here support the determination that FACE is a valid exercise of Congressional power. The statute regulates activity which is economic in nature, unlike *Lopez* and *Morrison*, which directly targeted individual actions of criminal behavior.

> In contrast to gender-motivated crime, the activity regulated by FACE—the physical obstruction and destruction of reproductive health clinics and the intentional interference and intimidation of persons obtaining and providing reproductive health services—is activity with an effect that is economic in nature. Reproductive health clinics are income-generating businesses that employ physicians and other staff to provide services and goods to their patients. Motivated by anti-abortion sentiment, the primary goal of individuals and groups engaged in the misconduct prohibited by FACE is to temporarily and permanently interrupt the operations of reproductive health facilities and prevent individuals from accessing their services. Congress found that the violent and obstructive acts directed at reproductive health facilities had caused millions of dollars of damage and forced clinics to close, caused serious and harmful delays in the provision of medical services and intimidated a number of physicians from offering abortion services. The effect of the conduct proscribed by FACE is to deter, and in some cases to stop completely, the commercial activity of providing reproductive health services.

*Gregg*, 226 F.3d at 262 (citations omitted). *See Norton*, 298 F.3d at 558 ("[w]hile the activity prohibited by the Act might be motivated by non-commercial sentiment—namely, staunch moral opposition to abortion—the effect of this activity is unambiguously and directly economic [and]] such conduct is properly considered commercial activity").

While FACE contains no express jurisdictional element, Congress documented at length the economic effect of clinic violence and obstruction. The defendant herself recognizes that "fairly extensive Congressional findings exist." (Dkt. 219, at 14). Such findings are entitled to judicial deference. *See United States v. Hampshire*, 95 F.3d 999, 1001 (10th Cir.1996); *cert. denied,* 519 U.S. 1084 (1997) (court should strike down legislation "only

if it is clear that there is no rational basis for a congressional finding that the regulated activity affects interstate commerce, or that there is no reasonable connection between the regulatory means selected and the asserted ends").

The congressional finding of a substantial effect on interstate commerce is sufficiently grounded in fact. *See Gregg*, 226 F.3d at 263 ("Congress's conclusion that the activity proscribed by FACE burdens interstate commerce is a conclusion derived from months of legislative hearings, research, and debate"); *Norton*, 298 F.3d at 557 ("the legislative record indicates that there is a national market for abortion services," that there is "a national shortage in reproductive services," and that as a result physicians and clinics must engage in a national market); *Bird I*, 124 F.3d at 681 ("[t]estimony before Congress made clear that activity proscribed by the Act delayed (and threatened to deny permanently) access to abortion-related services to women who, due to the existing shortage of such services, had traveled (or would be required to travel) interstate to obtain them").

Congress had a rational basis for concluding that a national restriction on clinic violence and obstruction was appropriate to protect the economic welfare of clinics, their employees, and their customers. *See Gregg*, 226 F.3d at 265 ("when it enacted FACE, Congress sought to regulate a truly national problem"); *Norton*, 298 F.3d at 559 ("Given the detailed congressional record, we are satisfied that Congress had a rational basis to conclude that the activities prohibited by the Act disrupted the national market for abortion-related services and decreased the availability of such services"). The court agrees

with the conclusions of the Fifth, Third, and Sixth Circuits, and denies the defendant's

motion to dismiss.

### Motions in Limine

### 1. Dr. Means's medical history

The government has moved to exclude any evidence relating to the medical history

of the recipient of the letter sent by Dillard, Dr. Mila Means. The government argues that

Dr. Means's subjective impression of the letter is irrelevant, since the test of a true threat

is how a reasonable recipient of such a communication would react. The government also

quotes the decision of the Court of Appeals in its recent ruling, stating that "[t]he Tenth

Circuit found that the information is the 'type of sensitive medical information that should

remain under seal.'" [2]

In her response to the government's motion, the defendant states that she does not

_____

[2] The court notes that the government's assertion that the Tenth Circuit's decision directly resolved the issue is incorrect. In the cited passage, the court merely held that the medical history evidence of Dr. Means should be sealed for purposes of the appeal; it made no ruling as to the admissibility of such evidence at trial. That the issues of trial admissibility and public accessibility in the appeal record are not identical is indicated by the two authorities the Tenth Circuit cited in its decision. See Russell v. Lannier, 404 Fed.Appx. 288, 289 n. 2 (10th Cir. 2010) (granting the defendant's motion to keep under seal medical records which were considered by district court and the Tenth Circuit in resolving plaintiff's claims on the merits); Eugene S. v. Horizon Blue Cross Blue Shield of N.J., 663 F.3d 1124, 1135-36 (10th Cir. 2011) (sealing for purposes of appeal the medical records of the plaintiff's son, while also noting that those records provided "[s]ubstantial evidence" showing that son's "symptoms diminished rapidly during the first couple of months in treatment").

intend to introduce this evidence, and states that if this intention changes, she will first seek leave of the court.  (Dkt. 232, at 2). The court accordingly grants the government's motion on these terms.

### 2. Testimony of Agent Fitzgerald

The government also seeks to exclude the opinion of FBI Special Agent Sean Fitzgerald, who testified that as a result of his investigation, he concluded that Dillard "posed no threat" to Dr. Means. The government correctly points out that the key issue in the case is whether a reasonable recipient would feel threatened by the letter. To this end, they cite as the law of the case the observation by the Tenth Circuit:

> It is not necessary to show that defendant intended to carry out the threat, nor is it necessary to prove he had the apparent ability to carry out the threat. The question is whether those who hear or read the threat reasonably consider that an actual threat has been made. It is the making of the threat and not the intention to carry out the threat that violates the law.

795 F.3d at 1199 (quoting *U.S. v. Viefhaus*, 168 F.3d 392, 395-96 (10th Cir. 1999)).

The government it its brief emphasizes the second sentence quoted here. But while this rule of law will be conveyed in the court's instructions to the jury — that the ultimate question is what a reasonable person in Dr. Means's position would think about the letter — the court must also note the first quoted sentence. The Tenth Circuit was not saying that a lack of intent or apparent ability to carry out a threat was *irrelevant*; it said that such evidence was not *necessary*.

Similarly, the court later held that "FACE includes a subjective intent element: a

defendant is only liable if she 'intentionally' injured, intimidated, or interfered by force or threat of force with someone seeking to obtain or provide reproductive health services." 795 F.3d at 1203. Agent Fitzgerald's testimony is relevant to this subjective intent inquiry.

Moreover, the court must read the government's motion in limine in conjunction with its response to Dillard's motion in limine (discussed below), addressing a news report from April, 2011. In its original motion in limine with respect to Fitzgerald's testimony, the government argues that the FBI's discovery that Dillard had no violent intent is irrelevant, purely because of its timing, occurring months after the letter was sent:

> Whether Defendant posed a future threat of harm to Dr. Means that may have required law enforcement intervention, however, is irrelevant to the issue of whether she violated FACE when she mailed the letter. By the time that Agent Fitzgerald interviewed Defendant Dillard – after she sent the letter – the harm had already been done.

(Dkt. 225, at 2. In contrast, in its response to Dillard's letter seeking to exclude the 2011 news article, the government argues that the such evidence is fair game, even though it occurred well "after [Dillard] sent the letter," because it supplies "context" for what Dr. Means may have known, and also explains Dillard's own "state of mind." (Dkt. 233, at 2, 4).

If context and state of mind are relevant, and the court agrees they are, then the defendant should be able to introduce evidence relating to Special Agent Fitzgerald's conclusions.

### 3. Roeder relationship.

The defendant's motion in limine notes that there are two potentially relevant news articles mentioning herself and Scott Roeder, an AP article from July 3, 2009 and another article which was published April 7, 2011. The defendant argues that the second article was only published months after the letter to Dr. Means, and indeed was apparently printed the same day the government filed its Complaint. She argues that the article could not have been relevant to Dr. Means's statement that she was allegedly intimidated upon receiving the letter, nor could she have learned about it during the online research she conducted shortly after receiving the letter.

As noted, above the government argues that this second letter is relevant, because discovering its existence can supply context for Dr. Means's reaction to the letter, and to address the general issue of Dillard's intent in sending the letter. The court finds that the evidence is admissible, and denies the motion in limine as to this article.

### 4. Prison Communications

In its response to the defendant's in limine motion, the government also announces that it intends to introduce three letters that Dillard sent to Roeder in prison, claiming that these letters *cannot* be privileged because Dillard sent them before she actually met Roeder.

The government's argument is inconsistent with the court's privilege ruling. The court stressed that "[t]he clergy-penitent privilege is not restricted to face-to-face communications." 989 F.supp.2d at 1167. And the court expressly concluded that the federal privilege "applies to any 'communication' *which is generally germane to the recipient's*

8

*role as 'spiritual advisor*.' There is no requirement that the actual writing be penitential or sacramental in nature." *Id.* (emphasis added). As a result "the content of the communications between Dillard and Roeder are privileged." *Id.* at 1169.

There is no indication at all that Dr. Means was informed of such letters before the present action was filed. The letters were issued in conjunction with and as a preface to the prison ministry. The letters are germane to Dillard's role as a spiritual advisor, and will not be admitted.

The government's response also expresses an intention to introduce evidence regarding the date and number of Dillard's prison visits.  Such evidence will not be admitted. In trying to defeat Dillard's motion, the government quotes a statement from this court's privilege decision supposedly concluding that information "'such as the date and number of prison visits' — are not privileged." (Dkt. 233, at 5).

The quotation to this court's earlier decision is misleading. The court did *not* hold that the additional information as to the number and timing of visits was *unprivileged for purposes of admission at trial*. The court in this portion of the opinion was addressing Dillard's additional motion seeking to quash all of the government's discovery as to the prison ministry. In the cited passage, the court simply observed that such evidence could be discovered as a means of addressing the larger question of privilege:

> Second, even if the additional interrogatories and requests for admission or production were addressed on the merits, *the information is proper discovery*, except as otherwise expressly stated in the present order. As noted above, the court finds that the contents of Dillard's direct communications with Roeder are privileged information. The other

information is not privileged [from discovery]. Rather, *information such as the date and number of prison visits simply provide a necessary threshold for the court to examine the claim of privilege.*

989 F.Supp. 1155.

The court will not permit evidence of the number or dates of Dillard's prison visitations, because it is a highly prejudicial attempt to circumvent the court's privilege ruling. There is no evidence that Dr. Means was ever aware of Dillard's prison ministry. More importantly, the government's attempt to introduce such evidence would force the defendant to respond by discussing the details of the prison ministry. The court will not permit such unnecessary prejudice, or circumvention of its earlier decision. FED.R.EVID. 403.

Finally, the defendant seeks to exclude reference to Scott Roeder's "jailhouse statements and threats." The court must note a lack of precision in the defendant's motion. The only *specific* evidence identified by the defendant is a May 13, 2013 article containing various comments by Roeder. Otherwise, the defendant argues that "[m]*uch of the evidence that the Government references* cannot be relevant because it was not known to Dr. Means at the time, or, even if it was known, it goes too far toward swaying the jury on an impermissible basis." (Dkt. 223, at 10).

In its response, the government offers a barren assertion, without any argument or authority: "The United States, however, is entitled to offer any otherwise admissible statements to the extent that they may be relevant to Defendant's relationship with Scott Roeder, the context in which the letter was received, or any other issue that may arise at

10

trial." (Dkt. 233, at 5).

Such cursory argument is insufficient, especially given the explicit previous determination by this court, with respect to this specific news report, that "there is absolutely nothing in the [2013] article which would tie Roeder's comments to Dillard. There is also nothing to show that these events were ever known to Dr. Means, or that they occurred prior to her decision to abandon her planned clinic." 989 F.Supp.2d at 1177.

The Tenth Circuit's subsequent opinion made no reference to this conclusion that the 2013 communications were irrelevant. Instead, the court referenced only the earlier, 2009 or 2011 publications: "*Shortly after receiving the letter*, Dr. Means' staff found an Associated Press article on the internet which discussed Defendant's friendship with Scott Roeder." 795 F.3d at 1197 (emphasis added). For purposes of determining the defendant's objective intent, the court wrote, "reports of [Dillard's] association with Mr. Roeder are part of the context that would have an impact on a reasonable recipient's reaction to her letter." *Id.* at 1202.

Again, there is no representation that the 2013 Reuters article was ever known to the recipient of the letter, Dr. Means. The article appeared over *two years* after Dillard sent the letter which is the focus of the present case.

The court finds that the May, 2013 article is insufficiently probative of the issues in the case, and such evidence is inadmissible. As noted earlier, the court will allow the government to introduce evidence relating to the July 3, 2009 and April 7, 2011 articles. To the extent any party seeks to introduce evidence of other publications, the party should

11

first notify the court of their intention.

IT IS ACCORDINGLY ORDERED this 20th day of April, 2016, that the defendant's Second Motion to Dismiss and Amended Second Motion to Dismiss (Dkt. 218, 219) are denied; the government's Motion in Limine as to Dr. Means's medical history (Dkt. 226) is granted; the government's Motion in Limine as to Special Agent Fitzgerald's testimony (Dkt. 225) is denied; and the defendant's Motion in Limine (Dkt. 223) is granted in part and denied in part as provided herein.

s/J. Thomas Marten
J. THOMAS MARTEN, JUDGE