478

```
1              IN THE UNITED STATES DISTRICT COURT
                      DISTRICT OF KANSAS
2

3  THE UNITED STATES OF AMERICA,

4              Plaintiff,

5        vs.                        District Court
                                    Case Number
6  ANGEL DILLARD,                   11-CV-1098-JTM
                                    Volume 3
7              Defendant.

8

               TRANSCRIPT OF PROCEEDINGS
9
               On the 5th day of May, 2016 at 8:25 a.m. came
10 on to be heard in the JURY TRIAL in the above-entitled
   and numbered cause before the
11 HONORABLE J. THOMAS MARTEN, Judge of the United States
   District Court for the District of Kansas, Sitting in
12 Wichita.
               Proceedings recorded by mechanical
13 stenography.
               Transcript produced by computer.
14

15 APPEARANCES

16         The Plaintiff appeared by and through:
               Mr. Richard C. Goemann
17             Ms. Julie Abbate
               US Department of Justice
18             Civil Rights Division
               950 Pennsylvania Ave, NW
19             SPL 601 D Street
               Washington, DC, 20530
20
           The Defendant, Angel Dillard, appeared in
21 person, by and through:
               Mr. Craig Shultz
22             Shultz Law Office
               445 N. Waco
23             Wichita, KS 67202

24             Ms. Theresa Sidebotham
               Telios Law, PLLC
25             1840 Deer Creek Rd., Suite 101
               Monument, CO 80132
```

479

```
 1                              INDEX

 2

 3  Instruction Conference                        480
    Instructions                                  605
 4  Closing Arguments by Ms. Abbate               622
    Closing Arguments by Mr. Shultz               673
 5
    WITNESSES FOR THE DEFENDANT:
 6      ANGEL DILLARD
            Cross Examination by Ms. Abbate       516
 7          Redirect by Ms. Sidebotham            568
            Recross                               570
 8
        ROBERT DILLARD
 9          Direct Examination by Ms. Sidebotham  573

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Jana L. McKinney, CSR, RPR, CRR, RMR
United States Court Reporter

480

```
 1              (The following proceedings commenced in the

 2              conference room at 8:30 a.m. with counsel

 3              present:)

 4         THE COURT:  Have you all talked with each

 5    other about the instructions?

 6         MR. GOEMANN:  We have not talked.  We

 7    exchanged our relative edits.

 8         THE COURT:  So, well, my question is, have you

 9    agreed on all but a handful of instructions?  That was

10    the point --

11         MS. ABBATE:  I think so.

12         THE COURT:  -- just to save us time here this

13    morning so we only spend time on the ones you haven't

14    agreed on.

15         MR. GOEMANN:  Yes, sir.  I mean, I think we

16    agree on most of the -- the more general instructions

17    at the beginning and at the end of the package that we

18    received yesterday.

19         THE COURT:  Well, having reviewed the one

20    written objection, I am modifying that one instruction

21    about a direct threat and instead of saying it is,

22    going to say, may be.

23         MS. ABBATE:  Oh.

24         THE COURT:  And that softens it, I think.

25              A true threat may be more likely to exist
```

```
 1  where a communication unequivocally, as opposed to is.
 2          I think it was fine the other way.
 3          Having read the Circuit opinion, I don't think
 4  this is exactly what they said.  A jury may find is
 5  what the Circuit said, but I'm going to go ahead and
 6  make that change.
 7          Okay.  Where do you all have problems with the
 8  instructions?  And if you're looking at a broad
 9  overhaul, it's not happening.  I am giving these
10  basically in the way that I have given them to you.
11          MR. GOEMANN:  Well, then let -- if we could,
12  there was one instruction --
13          THE COURT:  Sure.
14          MR. GOEMANN:  -- that actually we would like
15  to add.
16          THE COURT:  Okay.
17          MR. GOEMANN:  It relates to the -- the idea
18  that a true threat does not require the intent to carry
19  through on the threat, which is --
20          THE COURT:  We actually had that in an
21  instruction already.
22          MR. GOEMANN:  We did not see that.
23          THE COURT:  Let me see if I can find it but I
24  am sure that it is there.
25          MR. SHULTZ:  Was it Number 7?  That you're
```

482

1  changing more likely to may?

2        THE COURT:  Yes.

3        MR. SHULTZ:  Okay.

4        MR. GOEMANN:  May be more likely.

5        THE COURT:  Yeah.  As opposed to is.

6        MR. SHULTZ:  Oh, may be.  Okay.  I had not

7  seen that.  Okay.  That's all right.  May be more

8  likely.

9        MR. GOEMANN:  We had not seen --

10        THE COURT:  And tell me what it is that you

11  want, because I'll sniff it out here for you.  It's a

12  true threat does not require the intent to -- to follow

13  through on the -- I don't have the wording with me.

14        MS. ABBATE:  I think the problem is it is the

15  making of the threat.  Whether or not a person intends

16  to take any violent steps is irrelevant to the intent

17  to have made the threat.

18        MR. GOEMANN:  Do you have the text?  Oh, here

19  we go.

20        THE COURT:  Okay.

21        MR. GOEMANN:  Actually, why don't you just --

22        THE COURT:  Thank you very much.  Thank you.

23        MR. BRICKELL:  Do we have enough?

24        MR. GOEMANN:  Yes, I numbered this in terms of

25  7A in terms of the ordering and it says, A true threat

1 does not require that the sender intend to carry out

2 the threat or have the apparent ability to carry out

3 the threat, and that's from the Tenth Circuit case.

4 And then it just concludes, If a reasonable person in

5 the position of the recipient would include -- would

6 conclude that communication conveyed an actual threat

7 then a true threat exists.

8          THE COURT:  I'm sorry, Rich, I'm having a

9 little trouble finding where we are.

10          MR. GOEMANN:  I put it between 7 and 8 in the

11 substantive instructions.

12          THE COURT:  Okay.  Okay.  I'm right with you

13 now.

14          MR. GOEMANN:  The red lines are gone.

15          MS. ABBATE:  No, I've got mine still redlined.

16          THE COURT:  I thought where we said, An

17 expression that the sender of communication will

18 personally engage in violence is not essential in all

19 cases, and then we go on to say, But a warning of

20 violence by third persons may still be a true threat.

21 And I thought that picked up the idea that you're

22 talking about in this additional instruction.

23          MS. SIDEBOTHAM:  And, Your Honor, we would

24 object to the additional instruction because it's only

25 a partial statement of the law, although it's

484

1  grammatically wrong but the -- it's not -- it may be

2  true that a true threat doesn't require the sender

3  intend to carry out the threat, but a true threat does

4  require that the sender intend to put the person in

5  fear of actual violence and their conclusion that if a

6  reasonable person would conclude that it is a threat,

7  it's a threat, that completely leaves out the intent

8  element so it's a misstatement of the law.  In their

9  proposed instruction.

10        We have no problem with Your Honor's current

11  explanation of it.

12        MS. ABBATE:  The -- I think the first sentence

13  is the most important one and that, Your Honor, goes to

14  what we had addressed in our motion in limine as well

15  regarding Agent Fitzgerald's testimony because really

16  that is what he was looking at:  Is she going to act on

17  this going forward, and that is an important decision.

18        And, Your Honor, you said in your opinion,

19  Look, Fitzgerald testimony can come in because it goes

20  to her intent, you know, second element of the -- of

21  the charge here, and so people often get confused,

22  myself, lawyers included, that the harm is actually

23  making of the threat and oftentimes that's all that's

24  needed to effectuate what the threat is intending and

25  to -- to fail to put that out there specifically, I

485

1  think, would really cloud the issue and allow the jury
2  to consider whether she actually intended or had the
3  capacity to do anything as part of this element.
4          In fact, you know, if we had to have that
5  done, we wouldn't be here today, if we had to prove
6  that she had the intent or capacity to put
7  explosives --
8          THE COURT:  We aren't saying she does have to,
9  right, I think that is a common misconception, though,
10 that happens in these cases, that --
11         MR. GOEMANN:  The second sentence we're fine
12 with -- with deleting of the -- I had actually kind of
13 adapted it from your next instruction to kind of make
14 it parallel, again, I might have grammatically --
15         MS. ABBATE:  Mangled it.
16         MR. GOEMANN:  -- mangled it a bit, I didn't
17 want it to sound exactly the same because I thought
18 that because you had used the similar language in a
19 similar kind of instruction that I would basically
20 reflect it here to kind of give it balance.
21         But we do think it's important because much
22 has been made of that particular point, of her
23 subjective intent.  She has spent a lot of time
24 testifying yesterday about how peaceful she is, and she
25 would never do anything like this, and we don't contend

```
1   she is going to and so this language, I don't know
2   whether I mangled the Tenth Circuit or not, but I think
3   it's pretty close wording to their language, and I
4   believe they were also quoting from another previous
5   Tenth Circuit case.
6              THE COURT:  Well, I'm going to fold this one
7   over and give a little further thought to the first
8   sentence.
9              We will not give the second, absolutely.
10             What other issues do we have?
11             MS. SIDEBOTHAM:  Your Honor, on the
12  first -- the elements of FACE violation, we have one
13  fairly small change to propose and here is a draft
14  here.  I think you guys have seen it but here's another
15  copy.
16             So in -- in this element -- oh, great, am I on
17  the right one?  I've lost my page number.
18             MS. ABBATE:  It is one contention.
19             MS. SIDEBOTHAM:  Okay, so here.  So the
20  second -- the second contention, we would propose to
21  change it to the defendant intentionally made a true
22  threat of force to intimidate.  And we've got a very
23  similar change on the verdict form that I can give you.
24             And our reasoning there, Your Honor, is that
25  I'm concerned if it's just intimidate without including
```

1  the true threat, because intimidate is defined only as

2  putting someone in reasonable fear of bodily harm, that

3  could completely divorce it from any actual threat or

4  intent by the -- by the plaintiff and this is the -- I

5  mean, the defendant, this is the defendant's intent and

6  it concerns me that just a warning that made the

7  recipient think about bodily harm could get you there

8  unless we had the -- the true threat of force.

9          And the true threat of force parallels Your

10  Honor's other instructions, I think it's quite

11  consistent, and I can give you at the same

12  time -- let's see, the verdict -- the verdict form,

13  because it's almost -- it's almost the exact same

14  consideration.

15          This was the proposed change there.

16          MS. ABBATE:  I would be happy to respond when

17  you're ready, Your Honor.

18          THE COURT:  I don't think this is necessary.

19  I'm going to leave our instructions.  I think we've got

20  the elements fine and I think they're reflected in the

21  verdict form, as well.

22          So as long as you have filed your proposed

23  change, your record is obviously covered but I

24  think -- I think we've got the elements right and I

25  think we've got the verdict form.

488

```
 1            Not saying that's not right, but I am
 2  satisfied that ours is appropriate.
 3            MS. SIDEBOTHAM:  And, Your Honor, can you
 4  clarify when you say "filed it", is this what I am
 5  doing now or do I need to file a formal --
 6            THE COURT:  You ought to file your objections
 7  or, if you prefer, if you're noting your objection here
 8  and you're picking this up, I assume, Jana, then you're
 9  covered.
10            MS. SIDEBOTHAM:  Okay.  Thank you, Your Honor.
11            THE COURT:  Then you're covered.  Absolutely.
12            MS. ABBATE:  And just one brief wording issue
13  with the first element is the word in the second line
14  where it says "include a true threat" and we would
15  propose changing that consistent with your previous
16  rulings in this case to say "convey a true threat"
17  because it's conveying -- the whole thing is conveying,
18  it's not that there is one thing included in the
19  letter, that it conveys a threat.
20            That's just a one word change we would be
21  requesting that you consider.
22            THE COURT:  How do y'all feel about that?
23            MS. SIDEBOTHAM:  Your Honor, we don't feel
24  strongly one way or the other about that.
25            THE COURT:  We'll change that then to say
```

```
 1   convey.
 2          MS. ABBATE:  Thank you, Your Honor.
 3          Thank you, counsel.
 4          And then just for consistency just to change
 5   the one word on the jury verdict form, as well.
 6          THE COURT:  All right.  In the first question?
 7          MS. ABBATE:  Yes, Your Honor.
 8          MR. GOEMANN:  Yes.
 9          MR. SHULTZ:  And can I add one more comment?
10          THE COURT:  Sure.
11          MR. SHULTZ:  For the record on that first
12   substantive instruction where you've denied our
13   request, second thing in that paragraph, it also
14   includes the word "attempt" -- attempted, and we do not
15   believe that the wording of itself under the facts of
16   this particular case allow for an attempt, only applies
17   to actual providers who are at the time providing.  And
18   that's just for the record.
19          THE COURT:  Okay.  I'm going to leave it the
20   way it is.
21          All right.
22          MR. SHULTZ:  We have one more brief --
23          THE COURT:  Sure.
24          MS. SIDEBOTHAM:  Actually, it's two, Craig,
25   but --
```

490

```
 1          MR. SHULTZ:  Oh, I'm sorry.
 2          MS. SIDEBOTHAM:  -- both extremely brief.  So
 3  here on --
 4          MR. SHULTZ:  Number three.
 5          MS. SIDEBOTHAM:  -- number three, FACE, the
 6  First Amendment and true threats, in the very last line
 7  we would request that it read, Amount to intimidation
 8  by a true threat of violence, rather than Or a true
 9  threat of violence because, again, we contend that
10  intimidation by itself is not the issue, it's
11  intimidation by a true threat.
12          We don't want them in the disjunctive.
13          THE COURT:  Any objection to that?
14          MS. ABBATE:  No, Your Honor.
15          THE COURT:  Okay.  We'll make that change.
16  Intimidation by a true threat.
17          MS. SIDEBOTHAM:  And then our -- our last
18  small change, this is Number 8, true threats and
19  subjective fear, and you have, A true threat may arise
20  even if the actual recipient did not feel personally
21  threatened, and we would like to change it to, A true
22  threat may exist if a reasonable person in the position
23  of the recipient would conclude the communication was
24  an actual threat.
25          And the reason that I wanted to change it to
```

491

1  "may" is, again, because it can still only exist if

2  there is actual intent by the speaker and this

3  instruction isn't getting at that intent and so there

4  is still another element that has to be met.

5          It doesn't definitely exist based on the

6  perception.

7          THE COURT:  I think that's fair, also.

8  Because there are still other elements beyond this that

9  have to -- have to be proved so we'll say, A true

10  threat may exist.

11          And let's go ahead and take himself or herself

12  out of the first sentence, as well, so it will say, I

13  the actual recipient of the communication did not feel

14  personally threatened.  I don't think they're

15  necessary.

16          Okay.  Anything else from the defendant?

17          MS. SIDEBOTHAM:  I have one other matter I

18  would like to make a record on, if I may, but --

19          THE COURT:  Let's finish the instructions --

20          MS. SIDEBOTHAM:  Thank you.

21          THE COURT:  -- and then we'll do it,

22  Ms. Sidebotham.

23          MR. GOEMANN:  Your Honor, on the coming back

24  to the contentions and burden of proof, contention

25  number one.

1          THE COURT:  Okay.

2          MR. GOEMANN:  In terms of the Court's draft of

3    the contentions from the United States, basically, the

4    Court states that the United States alleges a violation

5    of the law and then the -- the instruction indicates

6    what the statute is designed to do.  We would ask that

7    the Court include specific factual language in terms of

8    the -- of the --

9          THE COURT:  I'm not going to do that.

10          MR. GOEMANN:  -- contentions.

11          THE COURT:  I'm not going to do that in the

12    instructions and I'll tell you why.  Because once you

13    start down that path, what goes in and what stays out?

14    The jury will have heard all of the evidence.  I think

15    this is an accurate statement.  This is basically a

16    summary that says, Here's what the case is about.

17          MR. GOEMANN:  Yes, Your Honor.

18          THE COURT:  And then we start funneling down.

19          MR. GOEMANN:  I'm sorry the -- there's

20    a -- first, there's an imbalance here because in the

21    second paragraph you do get specific in terms of the

22    defense's contention.  Angel Dillard contends that the

23    letter was not a threat of force.

24          THE COURT:  Right.

25          MR. GOEMANN:  What we're proposing is

1   that -- that the instruction simply say, from the

2   United States' point of view, that the letter she

3   mailed did have the -- she mailed it with the intent to

4   intimidate by communicating a threat of force in

5   violation of the law.

6           So that it basically parallels then their

7   contention.  Otherwise --

8           THE COURT:  Again, I think -- and I appreciate

9   and understand that, but I'm going to give this --

10          MS. ABBATE:  And --

11          THE COURT:  -- as I've written it.

12          MS. ABBATE:  And at a minimum, though, Your

13  Honor, I request that the final sentence in the first

14  paragraph just simply be removed as it's not actually

15  an accurate statement concerning FACE, that the statute

16  is designed to perform certain forms or obstruction

17  with facilities providing reproductive health concern

18  advises.

19          THE COURT:  Do you have any objection to

20  removing that?

21          MS. SIDEBOTHAM:  No, I would object, Your

22  Honor, because from the beginning we've always felt

23  that this -- this whole lawsuit is not in keeping with

24  the spirit or the letter of the statute, so --

25          MS. ABBATE:  It's not about a facility,

494

```
1   though, this -- the FACE is the act, threat of force,

2   or physical obstruction, those three.

3           THE COURT:  I am going to go ahead and take

4   that sentence out.

5           MS. ABBATE:  Thank you so much, Your Honor.

6           THE COURT:  I don't think it is necessary.

7           MR. SHULTZ:  Where we looking at here?

8           MS. SIDEBOTHAM:  Here.

9           THE COURT:  All right.  What else?

10          MS. ABBATE:  Your Honor, will you be providing

11  instructions before closing arguments?

12          THE COURT:  Yeah.

13          MS. ABBATE:  Great.  So we can go ahead and

14  use these.

15          THE COURT:  Absolutely.

16          MS. ABBATE:  All right.  Thank you.

17          THE COURT:  Yeah, you know, it's interesting.

18  I teach at Harvard every year for a week in a trial and

19  apparently in a lot of the jurisdictions back there,

20  they instruct after closings and I have just never

21  understood.

22          MS. ABBATE:  It happens.  You never know.

23          THE COURT:  Well, I have had people explain to

24  me that they do not want the jury in a frenzy of

25  emotion having been worked up to a fever pitch by the
```

1 lawyers in their closing arguments rushing off to the

2 jury room and making a less than well thought out

3 decision, which I have always thought is about the

4 stupidest thing I've ever heard.

5          MR. SHULTZ:  I've never seen that fever pitch.

6          MS. ABBATE:  Hope you're not expecting that.

7          THE COURT:  But, yeah, that's the explanation:

8 They're on this high of emotion and they're going to

9 rush in there and whoever has had the last word and has

10 them all worked up but and, no, we have always -- I

11 mean in the 40 years that I've been involved in the

12 practice on the bench I have never seen instructions

13 given after a closing argument, so we're way ahead of

14 the program.

15          You're also welcome, if you want to, to put

16 them on the ELMO, put them on your computer, whatever

17 you want to do.

18          MS. ABBATE:  Thank you, Your Honor.

19          MS. SIDEBOTHAM:  And we will have a final copy

20 at that point, Your Honor?

21          THE COURT:  Oh, yes, and each of the jurors

22 will, too.

23          MS. SIDEBOTHAM:  Thank you.

24          THE COURT:  Because they're going to read

25 along with me, if they want to, or just listen, they'll

496

```
1   each have their own copy and they each get to take them
2   to the jury room because trying to deal with -- if
3   they've got an instructions question with one copy
4   doesn't work well.
5           MS. ABBATE:  Yeah.
6           MR. GOEMANN:  Your Honor?
7           THE COURT:  And then we let them take them
8   home as parting gifts for their service.
9           MR. GOEMANN:  A little souvenir.
10          MS. ABBATE:  Court swag.
11          MR. GOEMANN:  So we do have a few other
12  requests, Your Honor.
13          Number six, again, under the substantive true
14  threats and conventional events.
15          As written, the -- the instruction, we think,
16  overly guides the jury in saying that a warning that
17  violence may occur only if certain conditions are met
18  may be less likely to constitute a true threat than one
19  that is conditional.  We certainly agree that a warning
20  made only if certain conditions are met may constitute
21  a true threat but to tell the jury that one way is less
22  likely than another, we believe, infringes upon their
23  prerogative to decide whether a warning, a condition
24  that threat is made, so we would ask that a warning
25  that violence may occur.
```

```
1         And, again, it's may.  Only if certain
2  conditions are met may constitute a true threat so long
3  as the communication conveys a gravity of purpose and
4  likelihood of execution.  But to add the -- the
5  direction that it is -- that it will be less likely, we
6  believe, goes too far in terms of instructing the jury.
7         THE COURT:  I'm going to leave it the way it
8  is.  It's the same, saying maybe less likely it doesn't
9  mean it is less likely, it may be, and we go on to say
10 in the second sentence, I think we explain that the
11 warning may still be a true threat so I think this is
12 fine.  I'm going to overrule that objection.
13        MR. GOEMANN:  Similarly, in the next
14 instruction, the first paragraph, again, gives the
15 jury, we believe, direction where it should be left to
16 their judgment.
17        A true threat is more likely to exist where a
18 communication unequivocally and directly expresses the
19 sender's intent.
20        THE COURT:  And, by the way, I have modified
21 that already to say true threat may be --
22        MR. GOEMANN:  Oh, yes, may be.
23        THE COURT:  -- more likely to exist and,
24 again, that's even a stronger statement than the
25 Circuit says where it says a jury may be more likely to
```

1   find a threat, not that a threat is necessarily more

2   likely to exist.

3            MR. GOEMANN:  All right.  Your Honor, I'm

4   sorry, I had forgotten that the Court had made that.

5            THE COURT:  That's all right.

6            MR. GOEMANN:  And we'll withdraw.

7        The Court has taken 7A under advisement.

8            THE COURT:  We have modified 8.

9            MR. GOEMANN:  I think 9, the intent element to

10  explain?

11           THE COURT:  Mm-hmm.

12           MR. GOEMANN:  We would simply request that the

13  first paragraph be deleted.

14       The second element is already listed among the

15  elements and here we think that basically it risks --

16  by kind of restating the element, it risks confusing

17  them.

18           THE COURT:  Undue emphasis.

19           MR. GOEMANN:  Yeah, and since you don't list

20  any of the other re -- re-list the other elements, to

21  start with the second paragraph, intent is a state of

22  mind and then it tracks I think probably a very general

23  instruction on what intent means, which seem to be

24  sufficient --

25           MS. SIDEBOTHAM:  It --

499

1          MR. GOEMANN:  -- but to -- to -- a defendant

2    is liable under FACE only if she intentionally, all

3    that is covered in other instructions.

4          MS. SIDEBOTHAM:  And I would state, on the

5    other hand, there are several instructions that talk

6    about the perception of the recipient and explain in

7    great detail of all the different possible ways that

8    the recipient could perceive a threat and so I think

9    it's absolutely correct here to have a clear and full

10   statement of the intent required.

11          This is the key element in this case, is the

12   defendant's intent.

13          THE COURT:  Well, I like it the way we've

14   prepared it and, again, I think it leads in to why

15   we're defining intent here and so I am overruling that

16   objection.

17          MR. GOEMANN:  Your Honor, I think the only

18   other -- the verdict form --

19          MS. ABBATE:  Oh.

20          MR. GOEMANN:  There was one other.

21          MS. ABBATE:  Just the parallel, the --

22          MR. GOEMANN:  Well, there was the parallel but

23   there was another -- yes, to language.

24          THE COURT:  And my language contains "to

25   convey."

1        MR. GOEMANN:  And the other one is in Number 2

2   to, again, I think parallel language from earlier,

3   intentionally seek to intentionally attempt to

4   intimidate Dr. Means, and I think that directly

5   parallels the language that you have in the setting out

6   the elements.

7        MS. SIDEBOTHAM:  And we have a continuing

8   objection to "attempt" being in there at all since we

9   believe that's not permitted by this portion of the

10  statute.

11       MR. SHULTZ:  Yeah, and the problem, if I may,

12  I know you don't --

13       THE COURT:  I've got no problem with number

14  two the way we've written it here.  I think it's fine.

15       MR. SHULTZ:  Can I express a --

16       THE COURT:  Oh, sure, I was just going back to

17  Richard's --

18       MR. SHULTZ:  The concern that I would express

19  on behalf of the defendant is when we're talking about

20  intentionally attempting to intimidate, and

21  intimidate -- intimidate means, under the definition,

22  to place a person in reasonable apprehension of bodily

23  harm, I mean basically period.

24       It's -- but as I understand it, the intent

25  needs to be to actually somehow threaten some type of

501

1  force or bodily harm, not just to place a person in

2  bodily harm or in fear, so that's what makes me a

3  little nervous about that.

4         THE COURT:  I am very, very comfortable that

5  we've got the law set out accurately here because it

6  requires a certain state of mind that is created in the

7  recipient, it requires a certain state of mind in the

8  sender, and I think we've covered all of that here.

9         MR. GOEMANN:  Your Honor, then there is just

10 one last, we don't -- I don't have a draft because we

11 only thought of it this morning, it is probably

12 something Your Honor has on a word processer, and this

13 is a limiting instruction regarding the testimony

14 concerning Agent Fitzgerald's telephone call comments

15 to Mrs. Dillard and Mr. Dillard -- Dr. Dillard

16 regarding his -- his opinion about how DOJ should

17 pursue this and the fact that he did not believe that

18 there -- that these were threats and whatever, I'll let

19 the testimony speak for itself, but I think Your Honor

20 gets -- I think the Court overruled my objection saying

21 it was not coming in for the truth of the matter and we

22 would just ask the Court -- and I'll be happy to draft

23 something, but that the Court instruct them that

24 those -- that that testimony was not admitted for the

25 truth.

502

1          THE COURT:  You can draft something and

2  propose it to me and I'll take a look at it.

3          MR. GOEMANN:  Thank you, Your Honor.

4          MS. SIDEBOTHAM:  And to make a record on that,

5  Your Honor had ruled on that so we didn't say anything

6  but we would argue that's an admission by party

7  opponent.  It was the government agent instructed by

8  the DOJ to talk to our client.  He was absolutely

9  acting as the agent of the Government and, therefore,

10 that capacity of party opponent, so we would object to

11 the limiting instruction because we think it's

12 admissible for the truth of the matter.

13          THE COURT:  Well, as I say, I'll take a look

14 at it.

15          My understanding has been that while Special

16 Agent Fitzgerald may have believed that the Government

17 was wrong in pursuing a civil case and in expressing

18 that, he was not binding the government to that

19 position, nor was he making an admission of any kind.

20 In other words, I think what -- that essentially

21 exceeded what his responsibilities were, and he was

22 offering a personal opinion and that invades the

23 province of the jury so I'll take a look at what you

24 have and I'll make a decision on that.

25          And once you all see it, too, you can make any

503

1  further record you want to.

2           Okay.  Let's go through these now, rapidly,

3  because we're after 9 o'clock already and the jury is

4  sitting in there waiting for us.

5           Instruction Number 1 is the one that just

6  starts out, Members of the jury.  Any problem with

7  that?

8           MR. GOEMANN:  No, Your Honor.

9           THE COURT:  Instruction Number 2 is the

10  impartial deliberations.  And we're just starting with

11  page one and I'm putting numbers in as we go.  It's the

12  one that starts out, You must weigh and consider this

13  case without sympathy and without bias.

14           MR. GOEMANN:  No objection.

15           MR. SHULTZ:  That's fine.

16           THE COURT:  Instruction Number 3, You must

17  consider all the evidence but you need not accept all

18  the evidence.

19           MR. GOEMANN:  No objection.

20           MR. SHULTZ:  That's fine.

21           THE COURT:  Number 4, In weighing the evidence

22  and judging the credibility of witnesses, you may and

23  should take in to consideration.

24           MR. GOEMANN:  No objection.

25           MR. SHULTZ:  No objection.

504

```
 1              THE COURT:  Instruction Number 6 deals with
 2   direct and circumstantial evidence.
 3              MS. SIDEBOTHAM:  Was there a five?
 4              MR. SHULTZ:  No objection.
 5              MR. GOEMANN:  Actually, no, I -- I lost, five,
 6   too.
 7              Four was two pages.
 8              THE COURT:  I'm sorry, four was two pages.
 9              This should be number five.  Thank you very
10   much.
11              MR. GOEMANN:  No objection, Your Honor.
12              THE COURT:  Instruction Number 6 has to do
13   with what they may consider as evidence and that
14   they'll have exhibits in the jury room.
15              MR. GOEMANN:  No objection.
16              THE COURT:  It's a very short one.
17              MR. SHULTZ:  Yeah, no objection.
18              THE COURT:  Instruction Number 7 is about
19   drawing reasonable inferences.
20              MR. SHULTZ:  No objection.
21              MR. GOEMANN:  No objection.
22              THE COURT:  Number 8.  I always hated this one
23   when I was practicing.  I didn't really want the judge
24   telling the juror that my statements and arguments were
25   not evidence.
```

505

```
 1            MR. GOEMANN:  We thought about asking for an
 2   exemption.
 3            MR. SHULTZ:  We would just prefer that you say
 4   that their statements.
 5            THE COURT:  Is 8 okay?
 6            MR. GOEMANN:  No objection.
 7            MR. SHULTZ:  No objection.
 8            THE COURT:  Number 9 is the impeachment
 9   instruction.
10            MR. SHULTZ:  That's fine.
11            MR. GOEMANN:  No objection.
12            THE COURT:  Number 10 I have modified to take
13   out the second sentence of the first paragraph, so I've
14   deleted, This statute's designed to prevent certain
15   forms of obstruction or interference.
16            MR. GOEMANN:  Your Honor, we still would
17   object to the Court's description of our contention as
18   we explained it earlier.
19            THE COURT:  Right.
20            MR. SHULTZ:  And we have previously made our
21   objections.
22            THE COURT:  All right.  And they're both
23   overruled.  I'm going to give the instruction as I've
24   modified it.
25            Instruction Number 11 is the burden of proof
```

506

```
1  instruction.  Any objection?
2          MR. GOEMANN:  No objection.
3          MR. SHULTZ:  Well, we -- we, again, to
4  clarify, of course, we submitted a request for clear
5  and convincing and --
6          THE COURT:  And that preserves your record on
7  that point --
8          MR. SHULTZ:  Right.
9          THE COURT:  -- if you filed it, and I think
10 you did, with your proposed instructions.
11         MR. SHULTZ:  Yes, we filed it.
12         THE COURT:  Okay.  I am overruling that and
13 instructing preponderance here.
14         Instruction Number 12 is the elements of the
15 FACE violation.  I have modified the first element so
16 it says, Dr. Means to convey a true threat, as opposed
17 to include a true threat and apart from that, I plan to
18 give it as is.
19         MR. GOEMANN:  With that change, Your Honor, no
20 objection.
21         MS. SIDEBOTHAM:  And we preserve our objection
22 to the second element, you have true threat of force.
23         THE COURT:  Thank you.  And that's overruled.
24         Intimidation and reproductive health services
25 definitions are Instruction Number 13.
```

507

1          MR. GOEMANN:  No objection.

2          MS. ABBATE:  There was a -- no?

3          MR. GOEMANN:  There -- I don't know if it is

4   worth -- the statutory -- you grab a quote from the

5   statute here on the definition of reproductive health

6   services, the statute includes we -- restates the word

7   "health" between "reproductive and services" in that

8   first line.  In the interest of time, I didn't think it

9   was a substantive issue but if the Court wants the

10  quote to be -- it's just that -- whether or not it

11  changes anything but that is what the statute says.

12          I was going to bring it up if there was more

13  time.

14          THE COURT:  I think it's fine.

15          MR. GOEMANN:  Yes, sir.  No objection.

16          THE COURT:  Any objection?

17          MR. SHULTZ:  No.

18          THE COURT:  Instruction 14 I have modified and

19  the last sentence will read:  However, the First

20  Amendment does not protect actions or speech which

21  amount to intimidation by a true threat of violence.

22  Any objection?

23          MR. GOEMANN:  No objection.

24          MR. SHULTZ:  No objection.

25          THE COURT:  Instruction Number -- are we at 15

```
 1   now?
 2            Defines what true threats are.  Any objection?
 3            MR. SHULTZ:  No objection.
 4            MR. GOEMANN:  No objection.
 5            THE COURT:  Instruction Number 16 deals with
 6   future violence.
 7            MR. GOEMANN:  No objection.
 8            MR. SHULTZ:  No objection.
 9            THE COURT:  Number 17 there was an objection
10   to may be less likely.  I'm leaving the instruction the
11   way we have drafted it.
12            You've noted your objection --
13            MR. GOEMANN:  Yes, sir.
14            THE COURT:  -- to that and that's overruled.
15            Any objection from the defendant?
16            MR. SHULTZ:  No.
17            THE COURT:  Instruction Number 18 I have
18   modified to say, A true threat may be more likely to
19   exist as opposed to is, at the request of the
20   Government.
21            Any objection?
22            MR. GOEMANN:  With that change, no objection,
23   Your Honor.
24            THE COURT:  All right.
25            MR. SHULTZ:  I can't remember if we objected
```

509

```
 1  to it or not.  If we did, we certainly don't waive
 2  those objections.
 3          THE COURT:  Okay.
 4          MS. SIDEBOTHAM:  Let's preserve the objection
 5  to that, yeah.
 6          THE COURT:  Sure.  Okay.  And that's
 7  overruled.
 8          Instruction Number 19 is the one that says
 9  that a true threat may arise even if the recipient does
10  not feel personally threatened.  I'll just read this
11  the way I've now got it.
12          Finally, a true threat may arise even if the
13  actual recipient of the communication did not feel
14  personally threatened.  A true threat may exist if a
15  reasonable person in the position of the recipient
16  would conclude the communication was an actual threat.
17          Any objection from the Government?
18          MR. GOEMANN:  No, Your Honor.
19          THE COURT:  From the defendant?
20          MS. SIDEBOTHAM:  No, Your Honor.
21          MR. SHULTZ:  No.
22          THE COURT:  Then we explain intent in the next
23  instruction, which is Number 20.
24          And the Government, I think, has sought to
25  eliminate the first paragraph, I've overruled that
```

510

```
 1  objection.
 2          Anything other or else from the Government --
 3          MR. GOEMANN:  No, Your Honor.
 4          THE COURT:  -- apart from that objection?
 5          MR. GOEMANN:  That was it, Your Honor.
 6          THE COURT:  All right.
 7          MS. SIDEBOTHAM:  No, Your Honor.
 8          THE COURT:  So the defendant doesn't object?
 9          MS. SIDEBOTHAM:  Correct.
10          THE COURT:  21 starts out, it's the motive
11  element.
12          Any objection?
13          MR. GOEMANN:  No, Your Honor.
14          MS. SIDEBOTHAM:  No, Your Honor.
15          THE COURT:  Number 22 just says that I'm
16  authorized to determine an appropriate remedy if the
17  jury finds that Ms. Dillard violated the FACE act.  Any
18  objection?
19          MR. GOEMANN:  No, Your Honor.
20          MS. SIDEBOTHAM:  No Your Honor.
21          THE COURT:  Now, I modified what we may have
22  originally sent to you as the next instruction because
23  we had it couched in terms of damages and I modified it
24  to mirror the prior instruction to say, I have
25  mentioned in the prior instruction that I'm legally
```

511

1  authorized to determine the appropriate remedy if you

2  decide that defendant violated the FACE Act, but that

3  does not mean I believe the plaintiff should or should

4  not prevail in the case.

5         In other words, I want to let them know just

6  because I mentioned that previously, I'm not taking the

7  position on the issue.

8         Any problem with 23?

9         MS. SIDEBOTHAM:  No, Your Honor.

10        MR. GOEMANN:  No, Your Honor.

11        THE COURT:  And looks like on the next page,

12 the very bottom of Instruction 23 is "their" and we'll

13 of course separate that and make sure that everybody

14 knows it goes with the prior one.

15        So, Instruction 24 is the one that says, At

16 times during the trial I have ruled on the admission of

17 certain testimony and exhibits and those are not

18 anything for them to consider.

19        MR. GOEMANN:  We certainly urge that one, Your

20 Honor.

21        THE COURT:  Any objection to that?

22        MS. SIDEBOTHAM:  No, Your Honor.

23        THE COURT:  Okay.  Instruction Number 25 gives

24 them some directions on what to do without telling them

25 what their verdict should be.

```
 1          MR. GOEMANN:  No objection.

 2          THE COURT:  Okay.  And it's when they get to

 3   the jury room, it's the way they might want to proceed,

 4   and then there's the verdict form.

 5          I have changed Number 1 from contains to

 6   conveys.  The letter conveys a true threat of force.

 7          Any objection?  As modified?

 8          MS. SIDEBOTHAM:  And we preserve our objection

 9   that element two should contain intentionally makes a

10   true threat of force to intimidate.

11          THE COURT:  Right.

12          MR. GOEMANN:  And we had asked that "seek" be

13   changed to "attempt" to conform to the elements.

14          THE COURT:  And I'm overruling that.

15          MR. GOEMANN:  Right.

16          THE COURT:  The Government and the defense

17   objections?

18          MR. GOEMANN:  No other objections.

19          THE COURT:  Okay, folks.

20          MS. SIDEBOTHAM:  May I have about 40 seconds

21   to make a record?

22          THE COURT:  Sure.

23          MS. SIDEBOTHAM:  My colleague, Ms. Ross, in

24   Colorado has been an appellate aficionado let me know

25   that it's not clearly established in the Tenth Circuit
```

1  that Your Honor's ruling on the motion to dismiss

2  denying it will actually be appealable if I don't renew

3  it, so I would like to move for a judgment of law

4  incorporating the premises and the arguments of our

5  motion to dismiss to preserve that record for appeal.

6          THE COURT:  And I appreciate that.  I am

7  denying it, and I think you adequately preserved it

8  yesterday but just to be darn sure, the belt and

9  suspenders approach, I'll deny the motion again for

10 today.

11         MR. SHULTZ:  I thought we were going to have a

12 chance on that.

13         THE COURT:  Well --

14         MR. GOEMANN:  Your Honor, could I just ask in

15 terms of the limiting instruction draft?

16         THE COURT:  Sure.

17         MR. GOEMANN:  At what point during the morning

18 will you need that in order to be able to consider it?

19         THE COURT:  As soon as possible.

20         MR. GOEMANN:  As soon as possible.  Yes, sir.

21         THE COURT:  And you can just bring it up to

22 the bench --

23         MR. GOEMANN:  Yes, sir.

24         THE COURT:  -- and we'll take a look at it.

25         And we'll take a break, as you know, an hour

514

```
 1  and 45 minutes or so from now if we're not through with
 2  the evidence at that point.
 3          MR. GOEMANN:  Yes, sir.
 4          THE COURT:  So just bring it up to Brian and
 5  we'll take it from there.
 6          MR. GOEMANN:  All right.  Thank you, sir.
 7          THE COURT:  Thank you all so much.
 8          MS. ABBATE:  Thank you.
 9          MR. SHULTZ:  Your Honor, do we have limits on
10  closing?
11          THE COURT:  I'm not going to close, whatever
12  you all need and -- do you want to break yours up?
13          MS. ABBATE:  Well, we will reserve a little
14  bit of time for rebuttal but I don't anticipate it
15  would be much.
16          THE COURT:  Okay.  All right.  Do you want to
17  know how much time you have used at any point?
18          MR. SHULTZ:  Not if you don't care.
19          THE COURT:  I really don't.
20          MS. ABBATE:  There's no limit?
21          MR. SHULTZ:  I am inclined to think I'm going
22  to -- I'm going to do that in -- I'm inclined to think
23  that I will not be overly lengthy.
24          THE COURT:  Okay.  I just think you ought to
25  take whatever time you need, I mean this case is a long
```

```
 1  time getting here and --

 2          MS. ABBATE:  Isn't it, though?

 3          THE COURT:  -- it's covered a lot of miles in

 4  the meantime, so you ought to have the opportunity to

 5  say what's on your mind and not have to be looking at

 6  your watch every --

 7          MR. SHULTZ:  Wasn't it Kelly that said no

 8  souls saved after 20 minutes?

 9          THE COURT:  That was actually the Honorable

10  Wesley E. Brown --

11          MR. SHULTZ:  Oh, okay.

12          THE COURT:  -- who said no souls are saved

13  after 15 minutes.

14          So, well thank you all so much.

15          (Recess was taken and proceedings continue in

16          the courtroom.)

17          (The jury enters the courtroom.)

18          THE COURT:  Please, have a seat.

19          Members of the jury, welcome back.

20          Today is the eighth anniversary of Jana

21  joining our chambers and we actually were right in the

22  middle of a trial her first day of work, so she walked

23  in and set up her machine and it all had to do with the

24  quality of fruits and vegetables, which were a part of

25  a sales contract.  But the donuts that you may have
```

516

```
 1  enjoyed this morning were courtesy of Jana, celebrating
 2  her anniversary, so I hope that you all indulge
 3  yourself.  Some of us have indulged ourselves more than
 4  we should have, not only today, but over the years.
 5          So all right.  Well, Ms. Dillard, if you'll
 6  take the stand again.
 7          And, of course, the oath carries over.
 8          And, Ms. Abbate, you were in the middle of
 9  your cross when we broke yesterday.
10          MS. ABBATE:  Thank you, Your Honor.
11                      ANGEL DILLARD,
12  recalled as a witness to testify on her own behalf as
13  the Plaintiff in the case, having been first duly
14  sworn, testified further as follows:
15                CONTINUED CROSS EXAMINATION
16  BY MS. ABBATE:
17   Q.    Good morning, Mrs. Dillard.  Ladies and
18  gentlemen.
19          When we were last speaking, we were talking
20  about your ministry, your jail ministry, your prison
21  ministry and I just wanted to clarify, we've been
22  talking about the fact that you hadn't visited anyone
23  except for Scott Roeder during the year of 2009,
24  correct?
25   A.    Yes.
```

517

1    Q.    And, in fact, it was actually prior to April,

2    2010 that you had only counseled Scott Roeder, is that

3    more accurate?

4    A.    At the chaplain's request, yes.  I still worked

5    in the office there, though.

6    Q.    Okay, so after April 10th -- after April, 2010

7    you started to see other -- counsel other inmates?

8    A.    I worked in the office in 2009 and counseled

9    Scott and then 2010 I took on other -- I took on a full

10   caseload.

11   Q.    Starting April, 2010?

12   A.    I don't know when.

13   Q.    Would it -- do you remember giving a deposition

14   in this case, correct?

15   A.    Yes.

16   Q.    And we were talking about when your prison

17   ministry started?

18   A.    If you could put the deposition in front of me

19   and I could see it I can tell you if that is right or

20   not, I don't recall.

21   Q.    Fair enough.

22         MS. ABBATE:  If you could call up Page 178 of

23   Ms. Dillard's deposition, please.

24   BY MS. ABBATE:

25   Q.    And, Mrs. Dillard, let me just direct your

518

```
 1  attention Line Number 16.  Just take a moment.
 2           Do you see it?
 3  A.    Yes.
 4  Q.    And Line Number 16 starts out...
 5           Question:  Prior to April, 2010 -- 2010 you
 6  didn't counsel anyone at Sedgwick County, other than
 7  Scott Roeder?
 8           And the answer:  I believe that's right.
 9           Did I read that correctly?
10  A.    Yes, you did.
11  Q.    Then it goes on, on Line 19:
12           Question:  Prior to April, 2010, did you
13  minister to anyone at Sedgwick County other than
14  Scott Roeder?
15           And Line 20, Answer:  I don't believe so.
16           My question to you, did I read that correctly?
17  A.    Yes.  Before that I just worked in the office.
18  Q.    Thanks.  Turning now to -- you actually writing
19  the letter to Dr. Means, you've testified that God told
20  you to write that letter?
21  A.    Yes.
22  Q.    And -- and so you did?
23  A.    Yes.
24  Q.    And you sat down, typed it out?
25  A.    Eventually, yes.
```

519

```
 1   Q.    You have testified in your deposition that it
 2   took you about 20 minutes?
 3   A.    Something like that, yes.
 4   Q.    And -- and that you wrote it straight through?
 5   A.    Yes.
 6   Q.    You didn't go back and change anything?
 7   A.    I don't believe so.
 8   Q.    Didn't go back and correct anything?
 9   A.    I don't believe so.
10   Q.    Didn't go back and move anything around?
11   A.    Not that I know of, no.
12   Q.    And then you printed it out pretty much
13   immediately after you were finished?
14   A.    I don't know if I wrote it on my word processer
15   on a notebook, first, but I did type it out some way,
16   yes.
17   Q.    You -- when you sent the letter it was in a
18   typed written form, correct?
19   A.    Yes.
20   Q.    And that would have been on your word processer?
21   A.    Mm-hmm.
22   Q.    Is that a yes?
23   A.    Yes, that's yes.
24   Q.    After you printed it out you took it to your
25   husband?
```

520

```
1   A.     Yes, I did.

2   Q.     And you asked him to look it over?

3   A.     Yes, I did.

4   Q.     And you testified at your deposition that you

5   did that because you take everything and allow your

6   husband to look it over?

7   A.     Well, this was the first time I had ever written

8   anything to her so, yeah, I wanted him to look it over

9   and see if he thought it was okay.

10  Q.     And you testified also that you run everything

11  past your husband?

12  A.     Well, I run anything that is of consequence past

13  him, yes.

14  Q.     And you testified here that you knew that the

15  letter contained very strong language?

16  A.     Yes.

17  Q.     And it did contain strong language?

18  A.     Yes.

19  Q.     You told the FBI the same thing, that you knew

20  that your letter contained strong language?

21  A.     I -- I don't remember that but...

22  Q.     After you gave your letter to your husband, he

23  gave it right back to you and you didn't mail it right

24  away, right?

25  A.     I think I held on to it for awhile, yes.
```

521

```
 1   Q.    And you put the letter aside, correct?

 2   A.    Yes.

 3   Q.    And you testified that you had put it aside for

 4   about two weeks?

 5   A.    Perhaps, yes.

 6   Q.    Do you recall testifying that you put it aside

 7   for two weeks?

 8   A.    I probably said that, I don't know when exactly

 9   that was, it was one or two weeks.

10   Q.    You testified that it was a couple of weeks?

11   A.    Okay.

12         MS. ABBATE:  Tim, if I could ask you to pull

13   up the deposition on Page 61, please.

14   BY MS. ABBATE:

15   Q.    Mrs. Dillard, I want to make sure I'm not

16   testifying for you.  I don't want you just to agree

17   with me, I want to make sure I am saying it accurately

18   so if you wouldn't mind when we get it pulled up, Page

19   61.  We'll start at Line 11, eventually, when he gets

20   there.

21         MS. ABBATE:  Could you put that -- pull out

22   that for me?  Just --

23         (Sotto voce discussion.)

24   BY MS. ABBATE:

25   Q.    It is actually Page 62.  And once he pulls it it
```

1  up, I want to make sure -- it is actually Line 11, as

2  well.

3          It is.  Thanks.

4          If we could take a look at Page 62 starting at

5  Line 11, and it says, Question:  After your husband

6  read it and said it was okay, then what did you do with

7  the letter?

8          Answer:  I put the letter aside for a couple

9  weeks, I prayed about it and made sure it was the right

10 thing to do, and then I sent it off.

11         Have I read that correctly?

12 A.    Yes, you have.

13 Q.    And so when you sent it, you had peace about the

14 letter?

15 A.    Yes, I did.

16 Q.    No changes since you originally sat down to

17 write it?

18 A.    I don't believe so.

19 Q.    And then so you addressed the envelope?

20 A.    Yes.

21 Q.    And you got her address from who?

22 A.    I don't know, I think probably David Gittrich

23 from the Kansans for Life.  It would have been in the

24 phone book, though.

25 Q.    And then you mailed the letter from town?

1   A.      Probably, yes.

2   Q.      You -- you have to drive into town because you

3   don't have the little red flag on your mailbox?

4   A.      No, I would have driven in to Wichita, I assume.

5   Q.      Okay.  And you were inspired by God to send the

6   letter, as well?

7   A.      Yes, I was.

8   Q.      So turning to the actual content of the letter,

9   when you would talk about "we will not let this

10  abomination continue without doing everything we can to

11  stop it" you testified that the "we" you're talking

12  about there is anyone who is concerned about abortion

13  being in Wichita, correct?

14  A.      Yes.

15  Q.      And about what you could do concerning that

16  everything we could do to stop it, you've testified

17  that you could pray, correct?

18  A.      Yes.

19  Q.      And that you could work on legislation?

20  A.      Yes.

21  Q.      Protest?

22  A.      Yes.

23  Q.      Offer counseling services?

24  A.      Yes.

25  Q.      And you could offer alternatives to the women

524

```
 1  who are going in, right?
 2  A.     Yes.
 3  Q.     Did you ever pray at an organized rally with
 4  anyone about Dr. Means?
 5  A.     No.
 6  Q.     Did you ever do anything with legislation
 7  concerning Dr. Means providing abortions?
 8  A.     Dr. Means wasn't providing abortions, there was
 9  no legislation or anything to do on that.
10  Q.     Did you do anything with any legislation once
11  Dr. Means announced her intent to practice?
12  A.     No.
13  Q.     Did you ever counsel any women regarding
14  Dr. Means' intentions to provide abortions?
15  A.     I don't know why I would counsel someone on her
16  intentions but, no.
17  Q.     Did you ever protest --
18  A.     No.
19  Q.     -- Dr. Means' plans to provide abortions?
20  A.     No.
21  Q.     You didn't have any plans -- well, you didn't do
22  anything other than write this letter to stop Dr. Means
23  from performing abortions?
24  A.     I spent a lot of time in prayer.
25  Q.     So you -- so you prayed?
```

1  A.    Yes.

2  Q.    And then the only other thing you did was to

3  write this letter, correct?

4  A.    Yes.

5  Q.    You were referencing the three churches that are

6  within a block of Dr. Means' Harry Street location?

7  A.    Yes.

8  Q.    You didn't talk to any -- you didn't talk to

9  your church about Dr. Means' decision at the time?

10  A.    I didn't really talk to any church about

11  my -- or --

12  Q.    I'm sorry, you didn't talk to --

13  A.    -- about that.

14        Can you repeat that again, please?

15  Q.    Yeah.  You didn't talk to your church about

16  Dr. Means' decision to start providing abortions?

17  A.    I didn't talk to any church about it, no, there

18  was -- we had a meeting in our church where they gave

19  us some general information, but that was it.

20  Q.    So you had never talked to any other church,

21  either, about it?

22  A.    No, I have not talked to anybody about that.

23  Q.    So you didn't discuss any lobbying efforts?

24  A.    There weren't any lobbying efforts to be had.

25  Nothing was going on, no, I did not.

1  Q.    You didn't discuss any protest activity at the

2  churches?

3  A.    No, I didn't.

4  Q.    No demonstrations?

5  A.    No.

6  Q.    And, of course, you never did any of those

7  things about Dr. Means' decision?

8  A.    There was nothing to do at that point.

9  Q.    The churches that have been referenced have

10 included the Revelation Ministry Church?

11 A.    Yes, that church is there.

12 Q.    And you have testified before that you don't

13 even know anybody that goes to that church?

14 A.    I do not know anybody who goes to that church or

15 any of those other churches.

16 Q.    And you've never gone in to those churches'

17 buildings, those actual churches?

18 A.    No, I haven't.

19 Q.    As far as you know, you have never even spoken

20 to any of the congregants?

21 A.    No, I haven't.

22 Q.    In and since 2009 you haven't submitted any

23 writings to any newspapers about abortion?

24 A.    Not that I know of.

25 Q.    No letters to the editor?

527

```
1    A.    Not that I know of.

2    Q.    Any op ed pieces?

3    A.    Not that I know of.

4    Q.    And you don't use the internet?

5    A.    I don't use the internet.

6    Q.    At all?

7    A.    I have never been on the internet.

8    Q.    When you wrote your first letter to

9  Scott Roeder, that was within a couple days of his

10 arrest, correct?

11   A.    Sometime soon after, yes.

12         MS. SIDEBOTHAM:  Objection, this is beginning

13 to invade the pastoral ministerial privilege.

14         THE COURT:  I'm going to overrule that for the

15 moment but there's obviously a fairly delicate line

16 there, Ms. Abbate.  It's overruled.

17 BY MS. ABBATE:

18   Q.    And this letter was the first time you actually

19 wrote a letter to any inmate, correct?

20   A.    As far as I know, yes.

21   Q.    And you wrote to Scott Roeder because God told

22 you to?

23         MS. SIDEBOTHAM:  Objection, we're -- we're

24 into the pastoral/clergy privilege at this point.

25         THE COURT:  Well, I think we're close, I'm
```

1  going to overrule this but that's about as far as you

2  can go with this.

3          You can answer the question.

4  A.    Yes, I felt after praying about it that God

5  wanted me to contact him, yes.

6          MS. ABBATE:  Okay, Your Honor, at this point

7  may we approach briefly?

8          THE COURT:  Sure.

9          (Whereupon the following sidebar conference

10         was had outside the hearing of the jury:)

11         MS. ABBATE:  May I put this here?

12         THE COURT:  I'm sorry?

13         MS. ABBATE:  May I put these papers here?

14         THE COURT:  Oh, sure.

15         MS. ABBATE:  Your Honor, at this time I would

16 like to ask -- since I've established some facts

17 surrounding when the relationship started relative to

18 what you said during the in limine conference, I would

19 like to request that because she's established

20 yesterday that the first times that she actually went

21 into the jail she was not with the prison ministry, she

22 was not in the Christian Ministries for Offenders

23 program, and that she just went in without any

24 affiliation.

25         I would like to request not to get in to any

1  contents of their communications together after that
2  but to look at the contents of one of her letters that
3  she sent before that, before they had -- before she had
4  ever been established through the Christian Ministry
5  for Offenders.
6          MS. SIDEBOTHAM:  And, Your Honor, counsel
7  misunderstands the clergy privilege.  It doesn't
8  require formal association with any organization or
9  coordination ordination, she was doing ministry, she
10 was reaching out in a pastoral ministerial capacity,
11 she felt that God wanted her to reach out and we would
12 strongly assert that, you know, even mustard seed
13 ministries, but even without that, we would strongly
14 assert that the privilege has already attached.
15          MS. ABBATE:  And, Your Honor, your -- your
16 ruling on this issue in the in limine you said
17 that -- I'm sorry, it's a long time ago -- about the
18 privilege was that the uncontroverted facts establish
19 that she visited him as part of a prison ministry
20 program and she was -- she was not yet a part of that
21 program.
22          You noted that she was required to sign an
23 oath to uphold confidentiality and, eventually, she
24 certainly was.  Eventually she absolutely became part
25 of that ministry and I'm not going to go in to any of

530

```
 1  that, I'm not going to go in to anything about the
 2  penitent himself, but they have also admitted in their
 3  interrogatories that the first date that she went in
 4  there was July 7th of 2009, so I don't know when
 5  she -- when she became affiliated with the Christian
 6  ministry organization, but I think it's clear that if
 7  that's the first day she went, then she's admitted on
 8  the stand yesterday during cross that she was not a
 9  part of that ministry when she first went in and so she
10  had not signed the -- the oath, which she has talked
11  about in her affidavits.
12            I simply wanted to go in to one letter that
13  she wrote to Scott Roeder on --
14            THE COURT:  Where's the letter?
15            MS. ABBATE:  -- June 10th, 2009.
16            It's Exhibit 9 in the exhibit binder.
17            MS. SIDEBOTHAM:  And, Your Honor, it doesn't
18  require an oath to trigger a clergy privilege on the
19  First Amendment.  That's well established during the
20  course of our constitutional history.  She was reaching
21  out as a pastoral ministry endeavor in Wichita.
22            MR. SHULTZ:  If I may, Judge, too, since I did
23  the motion in limine, just also remind counsel that
24  your ruling said that this was frocked with real -- the
25  possibility of real mischief.
```

```
 1              MS. ABBATE:  That's why I'm up here.
 2              MR. SHULTZ:  You're way into that, and this
 3   just gets too far to that.
 4              THE COURT:  When did you claim that the
 5   ministry began in terms of her relationship with
 6   Mr. Roeder?
 7              MS. SIDEBOTHAM:  Your Honor, I would claim
 8   that it began from the moment she reached out because
 9   she felt God directed her to reach out because he was
10   alone, because he needed the comfort and consolation of
11   clergy, which is the whole point of the clergy
12   privilege:  For people who are in pain and in sin to be
13   able to have comfort and consolation.
14              THE COURT:  I'm going to let you ask her if
15   she wrote this letter, if she sent it to Mr. Roeder,
16   and what her purpose was in sending the letter to him.
17              And if she says that it was simply to provide
18   comfort or whatever, or to reach out to him, that's one
19   thing, but I think you can ask her if she meant what
20   she said in the letter, too, and if she said, yes, she
21   did.
22              MS. ABBATE:  Yes, she did.
23              THE COURT:  Yes.  She said -- because there
24   are some things in there that are obviously pretty
25   harsh and that cast her in a totally different light
```

1  from what she's portraying here on the witness stand.

2  And if she had that frame of mind at the time

3  she -- you know, I think it's relevant.

4        I -- there is certainly plenty in there about

5  God and her religious beliefs, but I'll let you go as

6  far as I have said with this and if you want to go any

7  further into the content of this letter with her, we're

8  going to have to talk about that.

9        MS. ABBATE:  So I just want to make absolutely

10  sure that I understand.  I don't want to step over any

11  lines here.

12        THE COURT:  No, you can ask her if she knows

13  what this letter is.

14        MS. ABBATE:  Okay.

15        THE COURT:  If she sent it --

16        MS. ABBATE:  Okay.

17        THE COURT:  -- to him, what her purpose was --

18        MS. ABBATE:  Okay.

19        THE COURT:  -- in sending the letter to him.

20  And you can ask her if the things that she said in the

21  letter were -- were true.

22        MS. ABBATE:  May I quote -- quote the --

23        THE COURT:  If she believed --

24        MS. ABBATE:  May I --

25        THE COURT:  Not yet.

```
1              MS. ABBATE:  Okay, all right.  All right.  Oh,
2   I understand.
3              THE COURT:  Before we get into the content.
4              MS. ABBATE:  I understand, I understand.
5              THE COURT:  But if she says, yes, you know, I
6   do and I was speaking the truth, that's one thing.
7              If she says, I did it just to try and reach
8   out and comfort somebody, that's something else
9   entirely.
10             I am trying to walk a fine line here.
11             MS. ABBATE:  Yes, sir.
12             THE COURT:  And I know you are --
13             MS. ABBATE:  I appreciate that.
14             THE COURT:  And I know you are, too, and,
15  frankly, if -- I'd just as soon that the jury gets to
16  see everything, gets to see everything about every
17  person and gets to decide based on that but everybody
18  wants to keep some things out.  I think I could make a
19  great argument with the fact that this is relevant to
20  her state of mind and it was over a long period of
21  time.
22             You know, on the other hand, I am very mindful
23  of the privilege.  So without getting into the content
24  specifically, unless she opens herself up for it, I am
25  not going to let the content come in right now.
```

534

```
1           MR. SHULTZ:  If I may, and I'm going to sound
2    argumentative when I say this, but one of the concerns
3    that I would have certainly is that the ruling on the
4    motion in limine was what it was -- that this was not
5    going to be usable because they specifically wrote and
6    brought these letters up.
7           THE COURT:  And before you go any further,
8    every in limine ruling is provisional.
9           MR. SHULTZ:  Well, no, I understand but,
10   typically, something has to change and we certainly did
11   not open any doors and what -- what she's now trying to
12   do is kick the door open so that then she can run
13   through it and, to me, it just -- it's --
14          THE COURT:  Well, to the contrary, you did,
15   though, in the direct.
16          No, I would never do anything violent.  No, I
17   don't have violent thoughts.  No, I'm a peaceful
18   person.
19          And to the extent that you attempt to portray
20   her, you did, in fact, to some extent, you know, open
21   things up.  But I'm going to let her go this far and no
22   further.
23          We're not going to get into the content of the
24   letter right now.
25          So --
```

```
 1              MS. ABBATE:  Unless she believes what she
 2   wrote.
 3              THE COURT:  If she believes what she wrote,
 4   ask to come up here and then we'll take a look at it
 5   again.
 6              But I think you can go as far as I've told you
 7   you can.
 8              (Sidebar concludes and the following
 9              proceedings continue in open court:)
10              THE COURT:  Excuse me, counsel, could I see
11   you back up here again?
12              (The following sidebar conference was had
13              outside the hearing of the jury:)
14              THE COURT:  Brian just pulled up for me -- and
15   I make so many rulings in these things that they
16   sometimes get lost, but I very clearly ruled in the in
17   limine motion that the letters were issued in
18   conjunction with and as a preface to the prison
19   ministry, so I am backing away from what I told you
20   before and the letter's not to be used.
21              MS. ABBATE:  And just in response, I raised
22   the issue in the actual in limine conference and that's
23   when it -- specifically regarding this point, and
24   that's because I pointed out that I thought the dates
25   were at issue.  I'm not going into the context of the
```

536

1  ministerial privilege, simply trying to explore when

2  that privilege attached.

3          And, Your Honor, at that conference you

4  clearly said that it would be appropriate that if I

5  could give you facts about when the privilege had not

6  been in effect, then that would be an appropriate area

7  of inquiry.  And I believe I have done what have you

8  requested in showing that.

9          THE COURT:  Well, the fact of the matter is I

10 didn't say that I would admit the letters or the

11 contents of them at that time.

12         MS. ABBATE:  No.

13         THE COURT:  And they are germane to the prison

14 ministry, even though they predate the signing of the

15 oath, so going back and, again, taking a closer look at

16 my ruling here, I think you've already crossed the line

17 by bringing this up, so let's just stay clear away from

18 it and move on.

19         That's it.  Thank you.

20         MS. ABBATE:  Thanks, Your Honor.

21         (Sidebar concludes and the following

22         proceedings continue in open court:)

23         THE COURT:  Members of the jury, there are

24 some very fine legal points that we are dealing with in

25 this case, believe it or not.  It seems pretty simple,

537

1  you know, from all appearances, but the law is very,

2  very complex in this area, so our apologies for the

3  break that we took here.

4           And, Ms. Abbate, whenever you are ready, you

5  can proceed.

6           MS. ABBATE:   Thank you, Your Honor.

7  BY MS. ABBATE:

8  Q.    Ms. Dillard, have you made public statements

9  about how you feel about Scott Roeder?

10  A.    Uh, yes.

11  Q.    And you have made those statements to members of

12  the press?

13  A.    Yes.

14  Q.    And you were quoted, and we've talked about this

15  during the course of this trial already that, Quite

16  honestly, as soon as I heard about it I realized that

17  he was able to accomplish what those of us in the

18  pro-life movement had not been able to accomplish.  We

19  put millions of man hours in, protested, millions of

20  dollars, attempts at legislation, and we were butting

21  our heads up against the wall.  We were not getting

22  anywhere.

23           And that's you -- we have been talking about

24  that quote here, correct?

25  A.    The misquote, yes.

1  Q.    When you were -- gave your deposition in this

2  case, in discussing this quote, you -- do you

3  remember -- do you recall what we talked about at that

4  time?

5  A.    I guess, I -- I don't recall exactly the

6  conversation, no.

7  Q.    I don't want you to guess.

8        MS. ABBATE:  Tim, if you could pull up Page

9  313, please.

10 BY MS. ABBATE:

11 Q.    Direct your attention to Line 14, which is where

12 that quote begins, I'm not going to read it again but

13 that's the quote I just read, correct?

14 A.    Yes.

15 Q.    And then at 19, Question:  Did you say this?

16       And the Answer:  As far as I know I did, I

17 never got a transcript so I don't know whether exactly

18 what she wrote is accurate or not.

19       Is that what you testified to?

20 A.    She misquoted some of that, so I know I said

21 some of those things but not in the right context.

22       MS. ABBATE:  And, Tim, if I could ask you to

23 just go back one page to Page 312.

24       Give me one second, just my pages here.

25       Sorry.  Thanks for your patience.  I am

1  thinking that the low effect method may, in fact, be

2  the best way after all.

3         And, of course, Tim, there is a page in the

4  preceding -- it is Page 314.

5  BY MS. ABBATE:

6  Q.    And right there, the first line, question

7  is -- do you see where --

8  A.    Yes.

9  Q.    Question:  Do you have any reason to believe

10  that this is not accurate?

11         Then the answer:  No.

12         Did I read that correctly?

13  A.    Yes.

14  Q.    We've also been discussing another quote from

15  that same interview from July 2009 and that quote is

16  that, With one move Roeder was able to accomplish what

17  we had not been able to do, so he followed his

18  convictions and I admire that.

19         Do you recall us talking about that quote here

20  today?

21  A.    Yes, I do.

22  Q.    And when you referenced that one move, that one

23  move was killing Dr. Tiller, correct?

24  A.    I believe so, yes.

25  Q.    So you -- so you've made statements about Scott

540

```
1   Roeder in the press after Dr. Tiller's murder about how
2   you felt about him, correct?
3   A.    I believe so, yes.
4   Q.    Okay.  You are aware of other statements that
5   have been issued after the death of Dr. Tiller?
6   A.    Other statements?
7   Q.    Well, you are a member of Kansans for Life,
8   correct?
9   A.    Uh, uh, yeah.
10  Q.    Were you aware that Kansans for Life Director
11  Mary Kay Culp issued a statement on May 31st, 2009
12  saying that the organization deplores the murder of
13  George Tiller, Dr. George Tiller, and we wish to
14  express our deep and sincere sympathy to his family and
15  friends.  We value life, completely deplore violence
16  and are shocked and very upset by what happened in
17  Wichita today.
18        Were you aware that Kansans for Life issued
19  that quote the day he was murdered?
20  A.    I believe so, yes.
21  Q.    Were you aware that Operation Rescue released a
22  similar statement on May 31st of 2009?
23  A.    I don't recall exactly, no.
24  Q.    Do you recall that they stated a statement that,
25  We are shocked at this morning's disturbing news that
```

541

1    Mr. Tiller was gunned down.  Operation Rescue has

2    worked through years through peaceful, legal means and

3    through the proper channels to see him brought to

4    justice.  We denounce vigilantism and the cowardly act

5    that took place this morning.  We pray for Mr. Tiller's

6    family, that they will find comfort and healing that

7    can only be found in Jesus Christ.

8            Were you aware that Operation Rescue issued

9    that statement after Dr. Tiller was murdered?

10   A.    No.

11   Q.    One final statement from the National Right to

12   Life Committee, again, on May 31st, the day of

13   Dr. Tiller's murder.

14           Were you aware that they issued a statement

15   stating:  National Right to Life extends its sympathies

16   to Dr. Tiller's family over this loss of life.

17   Further, the National Right to Life Committee

18   unequivocally condemns any such acts of violence

19   regardless of motivation.  The pro-life movement works

20   to protect the right to life and increase respect for

21   human life.  The unlawful use of violence is directly

22   contrary to that goal.

23           Had you been aware that the National Right to

24   Life Committee had released that statement on May 31st,

25   2009?

542

```
 1   A.     No.
 2   Q.     You have testified in your deposition that, in
 3   fact, you thought that the murder of Dr. Tiller was
 4   God's action?
 5   A.     I don't know that I said that, no.
 6          MS. ABBATE:  Tim, if I could ask you to pull
 7   up Page 291 at the very bottom.
 8          That's actually the wrong page.
 9          Can you just pull that down for a second?
10          It's Page 293, Tim.
11  BY MS. ABBATE:
12  Q.     And I would like to have you look at a hard copy
13  before I ask you to put that up again.  Sorry about
14  that.
15          Direct your attention, Mrs. Dillard, please,
16  to Line 3, that place, and it says, Question:  Do you
17  think the murder of Dr. Tiller was justified.
18          Answer:  I think in God's eyes after what he
19  had done, I think God had had enough and it was
20  probably God's revenge, not revenge but God's action.
21          Have I read that correctly?
22  A.     Yes.
23  Q.     And, in fact, you believe that God acted through
24  Scott Roeder?
25  A.     Actually, what I said all along was I don't
```

1  agree with violence but I can understand that there's a

2  possibility that maybe God, uh, carried out some

3  judgment through him, I don't know, so I'm not going to

4  make any kind of judgment call on that.

5  Q.    You -- you thought, though, that God had acted

6  through Scott Roeder, correct?

7  A.    I said it's possible.

8  Q.    That's what you testified?

9  A.    I think it's possible.  But I don't know for

10  sure, I'm not God.

11  Q.    You had told the FBI that Scott Roeder followed

12  his conscience?

13  A.    I don't know that I told them that, no.

14  Q.    Do you think Scott Roeder folded his conscience?

15  A.    I think he probably did, yes.

16  Q.    And -- and you testified that you think that

17  what Scott Roeder did, that Scott Roeder did what he

18  felt was right?

19  A.    Scott and I never talked about any of this so I

20  said I thought he perhaps did, yes.

21  Q.    Yeah, I'm not -- I'm not asking you about any

22  conversations you may have had with Mr. Roeder, I'm not

23  doing that.

24         Just at the time when you -- you gave your

25  deposition, you did say that you think he did -- you

544

```
 1  think that he did what he felt was right.
 2   A.    If that's what it says in the deposition, yes.
 3  I don't have the deposition in front of me so I don't
 4  know.
 5   Q.    Well, let me get it in front of you.
 6  It's -- it's Page 293.
 7           And by 293, I mean 294.
 8           It seems like I'm always a page behind in
 9  life.
10           Let me direct your attention to Page 294, Line
11  2.
12           Question:  Do you think that Scott Roeder did
13  what he felt was right?
14           Answer:  I think he did.  He did what he felt
15  was right, yes.
16           Have I read that correctly?
17   A.    Yes.
18   Q.    So turning to people who you know, who you
19  associate with, who you are involved in -- in religious
20  and political activities, you had mentioned that your
21  main thing was the Kansans for Life, correct?
22   A.    Could you repeat that?
23   Q.    Your -- you have been involved with the Kansans
24  for Life, correct?
25   A.    I have volunteered in their office, yes.
```

1   Q.    And with no other organizations?

2   A.    Not that I can think of, no.

3   Q.    When you were working or volunteering with

4   Kansans for Life, you knew Mr. David Gittrich?

5   A.    Yes.

6   Q.    But you didn't know anybody else in Kansans for

7   Life?

8   A.    No, like I keep saying, I would go into the

9   office and I would get my work done and I would leave.

10  I was in other ministries, I was very busy, I didn't

11  have a whole lot of volunteer time, so I went in, got

12  my stuff done and got out.

13  Q.    And, in fact, other than David Gittrich, you

14  can't name anybody else who was involved in Kansans for

15  Life?

16  A.    No.

17  Q.    You do know Reverend Don Spitz?

18  A.    No, I don't.

19  Q.    He sent you a card, right?

20  A.    I think he probably sent me several cards, yes.

21  Q.    Sent you a couple of newspaper articles, too?

22  A.    Perhaps.

23  Q.    Perhaps?

24  A.    People sent me newspaper clippings and cards and

25  things from all over the country.  I -- I don't

546

```
 1  remember exactly what he sent.
 2  Q.    He sent you some things?
 3  A.    I'm sorry?
 4  Q.    He has sent you some?
 5  A.    I believe he did, yes.
 6  Q.    You're -- you're familiar with the name of
 7  Reverend Don Spitz?
 8  A.    I believe it was Pro-Life Virginia, Reverend Don
 9  Spitz that was on the envelope, yes.
10  Q.    And you know that he runs the Army of God -- God
11  website?
12  A.    I didn't at the time, no.  His envelope was from
13  Pro-Life Virginia Ministries.
14  Q.    He does run the Army of God website, correct?
15  A.    I'm sorry?
16  Q.    He does run the Army of God website, correct?
17  A.    How would I know?  I've never seen that.
18  Q.    You know that the Army of God celebrates
19  Paul Hill?
20  A.    No, I did not.
21  Q.    Paul Hill is the one who murdered Dr. Britton?
22  A.    I guess, I don't know, I -- I wasn't there.
23  Q.    You aware that Reverend Spitz supports
24  justifiable homicide?
25  A.    I don't know that he does or not.  I'm not sure
```

1  what that has to do with me.

2  Q.    You know that he basically advocates murdering

3  doctors who provide abortions?

4  A.    I had never heard of him until he sent me a card

5  saying, I'm praying for you, so, no, I don't know.

6  Q.    You are familiar and have met Michael Bray,

7  correct?

8  A.    I'm familiar with him.  Uh, I'm not sure I would

9  say familiar with him, I've -- I believe I've seen him

10 on one occasion and he's told me he was praying for me.

11 Q.    And he's a reverend?

12 A.    I don't know, I -- I think he is, I don't know

13 for sure.

14 Q.    He's a friend of Scott Roeder's, as well?

15 A.    I assume so.

16 Q.    Why do you assume so?

17 A.    Well, he went to visit him.

18 Q.    Michael Bray wrote a book A Time to Kill?

19 A.    Okay.

20 Q.    You aware of that?

21 A.    No.

22        MS. ABBATE:  Tim, if I could have you pull up

23 Page 165, please.

24 BY MS. ABBATE:

25 Q.    And, Mrs. Dillard, just have you look at that

548

```
 1  page.  Where it is a discussion about Michael Bray and

 2  then at Line 11, it starts.

 3          Question:  What else do you know about Michael

 4  Bray?

 5          Answer:  He had written a book and I think he

 6  said he had done some TV interviews or something.

 7          Question:  What book has he written?

 8          Answer:  "A Time to Kill."

 9          Did I read that correctly?

10  A.    Yes.

11  Q.    In that book, "A Time to Kill" discusses Bray's

12  belief in God-given right to kill doctors and nurses

13  who provide abortions?

14  A.    I don't know, I've never seen the book.  I've

15  never been offered the book.  I've never asked for the

16  book, so I don't know, I've never opened it.

17  Q.    Curious about it?

18  A.    No, not really.

19  Q.    You like Michael Bray, right?

20  A.    He seems like a nice man.

21  Q.    And you've called him on the phone?

22  A.    I believe he called when and said he was praying

23  for me.

24  Q.    But you called him as well, didn't you?

25  A.    I don't know, I don't remember who called who.
```

1  Q.    Could it have been both?  You called him and he

2  called you?

3  A.    Well, it was probably one or the other.

4        MS. ABBATE:  If I could ask for Page 167,

5  please.

6  BY MS. ABBATE:

7  Q.    Mrs. Dillard, directing your attention to Line

8  Number 11, it says:

9        Question:  Have you had any contact with

10 Michael Bray other than meeting him in the facility in

11 Lansing?

12       Line 14 says, Answer:  I think I -- I think I

13 called him to ask him for prayer when this whole thing

14 first started, for him to be praying and his family to

15 be praying for this.

16       Did I read that accurately?

17 A.    Yes.

18 Q.    And this whole thing being started, that's the

19 process of this Department of Justice lawsuit?

20 A.    The Department of Justice lawsuit, yes.

21 Q.    When you called him to tell him about the

22 Department of Justice lawsuit, he actually already knew

23 about it, right?

24 A.    I'm sure he did.

25 Q.    Do you know he did?  Do you remember testifying

550

```
 1  that he knew about it?
 2   A.    I don't remember that, no.
 3         MS. ABBATE:  Tim, would you pull up Page 168,
 4  please.
 5  BY MS. ABBATE:
 6   Q.    And, Mrs. Dillard, directing your attention to
 7  Line 8, Question:   What did you tell Michael Bray
 8  about this lawsuit?
 9         Answer:  Well, he already knew.  I assumed
10  he's better connected than I am.
11         Have I read that part accurately?
12   A.    Yes.
13   Q.    How did you get Michael Bray's phone number?
14   A.    I don't know, Scott Roeder might have given it
15  to me.  People came out of the wood work to support me
16  when this whole thing started and I had lots and lots
17  of people contacting me to offer their prayers and
18  support.
19   Q.    Are you aware that Michael Bray was
20  convicted -- had a previous conviction?
21   A.    Uh, I heard some -- I don't know, I've heard
22  some information about that.
23   Q.    Were you aware that he was convicted in 1985 of
24  two counts of conspiracy and one count of possessing
25  unregistered explosives?
```

1    A.    I don't have any knowledge of that, no.

2    Q.    And in speaking of explosives convictions, are

3    you aware that Scott Roeder had a previous conviction

4    prior to his current conviction?

5    A.    No, I'm not sure why that would concern me, I

6    was there for a ministry visit each time I saw him,

7    so...

8          I didn't need to know any of the information,

9    any of the inmates had.  I didn't ask any of them about

10   what they were in there for.  My only concern was their

11   spiritual and emotional needs and I really didn't care

12   what they were in there for.

13   Q.    Are you aware that in 1996 Scott Roeder was

14   arrested in Topeka and officers found explosive

15   charges, fuse cord, gun powder in his trunk, and that

16   he was convicted and sentenced on that charge?

17         MS. SIDEBOTHAM:  Objection, asked and

18   answered.

19         THE WITNESS:  I have no knowledge of that, no.

20         MS. ABBATE:  I'm sorry?

21         THE COURT:  Excuse me.

22         THE WITNESS:  I don't know.

23         THE COURT:  Ms. Dillard, when there is an

24   objection made, you stop talking --

25         THE WITNESS:  Oh.

1            THE COURT:  -- until I have an opportunity to

2  rule.

3            THE WITNESS:  I'm sorry.

4            THE COURT:  I'm overruling the objection.  I

5  think we're getting a fuller answer here.

6            You can now continue.  Thank you.

7  BY MS. ABBATE:

8  Q.    Had you answered the question?  I didn't mean to

9  cut you off.

10  A.    Could you repeat that?

11  Q.    Were you aware of Scott Roeder's previous

12  conviction for explosives?

13  A.    No.

14  Q.    You have actually received what you perceived

15  as -- as a threat before that prompted you to seek a

16  protective order, correct?

17            And before you answer, outside -- counsel, I'm

18  not asking about the contents of any letters.  And,

19  Mrs. Dillard, I'm not asking about the contents of any

20  letters but, merely, you had received a letter you

21  considered a threat such that you went to court to seek

22  a protective order, correct?

23  A.    Yes.

24  Q.    And you did that because you thought that the

25  writer would perhaps harm you?

553

1   A.     Uh, perhaps, yes.

2   Q.     Or perhaps harm your -- your girls, primarily?

3   A.     Yes.

4   Q.     The -- the letter didn't directly say, I will

5   harm you or your family, correct?

6   A.     I don't remember exactly what it said, no.

7   Q.     Didn't directly say, I will hurt you, though,

8   did it?

9   A.     I -- I don't remember at this point, that was

10  quite a few years ago.  If you could show me the

11  deposition...

12          MS. ABBATE:  Tim, if I could have you pull up

13  Page 28 -- 287.

14          Is it possible just to put it on the witness's

15  screen?

16          No?  Okay.

17  BY MS. ABBATE:

18  Q.    I don't want to get into any of the contents of

19  the letter, and I'm not sure how that would be, so if I

20  could approach you.

21          Mrs. Dillard, I'm showing you what -- showing

22  you Page 287 from your deposition, directing your

23  attention to Line 20, which is right here.

24  A.     Okay.

25  Q.     And it says at Line 20, Question:   Did he say

554

1   he was going to hurt you?

2            And the answer starts with, No.

3   A.    Okay.

4   Q.    Would you like to read the rest of that answer?

5   It's up to you.

6   A.    It doesn't matter to me, whatever you want.

7   Q.    And despite the fact that you said no, you

8   didn't think he was going to harm you, you -- you were

9   afraid that he was going to hurt you?

10           Was your fear, right?

11  A.    What?  I'm not even sure what you're talking

12  about.  Say that again.

13  Q.    Let me make it a little bit more clear.  Again

14  I'll give you Page 287 of your deposition, at page

15  (sic) 6.

16           And the --

17  A.    Go ahead.

18  Q.    The question says:  Were you afraid he was going

19  to hurt you?

20           Answer:  I thought he was certainly capable of

21  it.

22           Is that accurate?

23  A.    Yes.

24  Q.    And one thing that made this kind of scary was

25  that you didn't know what this guy looked like?

1  A.    That wasn't the most scary thing to me, no.

2  Q.    Well, it was scary, though, wasn't it?

3  A.    Uh, I'm not sure that that -- that it was, but I

4  didn't know what he looked like.

5  Q.    Well, when you went to the court to fill out

6  your protective order there was a space for you to

7  write down your reasons for wanting a protective order,

8  correct?

9  A.    I assume so.

10        MS. ABBATE:  Counsel, I've got an Exhibit 22

11  from Mrs. Dillard's deposition which is the Motion For

12  Protective Order.

13        I would like to take up there.

14        MS. SIDEBOTHAM:  And I don't think I have

15  that.  Thank you.

16        (Sotto voce discussion had.)

17        MS. ABBATE:  And, for the record, counsel, the

18  deposition that discusses this issue starts on Page 278

19  and continues through Page 289.

20        Again, give or take a couple of pages from my

21  deficiencies.

22  BY MS. ABBATE:

23  Q.    Mrs. Dillard, you did have to fill out a reason

24  for requesting this court to issue a protective order

25  to keep this person away from you, right?

```
 1   A.     Yes.
 2   Q.     And you wrote a little bit of -- of space to
 3   write, your reasons.
 4          And these are numbered paragraphs that go from
 5   4 through 8, and at Number 5 states --
 6          THE COURT:  Ms. Abbate, would you mind
 7   swinging one of those microphones around?  I am having
 8   trouble hearing you up there.
 9          Thank you very much.
10          MS. ABBATE:  Sure.
11   BY MS. ABBATE:
12   Q.     Paragraph 5 states, Plaintiff needs a
13   protective -- protection from stalking order
14   because -- and then there are three lines in which you
15   can hand write your reasons, correct?
16   A.     Yes.
17   Q.     And the last sentence you wrote, will start
18   here, turn it around for you, We don't know what he
19   looks like and are afraid for ourselves.
20          Is that -- have I read that accurately?
21   A.     Yes.
22   Q.     And you were afraid because he knew where you
23   lived because he sent you that letter, correct?
24   A.     Well, we were afraid for a lot of reasons.  He
25   had been contacting us by mail, he had been leaving us
```

557

1  phone calls in which he said the DOJ was putting him up

2  to this and, yeah, we were a little worried.  He

3  mentioned my sister's house, he mentioned my children,

4  yeah.

5  Q.    So he mentioned personal knowledge of your

6  family?

7  A.    Yes.

8  Q.    And you had not told him that?

9  A.    I had given him some but not what he had.

10  Q.    And, so then if he were to show up at your

11  house, you wouldn't know it?

12  A.    No.

13  Q.    The person who sent this letter to you signed

14  his name, didn't he?

15  A.    Yes, same man that has 28 convictions and 128

16  charges and while he was in prison, assaults on police

17  officers, yeah.

18  Q.    Signed his name?

19  A.    Yeah.

20        MS. ABBATE:  Your Honor, may we approach

21  briefly?

22        THE COURT:  Sure.

23        (The following sidebar conference was had

24        outside the hearing of the jury:)

25        MS. ABBATE:  I'm going to ask some questions

1  again about Mr. Roeder and I just want to make sure,

2  she testified in her deposition that she had taken the

3  letter from him to deliver it to some strangers in the

4  Wichita State University area and I just wanted to

5  clarify that she did a favor for him not knowing what

6  was contained in the letter and that she had not done

7  so for other prisoners.

8          THE COURT:  Any of this stuff that Dr. Means

9  knew?

10          MS. ABBATE:  It was not about the context in

11  which Dr. Means perceived it but this is about the

12  second aspect of the intent that you --

13          THE COURT:  Her own intention?

14          MS. ABBATE:  Exactly, her intention and where

15  she is coming from, and who she is.

16          MS. SIDEBOTHAM:  Your Honor, I think -- I

17  think this is going beyond what is relevant and I think

18  that what she has been working on is marginally

19  relevant, which is why I haven't objected but some

20  letter that she actually never even delivered that she

21  was going to drop off somewhere?

22          MS. ABBATE:  Well, what it was is that

23  Scott Roeder -- she testified that Scott gave her a

24  letter from a different inmate and he said, Take this

25  letter and please deliver it to this address.  She

559

1  didn't know who the letter was from, and she didn't

2  know who the letter was for.  He just asked her to

3  drive to the Wichita State University area and see if

4  this was a right address and deliver the letter.  And

5  she did so not knowing what was in it, who it was for,

6  who it was from, and she took that step to drive 20

7  minutes down to the Wichita State University area to

8  see if these people lived there.

9          She found out that they didn't, and so she

10 didn't drop anything off, and then she testified that

11 she just simply threw the letter away without knowing

12 what was in it so, to me, it seems like a significant

13 step in taking a step in aiding something that

14 Mr. Roeder was doing, or certainly establishing that he

15 did hold a special place above and beyond the offenders

16 that she had ministered to.

17          MS. SIDEBOTHAM:  And I think the friendship is

18 uncontested and she has done a lot of nice things for

19 people through the years.  She obviously didn't think

20 the letter was important.  She tried to deliver it and

21 then tossed it.  Maybe that was naive but it's never

22 been indicated that there was anything improper or

23 extraordinary or anything else.

24          THE COURT:  What other things are you wanting

25 to get into with her before you wrap up?

560

```
1          MS. ABBATE:  Yes, I -- good question.
2          She had written a song for Scott Roeder on
3  June 1st, the day after Dr. Tiller's murder and I just
4  wanted to establish that fact.
5          Full disclosure that the only reason we know
6  about this is through the letters that she had written
7  to Scott but what was contained in the letters was
8  actually a copyrighted song, she put a copyright on it,
9  so just the mere fact that not what she did with the
10 song or who she sent it to but simply the fact she
11 wrote this song.
12         And also in light of the direct deposition or
13 the direct testimony, I don't even care about the
14 lyrics, just the fact that she wrote it, where she had
15 written that song for the women that was so -- so
16 touching for them, so I want to give this as an
17 additional context of songs she writes and why she
18 might write them.
19         MS. SIDEBOTHAM:  And to distinguish, the song
20 we discussed and the song that she wrote that she
21 performed in open service was -- that's not privilege,
22 because that's in an open service, you know.
23         MS. ABBATE:  This is a copyrighted song.
24         MS. SIDEBOTHAM:  Well, all songs are
25 copyrighted as soon as you write it.  It doesn't mean
```

561

1  she filed a copyright, she just put a copyright on it,

2  unless you have evidence that she --

3          MS. ABBATE:  No.

4          MS. SIDEBOTHAM:  Most people when they write,

5  and especially if they don't know that they need one,

6  they just throw it on.  I think that's still part of

7  the privilege communication, that's how you got it.

8          MS. ABBATE:  So I am thinking just to

9  establish that she wrote it, the title, and simply the

10  dedication, and the dates, and that's it.

11          And I don't know about the words, if they have

12  any meaning, but if you wanted to introduce the words,

13  you know, I certainly have no objection to that.  I

14  don't really care about the words, just simply the fact

15  it was written, you know, the day after.

16          THE COURT:  After a fellow believer courageous

17  act of putting his faith in to practice despite the

18  consequences, which is -- I assume she wrote that.

19          You know, I think we're just getting far

20  afield here and so I'm not going to let you get into

21  the delivering of the letter or taking it out to

22  deliver, or the song that she wrote.

23          I think you've established abundantly that she

24  had a relationship of, you know, whether it's a

25  friendship or whether it's a pastoral or a combination,

```
 1  I think that is beyond dispute.
 2          MS. ABBATE:  Right.  And just because I'm a
 3  lawyer, one final question --
 4          THE COURT:  Sure.
 5          MS. ABBATE:  -- leading to the -- right, I
 6  don't want to let you down.
 7          THE COURT:  Just one more question.
 8          MS. ABBATE:  Well, that might not be true but
 9  I don't want to let you down but in their motion in
10  limine they raised an issue that had not been ruled on
11  so I am going to ask about this issue, so I am not
12  going to before having a chance to have them bring it
13  up again, but that is just to talk about that
14  he -- that Mrs. Dillard did, in fact, bring her two
15  girls, age 9 and 11 to visit Mr. Roeder, not in the
16  context of ministerial relationship, and that I can
17  stop it at that.
18          MS. SIDEBOTHAM:  And, again, she -- she did
19  bring them.  They walked in, they were introduced, they
20  waited outside while she talked to him.  I think that's
21  much more prejudicial than probative and it's just
22  being used to put her in a bad light.
23          THE COURT:  How's it prejudicial?
24          MS. SIDEBOTHAM:  Well, the -- the way it would
25  be prejudicial is, you know, you should infer because
```

563

```
 1  she's unwise in taking her girls in to meet him that,
 2  you know, somehow that's --
 3           THE COURT:  She hasn't disavowed her
 4  relationship with him in any way.  Although I don't
 5  know what probative value there is there at all.
 6           MS. ABBATE:  This would be the last area of
 7  inquiry regarding their relationship, is the
 8  relationship that she had, that the daughters have with
 9  him, which would include that he actually wrote them
10  letters and she -- they drew pictures for him, as well,
11  no other inmates.  And, again, it's just to establish
12  they raised this whole issue of this all happened as a
13  ministerial thing and -- and just coincidentally
14  happened.
15           THE COURT:  I am not going to allow that.  I
16  just don't see the relevancy here, so...
17           MS. ABBATE:  Understood.
18           Thanks, Your Honor, appreciate the
19  opportunity.
20           THE COURT:  Sure.
21           (Sidebar concludes and the following
22           proceedings continue in open court.)
23           THE COURT:  All right.  Ms. Abbate, you may
24  continue.
25           MS. ABBATE:  Thank you.
```

564

1  BY MS. ABBATE:

2  Q.    Ms. Dillard, you don't regret writing the letter

3  to Dr. Means?

4  A.    I feel I did what -- what God asked me to do,

5  yes, I don't -- I don't regret doing that.

6  Q.    You don't regret writing the letter to

7  Dr. Means?

8  A.    No.

9  Q.    And you would write the same letter again,

10 right?

11 A.    Well, like I said yesterday, I would probably

12 have an attorney look it over so that you guys couldn't

13 mix and match my words and make it mean something that

14 it didn't mean, but, yes.

15 Q.    Well, you know how it made Dr. Means feel once

16 she got it, or you know how she said it made her feel

17 because you were sitting here, you heard her say that?

18 A.    Yes.

19 Q.    And you would still write that same letter

20 again, knowing that she testified how it made her feel?

21 A.    I'm not really responsible for what she feels, I

22 mean, you can make anything sound like a threat if you

23 read it the right way.

24        I mean, Mary had a little lamb, a nursery

25 rhyme sounds like the lamb is stalking Mary so, you

565

1  know, you can make anything sound like a threat.  It

2  was not meant as a threat.

3  Q.    You don't understand -- you understand why she

4  would be intimidated by this letter?

5  A.    No.

6  Q.    You don't know -- you didn't consider how she

7  may feel when you referenced Dr. Tiller?

8  A.    I -- I wrote the letter, I prayed about it, I

9  felt compelled to send it.  I did not think it was a

10  threat, I did not think it would make her feel that way

11  and it was not meant to make her feel that way, so, no.

12  Q.    You did think about the letter a lot?

13  A.    Yes, I did.

14  Q.    You didn't think about how the reference to

15  Dr. Tiller would make Dr. Means feel?

16  A.    Well, I had hoped she would know that Dr. Tiller

17  ended up living a really miserable life and he would

18  tell that to her now and I did not want her to have to

19  go through the same stuff that he went through.

20  Q.    Why not?

21  A.    Because I care about her, I don't -- I don't

22  want her to have to have her life go down the drain.

23  Abortion is a miserable field.  I didn't want her to

24  have the same kind of problems that most abortionists

25  have.

1   Q.    So you wrote the letter because you care about

2   Dr. Means?

3   A.    Of course.

4   Q.    Do you think that your letter may have made her

5   think she might be killed for providing abortions?

6   A.    That never crossed my mind.

7   Q.    Regarding Scott Roeder's conviction, you agree

8   that under man's law, justice has been done?

9   A.    Yes.

10  Q.    But you're not so sure whether justice has been

11  done according to God's law, correct?

12  A.    I don't know.

13  Q.    You might not -- justice might not have been

14  done according to God's law, right?

15  A.    I don't know.

16  Q.    That means it could have or couldn't have?

17  A.    I don't know.

18  Q.    You, in fact, didn't want to see Scott Roeder

19  convicted for murdering Dr. Tiller, did you?

20  A.    I felt bad when any of the inmates that we

21  counsel were convicted, I -- I think a lot of times

22  they were charged and convicted with stuff that they

23  probably shouldn't have been.  I -- I don't want

24  anybody to have to go to prison but I understand that

25  happens.

1  Q.    Do you think that Scott Roeder shouldn't have

2  been charged with murder for killing Dr. Tiller?

3  A.    I don't know, that's not up to me.

4  Q.    Do you think other people should be charged with

5  murder for killing adults?

6  A.    Yes.

7  Q.    But you don't know if Scott Roeder should have

8  been charged with murder for killing Dr. Tiller?

9  A.    I would expect that he would be, yes.

10  Q.    But you didn't want to see him convicted?

11  A.    I -- I liked him.  I didn't think that a -- a

12  long, 60-year prison sentence that he got was -- it was

13  a little much.

14  Q.    Just go to that belief for a minute.

15        MS. ABBATE:  Whoop, you know what, Tim, if you

16  could pull up Page 130.

17  BY MS. ABBATE:

18  Q.    And, Ms. Dillard, if I could direct your

19  attention to Line Number 3.

20        For me to fully understand this, Question:

21  Why did you say, obviously you would not want to see

22  Scott be convicted?

23        Answer:   Well, I believe he did -- I believe

24  what he did was not out of any kind of revenge or

25  hatred or anything like that, it was strictly his

568

```
1   convictions and he certainly didn't do it for any gain

2   on his part.

3           Question:  When you say it was his

4   convictions, what do you mean by that, that it was his

5   convictions?

6           Answer:  Well, I believe he probably felt

7   inspired by God to do this.

8           Have I read that accurately?

9   A.    Yes.

10  Q.    Do you feel that Scott Roeder was inspired by

11  God to kill Dr. Tiller?

12  A.    I don't know, I assume that he felt that way, I

13  don't know.

14  Q.    In fact, you testified, Why else would he do it

15  if he was not inspired by God?

16  A.    Yes, I think I did.

17          MS. ABBATE:  I have no further questions.

18          THE COURT:  Thank you.

19          Redirect?

20                  REDIRECT EXAMINATION

21  BY MS. SIDEBOTHAM:

22  Q.    Angel, can you make an estimate of how many

23  cards and letters you have gotten since the DOJ sued

24  you?

25  A.    At least 200 of them.
```

1    Q.    Have you kept them?

2    A.    No, I -- they were very sweet and very

3    encouraging and I read them and -- and I threw them

4    away.   I don't have a lot of room to keep piles and

5    piles of papers.

6    Q.    Ms. Abbate asked you some questions about a

7    letter or a series of letters, in fact, that you had

8    received that you filed a protective order.

9          Was this individual trying to blackmail you

10   for money?

11   A.    Yes, he was.

12   Q.    Did you report that to law enforcement?

13   A.    Yes, I did.

14   Q.    Was this individual a convicted felon?

15   A.    Yes, he was.

16   Q.    Had this person committed violence on people

17   before?

18   A.    Oh, yeah.   Including the officer that came to

19   interview me.

20   Q.    Had he committed violent actions more than once?

21   A.    Oh, yeah, he had -- the law enforcement officer

22   that came to interview me told me that he had assaulted

23   every law enforcement officer he had ever come in

24   contact with.

25   Q.    Ms. Abbate read to you the statements from

570

1  Operation Rescue and Kansans for Life, and National

2  Right to Life.  Do you support those statements?

3  A.    Yes, I do.

4  Q.    Have you ever condoned the violence that

5  Scott Roeder engaged in?

6  A.    No, I haven't.

7  Q.    What's in your conscience about violence?

8  A.    I would never do anything of violence.  I don't

9  think you ought to do anything of violence.

10            MS. SIDEBOTHAM:  If I might have a moment.

11            Thank you.  No further questions.

12            THE COURT:  Ms. Abbate, any recross?

13            MS. ABBATE:  Very briefly, Your Honor.

14                    **RECROSS EXAMINATION**

15  BY MS. ABBATE:

16  Q.    Mrs. Dillard, I'm going to use the paper fashion

17  instead of the overhead, it's Page 286 of your

18  deposition.  I'm going to leave this up here for you.

19            And this is talking about the protective order

20  that you filed.

21            I'll direct your attention on 286, Line 9.

22            Question:  You filed a protection -- dash

23  dash -- you were alarmed by the letters.  Would the

24  letters alone have been enough to seek the protection

25  from stalking order?

571

```
 1            Answer:  In my mind or...
 2            Question:  In your mind for sure.
 3            Answer:  Yeah, yeah.
 4            Question:  Stop there.
 5            Have I read that part correctly?
 6  A.    I'm sorry, could you repeat that?
 7  Q.    Have I read that part correctly?
 8  A.    I believe you have, yes.
 9  Q.    You sure?  I could read it again.  I want -- I
10  don't want to read anything incorrectly.  I know that
11  sometimes I might mumble, so I just want to make sure
12  it's correct.
13  A.    I believe so.
14  Q.    Okay, well, at Line 9 it says:
15            Question:  You filed the protection -- you
16  were alarmed by the letters.  Would the letters alone
17  have been enough to have to seek the protection from
18  stalking order?
19            Have I read that correctly?
20  A.    Yes.
21  Q.    And then the next line says, Answer:  In my mind
22  or --
23            Have I read that correctly?
24  A.    Yes.
25  Q.    And then the following line, Question:  In your
```

572

```
 1  mind for sure.

 2          Have I read that correctly?

 3  A.    Yes.

 4  Q.    And then, finally, Question:  And then when the

 5  police officer came and told you about -- more about

 6  who this person was, did that heighten your

 7  apprehension?

 8          Have I read that correctly, except for the

 9  person's name, which...

10  A.    Yes.

11  Q.    And your answer is "absolutely," correct?

12  A.    Yes.

13  Q.    And then the following line says,

14          Question:  And then, finally, when you went in

15  to the clerk, if she gave you the official printout of

16  his charges, how did that affect your perception of

17  him?

18          And the answer was:  Well, it made me a lot

19  more nervous, we now knew what he looked like.  We had

20  never met him before.

21          Have I read that correctly?

22  A.    Yes.

23          MS. ABBATE:  Nothing further.

24          THE COURT:  Ms. Sidebotham, anything further?

25          MS. SIDEBOTHAM:  No, Your Honor.
```

573

```
 1              THE COURT:  All right.  Thank you.

 2              Ms. Dillard, you may step down.

 3              Let's go ahead and get started with the next

 4   witness.

 5              MS. SIDEBOTHAM:  Your Honor, we would call

 6   Dr. Dillard.

 7              THE COURT:  Thank you, sir.

 8              If you would step up to the court reporter

 9   here, please.

10              (Witness is sworn.)

11                       ROBERT DILLARD,

12   called as a witness on behalf of the Defendant,

13   Angel Dillard, having been first duly sworn, testified

14   as follows:

15                     DIRECT EXAMINATION

16   BY MS. SIDEBOTHAM:

17   Q.    Good morning, Dr. Dillard.

18   A.    Good morning.

19   Q.    Would you please state your full name for the

20   record.

21   A.    Robert Howell Dillard.

22   Q.    What's your professional occupation?

23   A.    I'm an emergency room physician.

24   Q.    What's your religious identity?

25   A.    Christian.
```

574

1    Q.    Does being a doctor and Christian give you a

2    reason to protect people?

3    A.    Absolutely.

4    Q.    Tell us a little bit about your education and

5    employment history, Dr. Dillard.

6    A.    I went to undergraduate at Oklahoma Baptist

7    University, I went to the University of Oklahoma

8    Medical College, and I was employed at Wesley Medical

9    Center as an ER physician after residency there and

10   currently employed at Newton Medical Center in the same

11   capacity.

12   Q.    So when you say "ER physician" does that mean

13   that you work in the emergency room?

14   A.    Yes.

15   Q.    How many years now have you worked in the

16   emergency room roughly?

17   A.    Going on 18.

18   Q.    What organizations do you belong to?

19   A.    Primarily professional organizations:  The

20   American Academy of Family Practice, the Wilderness

21   Medical Society, and a few hobby memberships, such as

22   Bass Master, that type of thing.

23   Q.    Have you been involved at all in the pro-life

24   movement?

25   A.    Not publicly, no.

1  Q.    In the course of your work do you often work

2  with law enforcement?

3  A.    Almost every day.

4  Q.    And tell me how that comes about.

5  A.    We see a lot of the same population:  I'll see

6  patients for clearance to go to jail, a lot of times

7  we'll have patients that we required law enforcement

8  for because of misbehavior issues or assaults, things

9  like that.

10  Q.    How would you describe your relationship with

11  law enforcement?

12       MR. GOEMANN:  Your Honor, I am going to object

13  at this point in terms of relevance.  His relationship

14  with law enforcement is not in issue in this case.

15       THE COURT:  We're still in background, I'm

16  going to give him a little leeway here, so that's

17  overruled.

18       THE WITNESS:  Could you repeat the question?

19  BY MS. SIDEBOTHAM:

20  Q.    I asked how your relationship with law

21  enforcement was overall.

22  A.    It's always been very good, both have a family

23  history with law enforcement, as well as military, and

24  then a professional history ongoing since the time of

25  residency.

576

```
 1   Q.    If you became aware of a threat against any
 2   individual, a threat of violence, how would you
 3   respond?
 4   A.    I would --
 5              MR. GOEMANN:  Objection, Your Honor, it's
 6   calling for speculation and, again, his reaction to
 7   that hypothetical is not in issue here and I would
 8   submit that that goes beyond the general background
 9   that Dr. Dillard has already laid out for us.
10              THE COURT:  Again, I'm going to overrule it.
11   You can answer.
12   A.    We would, obviously, report it immediately.  We
13   would contact law enforcement, probably go through
14   either the sheriff's office or Wichita PD, depending on
15   where it was.
16   BY MS. SIDEBOTHAM:
17   Q.    Let's talk a little bit about your ministry.
18   And I know you were here yesterday and you heard
19   Mrs. Dillard explain quite a bit about ministries,
20   so -- so let's focus in on the prison ministry.  Tell
21   us a little bit about that.
22   A.    We began the ministry, um, with Scott Roeder.
23   He was sort of our introduction to jail ministry.
24              Angel had begun with a letter to him and then
25   that expanded to ministerial visits, at which point we
```

1  were brought into the CMO because the jail had informed
2  us through the chaplain's office that in order to do
3  ministerial visits we had to operate through the CMO,
4  and that is how we got involved with them.
5          Angel initially did the ministry for several
6  months before I became involved, and then once we were
7  both involved we were doing church services -- I
8  believe they called them something else, but they were
9  basically worship services with the inmates.
10         She was continuing to do counseling, initially
11 with only Scott, and then once Scott was out of the
12 jail, then they expanded it and allowed her to see
13 other inmates as well.
14 Q.    How long did that prison ministry continue?
15 A.    I believe it was for about two years.
16 Q.    And was there a particular reason why it ended?
17 A.    Yes, we were asked to leave the jail ministry by
18 the chaplain's office due to --
19         MR. GOEMANN:  Objection, hearsay.
20         THE COURT:  Sustained.
21 BY MS. SIDEBOTHAM:
22 Q.    When -- let's talk a little bit about Angel's
23 involvement in the pro-life movement.
24         When she described her pro-life activities
25 yesterday, as far as your personal knowledge goes, did

578

1  that seem to be a complete --

2       MR. GOEMANN:  Objection, Your Honor, he is

3  being asked to comment on the veracity of another

4  witness's testimony.

5       THE COURT:  I'm going to overrule that one.

6  You can answer.

7  A.    Yes, I didn't see anything that was inaccurate,

8  according to my knowledge.

9  BY MS. SIDEBOTHAM:

10 Q.    And during the course of your marriage to Angel,

11 has there ever been anything that led you to think she

12 would engage in violent activity?

13 A.    No, not at all.

14 Q.    Are you aware of any illegal protest activity

15 that she has engaged in?

16 A.    None.

17      MR. GOEMANN:  Your Honor, I would object.

18 This is character evidence.  We have not put

19 Ms. Dillard's general character to issue here.

20      THE COURT:  The question, as I understood it,

21 was whether he has known her to engage in any protest

22 activity which doesn't go to character at all, so

23 that's overruled.

24      You can answer the question.

25 A.    Can you repeat it, please.

579

BY MS. SIDEBOTHAM:

Q.    I asked if you are aware of any illegal protest activity that Angel is engaged in.

A.    No.

Q.    Has Angel ever done anything that would make you believe that she would threaten violence to someone?

A.    Never.

        MR. GOEMANN:  Objection, Your Honor.  These beliefs --

        THE COURT:  Overruled.  Overruled.  I'm going to allow him to testify what he knows about his wife. It's overruled.

BY MS. SIDEBOTHAM:

Q.    I'll repeat the question.  Has Angel done or said anything that would make you believe she would threaten violence against someone?

A.    Never.

Q.    I think you heard yesterday when Angel testified about her attitude on God's law and man's law, that she wanted to obey both.

        In your experience with Angel, have you known her to deliberately violate the law?

A.    Never.  She's an extraordinarily diligent person in that she's a woman of absolute integrity.

        MR. GOEMANN:  Objection, Your Honor, this is

580

1  character testimony.  He's --

2          THE COURT:  Mr. Goemann -- come on up here,

3  counsel.  Let's visit about this for a minute.

4          (Whereupon the following sidebar was had

5          outside the hearing of the jury:)

6          THE COURT:  First of all, I want you to quit

7  jumping up and down.

8          I am going to allow her husband to testify

9  about what he knows about her and you can cross examine

10 him about it until the cows come home when you get up,

11 but these are absolutely legitimate questions, not

12 asking about a reputation, he is talking about

13 attributes in her that he has seen over their years

14 together.  And it would be weird, frankly, if -- if

15 this is not inquired into.

16          Now, you've noted your objection, I'll give

17 you a continuing objection to all of these questions,

18 but we're just wasting time with you jumping up and

19 down and throwing out character objections.  I'll give

20 you a continuing objection.

21          MR. GOEMANN:  Very well, Your Honor.  I've

22 made my objections once, I won't say any more.

23          THE COURT:  Okay.

24          MR. GOEMANN:  I think this is improper opinion

25 and character evidence bolstering her testimony.

```
 1            THE COURT:  Okay.  Well, I'm not seeing it
 2  quite that way.
 3            MR. GOEMANN:  Yes, sir.
 4            THE COURT:  I think they're just establishing
 5  that he knows her, that he knows her well, and
 6  that's -- as I say, if you have got any contrary
 7  information, for heaven's sake, bring it up when you
 8  cross him because you've got a right to do that.
 9            MS. ABBATE:  Your Honor, again, you know, we
10  do have contrary information so I wonder if he knew
11  about the statements that she made in what he just
12  read.
13            THE COURT:  Well, we may have to do something
14  outside the presence of the jury if that's the case.
15            MS. ABBATE:  Thanks.
16            THE COURT:  But the statements that she made
17  in her letter, or letters to --
18            MS. ABBATE:  Just the one.
19            THE COURT:  -- to Roeder -- well, I'm not
20  going to get into that, at this point.
21            Let's go ahead.
22            (Sidebar concludes and the following
23            proceedings then continue in open court:)
24  BY MS. SIDEBOTHAM:
25  Q.   Let's talk about the proposed abortion clinic
```

1   and Angel's letter to Dr. Means.

2           How did you first hear that Dr. Means intended

3   to provide abortions?

4   A.    On the news.

5   Q.    And was that an evening news type of thing?

6   A.    I believe so.

7   Q.    Did you hear any further public announcements

8   after that?

9   A.    I believe the primary announcement was on the

10  news that had been dispensed through either Dr. Means

11  or those who were handling her at the time, and then we

12  heard other things both on the news and I went on the

13  internet and looked it up, as well.

14  Q.    Are you aware that Angel wrote a letter and sent

15  it to Dr. Means?

16  A.    Yes.

17  Q.    Did you read that letter --

18  A.    Yes.

19  Q.    -- before she sent it?

20  A.    Sorry.  Yes, I did.

21  Q.    When you read the letter, did you think that

22  Angel was making a threat of force to harm Dr. Means?

23          MR. GOEMANN:  Objection, Your Honor.  It's a

24  personal opinion.

25          THE COURT:  Sustained.

583

BY MS. SIDEBOTHAM:

Q.    Why did Angel ask you to review the letter?

A.    Any time we've done anything of significant

importance we rely on each other.  We're both

intelligent people, well read, and we operate as

a -- as a husband and wife normally do and so it

wouldn't be out of the ordinary for me to do the same

thing to her, or her to ask my opinion on something

like that.

Q.    So when she asks you to review things, if you

have concerns, do you let her know about your concerns?

A.    Absolutely.

Q.    In this case, did you let her know about any

concerns?

A.    No concerns.  I did acknowledge that the letter

was not what I would consider a touchy, feel good

letter, we recognized that it had harsh language and it

dealt with a lot of ideas that were very intense but

those weren't concerns.

Q.    In your experience as a doctor is it common for

you to get complaints or threats from people?

A.    I would say -- common, yes, especially with the

complaints, threats are usually not as common.

Q.    And as a doctor, are you trained to evaluate

these complaints or threats?

```
1            MR. GOEMANN:  Your Honor, I object to his
2   training regarding evaluation of threats and
3   complaints.
4            THE COURT:  Overruled.
5            MR. GOEMANN:  It's irrelevant.
6   A.    Absolutely.  I was trained in the same place
7   that Dr. Means was and part of that training is
8   understanding the patient, understanding the
9   environment, and things like that.  If I had received
10  the letter, putting myself in her place --
11           MR. GOEMANN:  Objection, Your Honor.  He's
12  about to -- sounds like he's about to give opinion --
13           THE COURT:  Sustained.
14           MS. SIDEBOTHAM:  Your Honor, may I approach
15  for a moment?
16           THE COURT:  Yes.
17           (Whereupon the following sidebar conference
18           was had outside the hearing of the jury:)
19           THE COURT:  I have had more sidebars in this
20  case than I have in my last 20 trials combined.  You
21  are all looking at the pixels instead of the broad
22  picture here.
23           What's --
24           MS. SIDEBOTHAM:  Your Honor, because one of
25  the elements is -- here is the reasonableness of the
```

1   letter and Dr. Dillard is also a physician, I wanted to

2   ask him about the reasonable physician's opinion.

3           THE COURT:  I am not going to let him testify.

4   He is not reasonable and able to state a reasonable

5   standard here because he is Ms. Dillard's husband and I

6   think you're putting him in an impossible position if

7   you ask him what a reasonable person would do, simply

8   because I think he is too influenced by his own

9   feelings.  So don't ask him about his perspective on

10  whether this was a threat or not or whether it could be

11  reasonably perceived that way.  The jury is going to

12  decide that.

13          MS. SIDEBOTHAM:  Thank you, Your Honor.

14          THE COURT:  Okay.

15          (Sidebar concludes and the following

16          proceedings continue in open court:)

17  BY MS. SIDEBOTHAM:

18  Q.    Dr. Dillard, are you familiar with the kinds of

19  stresses faced by doctors who provide abortions?

20  A.    Yes.

21  Q.    Can you briefly describe those?

22          MR. GOEMANN:  Objection, Your Honor, it would

23  be hearsay if he is not an abortion provider himself.

24  He would have no way of knowing, other than through his

25  opinion.

```
 1              THE COURT:  Well, I don't think there is
 2   enough foundation for him to testify, so you can go
 3   ahead and try to lay some foundation about how he would
 4   be aware of those.
 5   BY MS. SIDEBOTHAM:
 6   Q.    Dr. Dillard, how would you be aware of some of
 7   the stresses faced by abortion providers?
 8   A.    Physicians are a fairly tight knit community, we
 9   talk a lot with each other, we share ideas, we share
10   daily stresses, even Dr. Means has eluded to at
11   meetings that we have connection with each other.
12   Q.    Can you tell us what some of the stresses are
13   that are experienced by abortion providers?
14              MR. GOEMANN:  Your Honor, I renew my
15   objection.  The testimony now is that he received this
16   information because doctors talk a lot to each other
17   and share ideas, so it is hearsay.
18              THE COURT:  Well, and on the other hand, it
19   may go to common knowledge and experience among
20   physicians and we're not identifying any particular
21   source here.
22              I'm overruling your objection but I do think
23   some further foundation would be helpful in terms of
24   whether he has visited with providers himself and the
25   sources of his information, as opposed to -- and
```

1  members of the jury, I actually will talk to you a

2  little further about this later, but information you

3  get from Dr. Phil or from the Oprah Winfrey show or

4  places like that are not things you can consider as you

5  make your decisions.

6        And I think it's fair to ask the doctor what

7  the sources of his information are before he gets in

8  to, if I allow it, this kind of testimony.

9  BY MS. SIDEBOTHAM:

10  Q.    Dr. Dillard, have you had any conversations with

11  abortion providers or have you heard abortion providers

12  speak on issues of these stresses?

13  A.    Actually, I have.  Dr. Tiller and I actually

14  spoke about it in advanced cardiac life support class

15  that I was teaching, as well I've read a lot of

16  resources that abortion providers themselves have

17  published.

18  Q.    When you and Dr. Tiller spoke about the

19  stresses, what did Dr. Tiller mention as some of the

20  stresses that abortion providers face?

21        MR. GOEMANN:  Objection, Your Honor, now we

22  clearly have a statement, out of court statement.  It's

23  hearsay.

24        THE COURT:  I agree.  I'm going to sustain the

25  objection.

588

1   BY MS. SIDEBOTHAM:

2   Q.    So, Dr. Dillard, in addition to the two sources

3   that you mentioned, are there other sources where you

4   have heard about stresses faced by abortion providers?

5   A.    I would say those are the two primary, the

6   public cases that abortion providers have -- have

7   published is public content would be my primary.

8   Q.    And can you summarize for us from the various

9   sources without necessarily mentioning a statement by a

10  given individual what the stresses are that abortion

11  providers face?

12  A.    Yes.

13         MR. GOEMANN:  Your Honor, I don't mean to keep

14  jumping up and down but we haven't heard any source

15  beyond what he's already testified to.  No personal

16  knowledge.

17         THE COURT:  I think he has taken it to the

18  point, no, where this is part of what he learns as part

19  of his profession and I think he's entitled to talk

20  about that.  So I'm overruling.

21         You can answer the question.

22  A.    It's very well-known that abortion providers

23  undergo tremendous amount of stress, both from the

24  public debate and pressures on both sides of the

25  abortion issue, as well as dealing literally with death

589

1   that they're inducing every single day and so those

2   stressors have been listed as both psychological,

3   professional, drug and alcohol abuse are very common,

4   as well as significant sleep issues, personal issues as

5   far as relationships, staffing the clinics, as well as

6   feeling as though they have no other option once

7   they've gotten into that and so the stresses are

8   monumental, I would say.

9   BY MS. SIDEBOTHAM:

10  Q.    Dr. Dillard, let's talk about your discussions

11  with Special Agent Fitzgerald.  Did -- did he

12  contact -- did -- did you speak to him at some point

13  after Angel wrote the letter?

14  A.    Yes, he had contacted us by phone to request a

15  meeting, as we found out later, with representatives of

16  the DOJ.  The meeting that he described seemed very

17  clandestine to us but he said that they were requesting

18  a meeting because they were filing a civil suit against

19  Angel.

20          They could not tell us where the meeting

21  exactly would be until the moment before; that we would

22  receive no written notification of the meeting; and

23  upon our inquiry, he recommended that we attain -- or,

24  excuse me, we obtain an attorney.

25  Q.    At some point in that conversation did

1 Special Agent Fitzgerald tell you anything about the

2 FBI's conclusions on your investigation?

3 A.    Yes.  He had told us that their conclusions were

4 that the letter was not a threat; that no criminal

5 charges --

6            MR. GOEMANN:  Objection, Your Honor.

7            THE COURT:  Excuse me?

8            MR. GOEMANN:  Your Honor, once again, we would

9 ask that it not be admitted for the truth.  This

10 is -- we would suggest, otherwise it's hearsay.

11            THE COURT:  Well, obviously

12 Special Agent Fitzgerald was here and testified in the

13 case, so there was an opportunity at least to ask him

14 about it but, members of the jury, I'm going to be

15 giving you a limiting instruction because

16 Special Agent Fitzgerald is not the person who gets to

17 make the determination for the Department of Justice in

18 terms of whether a case is prosecuted or not.

19            He may have a personal opinion about that but

20 that should have no bearing in terms of what the facts

21 are and the elements of the case that I'll be giving to

22 you.  You can consider it for the fact that he made the

23 statement but for nothing beyond that purpose.

24            You can now answer the question.

25 A.    He had told us that no criminal charges were

1  going to be filed and the words that he told us, quote,

2  we shouldn't worry about that any more, and then he

3  went on to describe the -- the meeting that was being

4  requested.

5  BY MS. SIDEBOTHAM:

6  Q.   Did he at some point tell you that he had made

7  some kind of recommendation?

8  A.   Yes, he had said that the FBI was making a

9  recommendation that the DOJ not pursue this because he

10 admitted that they were trying to build rapport and

11 that it was counterproductive to the efforts to

12 identify -- he didn't use the word terrorists but he

13 used the word, I believe it was something similar to a

14 fanatic, or an outlying extreme fringe of the pro-life

15 movement.

16          MS. SIDEBOTHAM:  If I might have a moment.

17          THE COURT:  Of course.

18 BY MS. SIDEBOTHAM:

19 Q.   Based on what Special Agent Fitzgerald

20 commented, how do you interpret the lawsuit?

21          MR. GOEMANN:  Objection.  His interpretation

22 of the lawsuit is irrelevant.

23          THE COURT:  Sustained.

24 BY MS. SIDEBOTHAM:

25 Q.   Would Angel notify the authorities if she were

```
 1  aware of any illegal activity?

 2   A.     Absolutely.

 3          MR. GOEMANN:  Objection.  Objection, Your

 4  Honor, to him commenting about what his wife would do.

 5  He can testify about what he would do but not his wife.

 6          THE COURT:  Overruled.

 7          THE WITNESS:  Yes, sir.

 8          THE COURT:  The answer stands.

 9  BY MS. SIDEBOTHAM:

10   Q.     Did the FBI ask you at any point if you would

11  report illegal activity related to abortion?

12   A.     Yes, they did and I told them that we certainly

13  would.

14   Q.     Would you today still report any violence or

15  threats of violence?

16   A.     Absolutely, despite this experience and the

17  things that we have learned about the DOJ, we're still

18  very much in favor of law and order.

19   Q.     Thank you.

20          MS. SIDEBOTHAM:  No further questions.

21          THE COURT:  All right.  Before we start cross,

22  let's go ahead and take 20-minute break.  We'll start

23  back up at 11:35.

24          I remind you, again, you're not to discuss

25  this case or any aspect of among yourselves or with
```

1  anyone else.  No independent research, electronic or

2  otherwise.

3          We'll bring you back in at 11:35.  Thank you.

4          (The jury leaves the courtroom)

5          THE COURT:  Okay.  Well, folks, Brian is

6  working on the limiting instruction.

7          Richard, I don't know if you have a draft one

8  or not, but we'd sure be happy to see it, if you do.

9          MR. GOEMANN:  Thank you, Your Honor.

10          THE COURT:  You bet.

11          MR. GOEMANN:  If I could just bring the screen

12  up and I can show it to him.

13          THE COURT:  That's fine.

14          MR. GOEMANN:  Thank you.

15          Your Honor, I'll do that momentarily.

16          THE COURT:  And if you would obviously share

17  it, as well --

18          MR. GOEMANN:  Yes.

19          THE COURT:  -- with Ms. Dillard's lawyers.

20          MR. GOEMANN:  Absolutely, Your Honor.

21          THE COURT:  Just out of curiosity, how long do

22  you think you're -- and I'm not going to hold you to

23  it, obviously, but how long do you think you'll be on

24  cross?

25          MR. GOEMANN:  It won't be a long cross, Your

594

```
 1  Honor.

 2          THE COURT:  Okay.

 3          MR. GOEMANN:  I'm -- I am trying to think

 4  about that right now exactly what we want to do, but it

 5  won't be a lengthy one.

 6          THE COURT:  And are you going to plan to

 7  present any more evidence on the defense side?

 8          MR. SHULTZ:  Maybe, but it will be three

 9  minutes.

10          THE COURT:  Okay.  And you looking to put on a

11  rebuttal case of any kind?

12          MR. GOEMANN:  We would need to discuss that at

13  this point, Your Honor.

14          THE COURT:  Okay.  I'm just trying to get a

15  handle on where we are time wise and when we ought to

16  have the jury's lunch brought over.  12:30 might be a

17  pretty safe bet, or even 12:15 if you're not going to

18  be long on cross, and if you have one more minuscule

19  witness.

20          And I would assume any other evidence that the

21  Government would put on here would not take too long?

22          MR. GOEMANN:  No, Your Honor.  No, that's

23  correct.

24          THE COURT:  Okay.  Well, we'll shoot for 11:15

25  as the time to -- or excuse me, 12:15 as a time to
```

595

1 break for lunch.  You can make any other motions you

2 wish to at that time, assuming that we're through with

3 the testimony, and give everybody a chance to take a

4 look at the final set of instructions and make sure

5 even if you're not happy with them, that at least you

6 have you an opportunity to object to them.

7          And then we'll plan on instructing and doing

8 closings right after lunch.

9          Thank you all so much, I appreciate it.

10          MR. GOEMANN:  Thank you, Your Honor.

11          (At this time a recess was taken after which

12          continued the following proceedings:)

13          THE COURT:  Okay.  Let's go ahead and bring

14 the jury back in.

15          (The jury enters the courtroom.)

16          THE COURT:  Go ahead and have a seat, folks.

17          MR. SHULTZ:  I appreciate that, I was

18 concerned about an issue.

19          THE COURT:  Not everybody has got things going

20 all the time.

21          I think we're ready for the cross, so,

22 Mr. Goemann.

23          MR. GOEMANN:  Your Honor, we have no questions

24 for Dr. Dillard.

25          THE COURT:  All right.  Thank you.

596

```
 1           Well, Dr. Dillard, you can step down then,
 2  thank you so much.
 3           Mr. Shultz, any further evidence on behalf of
 4  Ms. Dillard?
 5           MR. SHULTZ:  No, Your Honor.
 6           THE COURT:  You resting?
 7           MR. SHULTZ:  We're resting.
 8           THE COURT:  All right.  And, Mr. Goemann, any
 9  rebuttal evidence?
10           MR. GOEMANN:  No, Your Honor.
11           THE COURT:  Well, what do you know?  Folks, I
12  am just as surprised as you are, but your lunch will be
13  arriving in about half an hour.  I am not going to rush
14  you through it but we are in the process of printing
15  off the final version of the instructions and once we
16  have those ready and you've had a chance to eat your
17  lunch, we'll bring you back in, I'll instruct you, and
18  then we'll hear the closing arguments in the case and
19  the case will be yours.
20           You know, this is one of those things where on
21  the one hand I think we were all prepared to hear some
22  further evidence but, you know, on the other hand,
23  you're always -- well, it's always a wonderful moment I
24  think in a case when both sides say, you know, we've
25  presented everything that we think we need to here.  So
```

597

```
 1  while it means a little extra waiting time for you, I
 2  hope that doesn't create a problem for you.
 3          I am going to let you go back to the jury room
 4  again.  You are welcome to be outside the jury room if
 5  you wish to but, again, no discussion of the case among
 6  yourselves or with anyone else and no independent
 7  investigation, electronic or otherwise.
 8          If you do decide to leave the building for any
 9  reason in the next half hour, take some ID with you so
10  that you'll be able to get back in without any issues.
11          Thank you so much.  And we'll get your lunch
12  to you and plan to see you in here in just a little
13  bit.  Thank you so much.
14          (The jury leaves the courtroom.)
15          THE COURT:  Okay.  Have a seat.
16          Let me take a look at what we've received back
17  from the Government with our proposed limiting
18  instruction.
19          (Pause.)
20          THE COURT:  Has the defense had an opportunity
21  to review the proposed instruction?
22          MS. SIDEBOTHAM:  Yes, we reviewed it, Your
23  Honor.
24          THE COURT:  You can sit down if you'd like to,
25  Ms. Sidebotham, and you can speak from the chair.
```

598

```
 1         What's your take.
 2         MS. SIDEBOTHAM:  Well, as Your Honor knows, we
 3 initially object because we're asserting admission by
 4 party opponent but even given Your Honor's ruling
 5 against that, while it wouldn't be hearsay state of
 6 mind as to the Dillards' testimony, as to
 7 Sean Fitzgerald's own testimony about his own beliefs,
 8 we believe that would still be admissible for the
 9 truth.
10         And I know it looks like Mr. Shultz maybe was
11 going to add something.
12         THE COURT:  Go ahead.
13         MR. SHULTZ:  Yeah, I think that I understand
14 and though I would like to argue probably cannot
15 effectively argue that he can bind the Government, I
16 get that but the other statements are just a little too
17 broad to put that in a limiting instruction to say that
18 those cannot be considered and I think that's sort of
19 what that does.
20         I think it should be limited to basically
21 reflect that he's not representing the Government with
22 regard to his recommendation that it go forward or not
23 go forward.
24         THE COURT:  Anything further, Mr. Goemann?
25         MR. GOEMANN:  Just to respond.
```

```
 1            THE COURT:  And you can sit down, too, if you

 2    want to.  It's easier to hear with the mike right up to

 3    your mouth.

 4            MR. GOEMANN:  I tried to balance in the

 5    drafting, not to be too specific about quoting his

 6    testimony but to cover primarily his -- his opinion

 7    regarding the Government's lawsuit and his personal

 8    opinion.  I think both of those did not come in for the

 9    truth of the matter and any other statements he made

10    regarding to them about the case, about the letter,

11    about anything else is not covered by that, and I think

12    that's the appropriate boundary.

13            MS. SIDEBOTHAM:  Your Honor --

14            THE COURT:  Yes.

15            MS. SIDEBOTHAM:  -- if I may respond to that,

16    Your Honor had ruled a little earlier that

17    Dr. Dillard's opinion as to a reasonable recipient was

18    something you weren't going to allow but here we have

19    the quintessential reasonable observer who observes

20    threats all the time and so his own statement about his

21    own opinion and recommendation should come in for the

22    truth of his own observation, even if he is not binding

23    the Government.

24            THE COURT:  Well, this is a tough issue but I

25    am going to give the instruction that we have proposed
```

1   here and this is, You have heard evidence regarding or

2   relating to Special Agent Fitzgerald's conversation

3   with the Dillards.  You may consider evidence of

4   statements made by Special Agent Fitzgerald as evidence

5   relating to the reaction or results of law enforcement

6   investigation, as I have instructed you elsewhere in

7   these instructions.  However, Special Agent Fitzgerald

8   was not authorized to speak for the Department of

9   Justice or to make the legal decision as to whether a

10  case is prosecuted or not.  You should not consider

11  statements by him as to the legal judgment or opinions

12  of the Department of Justice.

13        So that's what we're going to insert into the

14  instructions.  And you have preserved your record,

15  Mr. Goemann, with your proposed instruction and we'll

16  make sure that it -- well, I'll just read it into the

17  record right now.

18        This is what the Government has proposed:

19  You have heard testimony regarding

20  Special Agent Sean Fitzgerald regarding his opinions

21  concerning the Government's position in this lawsuit

22  and some of the evidence in this case.  Those opinions

23  were conveyed during a telephone conversation with

24  Angel Dillard and Robert Dillard.  Testimony regarding

25  those opinions was not admitted to prove that

1  Special Agent Fitzgerald's statements were true but

2  solely for the fact that he said them during that

3  conversation.

4          That is the instruction that I am rejecting

5  here.

6          I think everything that's important is

7  incorporated in our instruction and I recognize that it

8  is a bit of a shift from what I said earlier, but I

9  also think it's more accurate.  And having taken a look

10 at some of the case law during this last break that

11 addresses just these kinds of issues, I think it's the

12 appropriate ruling in the case.

13         So, record's been made.  We'll insert it in

14 the instructions and make sure that you all get a copy

15 of it.

16         Is there now a motion?

17         We're at the close of the evidence here.

18         MR. SHULTZ:  Well, Your Honor, we would, for

19 the record, renew our motion that we made previously

20 and, furthermore would add, obviously, the evidence

21 that we put on and move that the case be dismissed or

22 that judgment be granted as a matter of law.

23         THE COURT:  Well, again, I believe that there

24 is sufficient evidence on each of the elements of the

25 charge or the claim to give the case to the jury.

602

```
 1  There obviously are questions about Dr. Means and
 2  whether she perceived or a reasonable person would
 3  perceive this as a threat and the Circuit as much as
 4  told me that in my earlier ruling.
 5          I think there is an issue for the jury to look
 6  at in terms of what Ms. Dillard's intention was at the
 7  time that she sent it and the consequences, so I think
 8  each of the elements have been sufficiently supported
 9  by the evidence to give the case to the jury and allow
10  it to make a decision.
11          Once -- we will go ahead and get copies of the
12  instructions to you all and we will have copies sitting
13  on the jurors' chairs so when they come back in, we'll
14  go right into the instructions.
15          My experience is that it generally takes
16  between 30 and 45 minutes to read the instructions.
17  You all probably have noticed that I am not the fastest
18  talker this side of the Mississippi but I think it also
19  allows for some of that to sink in a little more than
20  it might otherwise.  And then once we have instructed
21  the jury, the Government will have the opportunity to
22  close, the defendant will have the opportunity to
23  close, and the Government will have the opportunity to
24  do a rebuttal closing.
25          Mr. Goemann.
```

603

1            MR. GOEMANN:  Yes, sir, Your Honor.  Two small

2  points.

3            One, is we want to make sure that each of our

4  exhibits has been properly moved into evidence and we

5  will have copies available -- I don't know that we have

6  provided hard copies in this day and age of electronic

7  viewing, and we would provide hard copies of everything

8  for the Court.

9            THE COURT:  I think I have got hard copies of

10 about everything in the book here.

11           The exhibits that I have as having been

12 admitted are 1, 2, 3, 6, 7, and 8 from the Government.

13           Ms. Sidebotham.

14           MS. SIDEBOTHAM:  Do you have this one?

15           THE COURT:  I -- is that the redacted?

16           MR. SHULTZ:  Yes.

17           THE COURT:  I think that's 6 but let me --

18           MR. GOEMANN:  Exhibit A.

19           THE COURT:  I'm sorry.

20           MR. SHULTZ:  Defendant's Exhibit A.  It won't

21 be in their notebook.

22           THE COURT:  The number on it again?

23           MR. SHULTZ:  A.

24           THE COURT:  Defendant's A.  We'll make sure

25 that goes in.

1              MR. GOEMANN:  Your Honor, we have blown up

2    versions of three letters, that would be 1, 6, and 7,

3    the Government's 1, 6, and 7 that we would like to

4    provide and use as demonstratives.

5              THE COURT:  Oh, that's fine.

6              MR. GOEMANN:  Yes, Your Honor.

7              THE COURT:  Yeah, that's not a problem at all.

8              MR. GOEMANN:  Might make it easier for them to

9    reference.

10             THE COURT:  Absolutely.  No, that's just fine,

11   Mr. Goemann.

12             MR. GOEMANN:  Your Honor, the only other, and

13   I -- I just want to make sure the record is complete,

14   as you had indicated, regarding the last instruction, I

15   of course respect the Court's ruling.  The only other

16   objection I would like to bring to the Court's

17   attention regarding Agent Fitzgerald's opinion

18   testimony is that it would be improper lay opinion or

19   expert opinion.

20             THE COURT:  Thank you very kindly.

21             MR. GOEMANN:  Thank you, Your Honor.

22             THE COURT:  And those are overruled.

23             All right.  Well, counsel, as I've told you, I

24   really appreciate the way you tried the case.  I think

25   you've moved it along and have been concise in your

1 | questioning of the witnesses and it's a pleasure to

2 | have you here.

3 | Let's take a little time.  As soon as the jury

4 | is ready, you can leave the courthouse if you wish to,

5 | I would imagine it's going to be 12:30 before they're

6 | close to being done with their lunch and if you just

7 | let us know how we can contact you so we can get you

8 | back here, we'll do that.  If you want to stay here,

9 | that's entirely up to you, but you're welcome to do

10 | that, too.

11 | Thank you all so much.

12 | (Recess taken from 12:00 p.m. to 12:35 p.m.)

13 | (The jury enters the courtroom.)

14 | THE COURT:  Well, folks, welcome back.

15 | You should each have a copy of the

16 | instructions on your chair.  You are welcome to read

17 | along with me or just to sit back and listen but these

18 | are the final, legal instructions that I'm giving you

19 | in the case.

20 | Instruction Number 1.  Members of the jury:

21 | The presentation of evidence is now complete.  I gave

22 | you some general instructions and definitions at the

23 | outset of this case and I now give you final

24 | instructions.  You may read along with me, or you may

25 | simply listen as I read these instructions.  If you

606

1  read along, stay with me.  You will each be allowed to

2  take your copy of the instructions to the jury room for

3  further reference during your deliberations.

4          You must follow the law as set out in these

5  instructions and apply that law to the facts you find

6  from the evidence presented in this trial.  No single

7  instruction or smaller group of instructions states the

8  law; you must consider all the instructions as a whole.

9  You are not to question the wisdom of any of these

10 instructions.

11         Instruction Number 2.  You must weigh and

12 consider this case without sympathy and without bias

13 for or against any party.  You must not be influenced

14 by anything not within the evidence, the instructions,

15 or your own common sense, knowledge and experience.

16         You must consider and decide this case as an

17 action between persons of equal standing in the

18 community.  All parties stand equal before the law, and

19 are to be dealt with as equals in a court of justice.

20         Circumstances in the case may arouse sympathy

21 for one party or the other.  Sympathy is a common,

22 human emotion.  The law does not expect you to be free

23 of such normal reactions.  However, the law and your

24 oath as jurors require you to disregard sympathy and

25 not to permit it to influence your verdict.

607

1          Instruction Number 3.  You must consider all

2    the evidence, but you need not accept all the evidence

3    as true or accurate.

4          You will determine the weight and credit to be

5    given the testimony of each witness.  You may use

6    common sense, common knowledge and experience in

7    weighing that testimony.

8          The number of witnesses who testify about a

9    matter does not necessarily determine the weight of the

10   evidence.  The testimony of a fewer number of witnesses

11   concerning any fact may be more credible than the

12   testimony of more witnesses to the contrary.

13         You will determine the weight and credit to be

14   given to each exhibit in similar fashion.

15         Instruction Number 4.  In weighing the

16   evidence and judging the credibility of witnesses, you

17   may, and should, take into consideration the general

18   information which you possess as to matters of common

19   knowledge, observation and experience of life.

20         In weighing the testimony of the witnesses you

21   may consider their demeanor while testifying, their

22   interest or lack of interest in the outcome of the case

23   and all other facts and circumstances which will help

24   you decide the facts of the case.  You will decide

25   whether to believe a witness and in evaluating a

608

1  witness' testimony, you may want to ask yourself the

2  following questions:

3          And, incidentally, members of the jury, before

4  I get into reading the rest of this, obviously, there

5  is not any real dispute among the witnesses about what

6  happened here.  There are some differences in detail

7  about recollection and so those are the things that

8  you're going to want to look at here.

9          1.  How well could the witness see or hear the

10 things that the witness testified about?

11         2.  How well was the witness able to remember

12 and describe what happened?

13         3.  Did the witness understand the questions

14 and answer them correctly?

15         4.  Did the witness seem believable to you?

16         If you believe that any witness has

17 intentionally given false testimony on any material

18 fact, you may disregard all or part of his or her

19 testimony, but you are not required to believe or

20 disbelieve all the testimony of any witness.  If there

21 has been conflicting testimony, you should reconcile it

22 with truthfulness, if reasonably possible, but if you

23 cannot do so then you must use your best judgment in

24 determining what testimony you will believe.

25         People often forget things, or they may

1  honestly believe that something happened even though it

2  turns out later that they were wrong.  Inconsistencies

3  or discrepancies in the testimony of a witness, or

4  between the testimony of different witnesses, may or

5  may not cause you to reject such testimony.  Two or

6  more persons witnessing an incident may see or hear it

7  differently and innocent misrecollection, like failure

8  of recollection, is not an uncommon experience.  In

9  weighing the effect of a discrepancy, always consider

10  whether it pertains to an important issue or an

11  unimportant detail, and whether the discrepancy is

12  innocent or material.

13         Instruction Number 5.  The parties may prove

14  any fact through either direct or circumstantial

15  evidence.  Direct evidence is direct proof of a fact,

16  such as eye witness testimony.  Circumstantial evidence

17  is indirect proof, where proving a chain of facts

18  allows you to conclude another fact.

19         To decide if a fact has been proved by

20  circumstantial evidence, consider all the evidence in

21  the light of reason, common sense, and experience.

22         Circumstantial evidence and direct evidence

23  may have equal weight.

24         Instruction Number 6.  You may consider as

25  evidence the testimony of witnesses and the exhibits

610

```
1  admitted into evidence.  You will have those exhibits
2  in the jury room during your deliberations.
3          Instruction Number 7.  You may draw reasonable
4  inferences from the evidence which you feel are
5  justified in the light of common experience.  In other
6  words, you may make deductions and reach conclusions
7  which reason and common sense lead you to draw from the
8  facts established by the evidence.
9          Instruction Number 8.  Lawyers' statements,
10 objections and arguments are not evidence.
11         Instruction Number 9.  A witness may be
12 discredited or "impeached" by contradictory evidence,
13 or by evidence that at some other time the witness has
14 said or done something, or failed to say or do
15 something, which is inconsistent with the witness's
16 testimony at trial.  If you believe any witness has
17 been so impeached, you may give the testimony of that
18 witness such weight as you believe it deserves.
19         Instruction Number 10.  You have heard
20 evidence relating to Special Agent Fitzgerald's
21 conversation with the Dillards.  You may consider
22 evidence of statements made by Special Agent Fitzgerald
23 as evidence relating to the reaction or results of a
24 law enforcement investigation, as I have instructed you
25 elsewhere in these instructions.  However,
```

611

```
1   Special Agent Fitzgerald was not authorized to speak
2   for the Department of Justice, or to make the legal
3   decision as to whether a case is prosecuted or not.
4   You should not consider statements by him as to
5   the -- by him as to the legal judgment or opinions of
6   the Department of Justice.
7           Instruction Number 11.  The plaintiff United
8   States contends that the defendant Angel Dillard, in
9   writing the January 19, 2011 letter to Dr. Mila Means,
10  violated a federal statute known as the Freedom of
11  Access to Clinic Entrances Act, also known as FACE.
12          The defendant Angel Dillard contends that her
13  letter was not a threat of force or physical harm, but
14  persuasive speech protected under the First Amendment,
15  and not a violation of the statute.
16          Instruction Number 12.  The United States must
17  prove each element of its case by a preponderance of
18  the evidence.  In this situation, a preponderance of
19  the evidence simply means that an -- that an amount of
20  evidence that is enough to persuade you that the
21  Government's claim is more likely true than not true.
22          In determining whether the Government has met
23  this burden, you may consider the testimony of all of
24  the witnesses, regardless of who may have called them,
25  and all of the exhibits received in evidence,
```

612

1  regardless of who may have produced them.

2          Instruction Number 13.  To establish its claim

3  that the defendant Angel Dillard violated the FACE Act,

4  the Government must prove by a preponderance of the

5  evidence:

6          First:  That the defendant's letter to

7  Dr. Means would be taken by a reasonable person in the

8  position of Dr. Means to convey a true threat,

9          Second:  That the defendant intentionally

10 attempted to intimidate Dr. Means, and

11         Third:  That the defendant did so to

12 intimidate Dr. Means from providing reproductive health

13 services.

14         Instruction Number 14.  Intimidation, as used

15 in these instructions, means to place the person in

16 reasonable apprehension of bodily harm to himself or

17 herself or to another.

18         Reproductive health services under FACE means

19 "reproductive services provided in a hospital, clinic,

20 physician's office, or other facility, and includes

21 medical, surgical, counselling, or referral services

22 relating to the human reproductive system, including

23 services relating to pregnancy or the termination of a

24 pregnancy."

25         The First Amendment to the United States

1  Constitution protects the right of all persons to speak

2  to issues of public concern.  FACE explicitly exempts

3  from its coverage "expressive conduct" which is

4  "protected from legal prohibition by the First

5  Amendment."

6         However, the First Amendment does not protect

7  actions or speech which amount to intimidation by a

8  "true threat" of violence.

9         Instruction Number 16.  A true threat is a

10  serious expression of an intent to commit an act of

11  unlawful violence to a particular person.

12         A true threat exists when a reasonable person

13  in the position of the recipient of a communication

14  would consider that an actual threat has been made.  In

15  making this determination, you should consider the

16  content of the communication, its context, and the

17  actual recipient's response.

18         If a reasonable recipient of the communication

19  would conclude that a communication conveys a true

20  threat, a true threat exists, even if the sender did

21  not actually intend to carry out the threat.

22         Language indicating that future violence is

23  certain or contention, imminent or remote in time, or

24  will be undertaken directly by the sender or by other

25  persons are all relevant factors which you may

614

```
1  consider.
2         Instruction Number 17.  A warning of imminent
3  violence may contribute to a finding of a true threat.
4  But even a suggestion of future violence which is not
5  imminent may still be a true threat, so long as the
6  communication conveys a gravity of purpose and
7  likelihood of execution.
8         Instruction Number 18.  Similarly, a warning
9  that violence may occur only if certain conditions are
10 met may be less likely to constitute a true threat than
11 one that is unconditional.  But such a warning of
12 violence in the event that an additional condition
13 occurs may still be a true threat, so long as the
14 communication conveys a gravity of purpose and
15 likelihood of execution.
16        Instruction Number 19.  A true threat may be
17 more likely to exist where a communication
18 unequivocally and directly expresses the sender's
19 personal intent to commit an act of violence.  In
20 contrast, a prediction of violence by third parties
21 unknown to and unaffiliated with the defendant may be
22 less likely to constitute a true threat.
23        An expression that the sender of a
24 communication will personally engage in violence is not
25 essential in all cases.  A warning of violence by third
```

615

1 persons may still be a true threat if the recipient

2 could reasonably conclude, based on the entire context

3 of the communication, that the communication is

4 actually a veiled threat of violence by the sender or

5 by third persons acting under the sender's direction or

6 in conspiracy with her.

7 　　　　　Instruction Number 20.  Finally, a true threat

8 may exist even if the actual recipient of the

9 communication did not feel personally threatened.  A

10 true threat may exist if a reasonable person in the

11 position of the recipient would conclude the

12 communication was an actual threat.

13 　　　　　Instruction Number 21.  The second essential

14 element of the Government's case requires you to

15 determine the defendant's intention in sending the

16 letter.  A defendant is liable under FACE only if she

17 intentionally injures, intimidates, or interferes with

18 by force or threat of force someone seeking to provide

19 or obtain reproductive health services

20 　　　　　Intent is a state of mind.  Since it is not

21 possible to look in to a person's mind to see what went

22 on, the only way you have of at arriving at the intent

23 of the defendant -- excuse me -- is for you to take

24 into consideration all of the facts and circumstances

25 shown by the evidence, including the defendant's

616

1   statements, the results of any law enforcement

2   investigations, the exhibits admitted, and determine

3   from all such facts and circumstances what the intent

4   of the defendant was at the time in question.

5           You may also consider the natural and probable

6   results or consequences of any acts the defendant

7   knowingly did, and whether it is reasonable to conclude

8   she intended the ultimate consequences.  You may find,

9   but you are not required to find, that the defendant

10  knew and intended the natural consequences of her acts

11  she knowingly did.  This means that if you find that an

12  ordinary person in the defendant's situation would have

13  naturally realized that certain consequences would

14  result from her actions, then you may find, but you are

15  not required to find, that the defendant did know and

16  did intend that those consequences would result from

17  her actions.  This is entirely up to you to decide as

18  the finders of facts in this case.

19          Instruction Number 22.  For purposes of the

20  third element set forth above, you must determine the

21  defendant's purpose in sending the letter.  The element

22  is met if the defendant sent the letter for the purpose

23  of intimidating Dr. Means from providing reproductive

24  health services.

25          This element may be satisfied even if the

1   recipient of the communication was not then providing

2   reproductive health services currently.  FACE is also

3   violated if a threat is sent with the intention of

4   intimidating a provider from such services in the

5   future.

6           Instruction Number 23.  If you determine that

7   the defendant violated the FACE Act, the statute

8   authorizes me to determine the appropriate remedy.

9           Instruction Number 24.  I have mentioned in

10  the prior instruction that I am legally authorized to

11  determine the appropriate remedy if you decide that

12  defendant violated the FACE Act, but that does not mean

13  that I believe the plaintiff should, or should not,

14  prevail in the case.  That decision rests solely with

15  you.

16          Your verdict must represent the considered

17  judgment of each juror.  Your verdict must be unanimous

18  verdict.  In other words, to return a verdict, each of

19  you must agree to it.

20          If you do not reach a verdict, the

21  participants may be put to the expense of another

22  trial.  If the case is retried, a new jury must be

23  selected in the same way and from the same sources you

24  have been chosen, and we have no reason to think that a

25  future jury would be more competent or that evidence

618

1  produced at a future trial would be more clear or

2  substantial.

3          As jurors, you must consult with one another

4  and deliberate with a view to reaching an agreement if

5  you can do so without violence on individual judgment.

6  Each of you must decide the case for yourself, but only

7  after an impartial consideration of all the evidence

8  with your fellow jurors.  During your deliberations, do

9  not hesitate to re-examine your own views or to change

10 your opinion if you are convicted it is erroneous.  But

11 do not surrender your honest conviction as to the

12 weight or effect of the evidence solely because of the

13 opinion of your fellow jurors or simply to return a

14 verdict.

15         Remember at all times you are not partisans.

16 You are judges of the facts.  Your sole interest is to

17 seek the truth from the evidence in the case.

18         Instruction Number 25.  At times during the

19 trial, I have ruled on the admission of certain

20 testimony and exhibits.  Those matters are questions of

21 law for the court.  Do not concern yourselves with or

22 draw any inferences from those rulings.

23         I have not intended to and I do not express

24 any opinion in these instructions, any rulings, actions

25 or remarks about the resolution of any issue in this

619

1  case.

2          You will now hear the arguments of counsel.

3  Their role is to offer interpretations of the evidence

4  consistent with their respective causes.  Please give

5  them your thoughtful and respectful attention.

6          Finally, Instruction Number 26.  Upon retiring

7  to the jury room you should first select one of your

8  number to act as your presiding juror.  The presiding

9  juror will preside over your deliberations and speak

10  for you during court.  A form of verdict has been

11  prepared for you.

12          You will take the verdict form to the jury

13  room, and when you have reached unanimous agreement as

14  to your verdict, you will have your presiding juror

15  fill it in, date and sign it, and then return to the

16  courtroom.

17          If, during your deliberations, you need to

18  communicate with the court, please write out your

19  message or question, have the presiding juror sign it,

20  and notify our chambers.  May law clerk will be

21  dispatched to receive your message or question.  I will

22  respond as promptly as possible, either in writing or

23  by having you return to the courtroom so that I can

24  address you orally.

25          With regard to any message or question you

1  might send, you should never state or specify your

2  numerical division at the time.  In other words, do not

3  reveal how the group is voting, unless it is in

4  response to a direct question from me about your

5  division.

6          Dated May 5, 2016, signed J. Thomas Marten,

7  Judge.

8          You each also have an exemplar of the verdict

9  form with a caption at the top.  It says:  We, the

10 jury, impaneled and sworn in the above entitled case,

11 upon our oaths, do make the following answer to the

12 questions propounded by the Court:

13         1.  Under all the circumstances of the case,

14 would a reasonable recipient of defendant's January 15,

15 2011 letter believe it conveys a true threat of force?

16 You will answer that question yes or no.

17         If your question to Number 1 is no, then your

18 presiding juror will date and sign the back page of the

19 verdict form and notify us that you have a verdict.

20         If you answer number one yes, you go to the

21 second question.  Did the defendant, in sending her

22 letter, intentionally seek to intimidate Dr. Means?

23         Your answer here again will be yes or no.

24         If your answer to number two is no, your

25 deliberations are over and, again, the presiding juror

621

1   should sign and date the last page of the verdict form.

2          If your answer is yes, you go on to question

3   number three which is:  Did Defendant Dillard send the

4   letter for purposes -- or for the purpose of preventing

5   Dr. Means from providing reproductive health services?

6          Again, you'll answer that question yes or no

7   and once you're through, the presiding juror is to sign

8   and date the form and then notify us.

9          Now, as I indicated, you each have a copy of

10  the instructions and the verdict form.  My

11  instructions, which are identical to yours except where

12  I've corrected a couple of typos along the way here

13  today, are the actual original instructions.  As I say,

14  they are identical to yours with a couple of

15  corrections.  You can see where those are.

16         The verdict form that I am sending back with

17  you is also the same.  Both the original instructions

18  and verdict form are -- are stamped "original."  Those

19  are the ones that you should, at least the verdict

20  form, sign and date when you have the verdict in the

21  case.

22         And, incidentally, as I noted, you're all to

23  take your instructions with you to the jury room so you

24  can refer to them if you need to during your

25  deliberations and at the conclusion of the case, you

622

```
 1  are all welcome to take your set of instructions home,
 2  so if you have a history to reflect on anything here
 3  you can pull out the instructions.  There they are.
 4          The Government has the burden of proof in this
 5  case so it will go first.  And, then Ms. Dillard's
 6  counsel will do her closing, and then the Government
 7  again with the burden of proof will have the
 8  opportunity to preserve a rebuttal.
 9          So, who will be closing for the Government?
10          MS. ABBATE:  I will, Your Honor.
11          THE COURT:  All right.  Ms. Abbate, come on up
12  and you can begin your closing.
13          And, folks, while this is not evidence, you
14  are going to be hearing -- all of these folks have
15  lived with this case for a number of years and so you
16  ought to pay attention to their arguments and their
17  interpretations of the evidence.
18          MS. ABBATE:  May it please the Court.
19  Counsel.
20          THE COURT:  And you're certainly welcome to
21  turn the podium if you wish to, Ms. Abbate.
22          MS. ABBATE:  Thank you, Your Honor.
23          THE COURT:  Certainly.
24          MS. ABBATE:  Ladies and gentlemen of the jury,
25  the defendant, Angel Dillard, opposes abortion and that
```

1    is her right.  She did not want Dr. Means to provide

2    abortions.  And, again, that is also her right.  But

3    it's how she opposed Dr. Means, how she opposed her

4    plans by writing this letter and by using fear and by

5    using intimidation, by invoking violent imagery, that

6    is not her right.

7            She could have done a lot of things about

8    Dr. Means' decision.  She could have protested or

9    demonstrated.  She didn't do that.  She could have

10   lobbied.  She could have written to the legislature.

11   She could have organized churches.

12           THE COURT:  Ms. Abbate, I am sorry, I can't

13   hear you.  You can move the podium up and swing that

14   mike out to the side if you want to so you don't have

15   to be stuck behind it.

16           MS. ABBATE:  This podium is not designed to be

17   driven.  All right.

18           THE COURT:  And you're going to need to speak

19   right into the mike, so if you want to -- what I'm

20   saying is if you want to turn that podium directly to

21   the jury so you can look at them, pull the mike out to

22   the side so you can stand to the side of it.

23           MS. ABBATE:  Oh.

24           THE COURT:  And we'll still pick you up

25   beautifully.

624

1          Thank you very much, I appreciate it.

2          MS. ABBATE:  All right.  This is going to

3    work.

4          So the Defendant Dillard, she could have done

5    a lot of things to express her views on abortion and

6    many people do.  And, again, that's their right.  But

7    the defendant didn't do any of the things that people

8    usually do, even as they are in this society.  She

9    didn't even talk to anybody in Wichita about this

10   problem, about this issue, about Dr. Means starting to

11   provide abortions, or planning to.

12         She didn't talk to anybody in those three

13   churches that she mentioned and, in fact, her

14   description of three churches within one block wasn't

15   even accurate.  She wasn't talking about them, she

16   wasn't talking to them.

17         The other church she had mentioned was the

18   church that her and her husband had belonged to and

19   that church actually asked her to leave because of this

20   letter, because they did not want to be associated with

21   the violent imagery.  They did not want to be

22   considered one of those three churches.  They didn't

23   want to be associated with the violent imagery.

24         So one of the things that certainly people can

25   do to show their opinions, their opposition to

625

1  anything, including abortion, is to write a letter and

2  of course that's what the defendant did.  She wrote a

3  letter.  She didn't write just any letter, though, she

4  wrote a letter that was designed to intimidate

5  Dr. Means.  She meant to scare her and she did.  This

6  letter talked about explosives and it referenced Dr.

7  Tiller and this letter showed that the defendant

8  already knew certain things about Dr. Means.  She knew

9  things already.

10        Now the defendant, she didn't write a letter

11 like the other minister, Minister Reverend Smith who

12 said Dear Dr. Means, please don't perform abortions in

13 Wichita.  Sincerely, Paul Smith.

14        He used the word "please" and says "Dear" and

15 signs off "Sincerely" and he comes across as a

16 gentleman, as someone who is just concerned about

17 keeping abortions out of Wichita.

18        Angel Dillard did not write a letter anything

19 remotely like that and she did not write a letter like

20 Mrs. Kliewer, either.  Now, Mrs. Kliewer's letter was a

21 little bit longer, longer in length to the defendant's

22 letter, single page, a little bit more, single spaced,

23 and her letter was really heartfelt.  She really meant

24 what she said.

25        She believes in her views, she believes in her

1  opposition to abortion every bit as much as

2  Mrs. Dillard does.  Every bit.  It is heartfelt, it's

3  personal, it's real, and she conveyed that in a way

4  that was legal.  She conveyed that in a really

5  heartfelt way.  She wanted to share her story, her

6  story of loss, of personal regret, and of redemption.

7  That letter went on to share the love of Jesus Christ

8  and the salvation that he offers to us.  And when that

9  letter uses the word "we" and "us" she is including Dr.

10 Means in that we, in that us.

11         When the defendant talks about "we" and "us"

12 she's talking about a "we" and "us" that is absolutely

13 against Dr. Means.  This wanted to bring Dr. Means to

14 love and to hope, to salvation and, in fact, she used

15 the word love five times in her letter.  Five times she

16 uses the word "love".  She uses "please" four times and

17 she signed off by saying, "Love in Jesus' name."  And

18 that is her truth, and that is what she sends and

19 Dr. Means received it, and she read it, and that was

20 fine.

21         We know that the defendant, Mrs. Dillard, she

22 wrote her letter for a far different reason.  She did

23 not want to save Dr. Means; she wasn't concerned about

24 Dr. Means.  She wanted Dr. Means to be so fearful that

25 she would stop her plans.  That she would decide not to

627

1   go forward and provide abortions here in Wichita.  And

2   because of this letter, Dr. Means was afraid.  You

3   heard her testify.  She was intimidated.  Angel Dillard

4   is an intelligent woman.  Is she a criminal?  She did

5   intimidate Dr. Means.

6           She did it on purpose, too.  You heard that

7   she was very intentional about how she wrote her

8   letter; thoughtful.  She didn't just write it and send

9   it.  She put it away for a couple weeks.  She prayed

10  about it.  She knew what was in that letter.  She

11  thought about it.  And she sent it.  Because she wanted

12  to intimidate Dr. Means.

13          So what does that mean for us today?  What it

14  means is that to establish the claim that the defendant

15  violated the Freedom of Access to Clinic Entrances Act,

16  federal law, that we the United States have to prove by

17  a preponderance of the evidence those three factors.

18          First, that the defendant's letter to

19  Dr. Means would be taken by a reasonable person in the

20  position of Dr. Means to convey a true threat.  That's

21  not looking at solely Dr. Means, it is looking at a

22  reasonable person in her position.

23          Second, that the defendant intentionally

24  attempted to intimidate Dr. Means.

25          And then, finally, that the defendant did so

1   to intimidate -- did so intimidate Dr. Means from

2   providing reproductive health services.

3           And I think, you know, starting with the

4   easiest one, there is really no question that the third

5   element, whatever Mrs. Dillard did here today, whatever

6   conclusion you reach about what she did and how to

7   characterize it, the -- under the first two prongs of

8   this test, I think it is quite clear whatever she did

9   it was because she did not want Dr. Means to provide

10  abortion services.

11          So if you find number two, the second one that

12  she indeed attempted -- attempted to intimidate

13  Dr. Means, clearly, the only reason that would be is

14  because she was trying to provide abortion services.

15          So the first question we get to is, is this a

16  threat of force?  Is the letter a threat of force?  And

17  you heard the judge talk about the definitions and

18  things to consider but, basically, it's a threat of

19  force if a reasonable person in Dr. Means' position

20  would fear harm from the defendant or from her

21  associates.

22          And, so, if as Mr. Goemann said, words truly

23  are like stones dropped from great heights.  Then where

24  they land:  Context.  When we are looking at context,

25  we're looking at the input.  What did the recipients

629

1   know?  What could this reasonable person we placed in

2   that position, what could that reasonable person know?

3          What was knowable at that time from that

4   letter that landed in Dr. Means' medical office?  And

5   to be clear, at this point in the game we're only

6   looking at where the words landed, at the recipient,

7   we're only looking at Dr. Means.

8          The second prong about intent to intimidate,

9   that we'll look at what the defendant was thinking

10  herself but right now, how did the words -- how do they

11  feel?  How do they react?  As a matter of fact, how do

12  they land?  Do they do any harm?  What harm and why?

13         And there's -- there's a reason for that and

14  that's because when we are dealing with threats we're

15  not dealing with a physical injury that you might get

16  from being shot or pushed down or what have you.  The

17  injury we're talking about here is fear, that's the

18  injury.  And that's what happens when you get a letter

19  like this, when you get a letter that discusses things,

20  that contains a threat, that talks about this bodily

21  injury, the feeling is fear and that's the feeling that

22  the law is designed to protect and prevent people from

23  causing fear; apprehension.

24         So, first we have to look to see whether a

25  reasonable person would be intimidated and whether a

1  reasonable person would be afraid.  And, again, it

2  always boils down to context.  Certainly, we can all

3  think of times when somebody would say something in one

4  circumstance and be threatening and not so threatening

5  in another circumstance.  You know, the -- the typical

6  one is, you know, you can't yell "fire" in a crowded

7  theater unless there is a fire.  Well, you can if

8  you're on stage in a play so, it is that type of thing

9  of, well, what matters is the words, absolutely, but

10  also what's going on and where the words were heard

11  were received by the people they were intended to.

12         So the other thing that it's important to note

13  that as we're talking about an expression of intent,

14  we're not talking about actual intent.  So you're not

15  going to be asked whether the defendant or anybody else

16  intended to take action, intended to do a violent act.

17  We're not talking about what was going to happen in the

18  future with some sort of a force.

19         We're talking about what happened when the

20  letter landed, with the threat, with the fear; nothing

21  physical, nothing violent and nothing in the future.

22  When we're talking about the context, that's all we're

23  talking about.

24         Context, again, it's not even one moment in

25  time.  It's not like when you get hit by a ball, you're

631

1   hit and it's done, and you've had your injury.

2          The threat can go on and on depending on what

3   the threat is.  It's not limited to a moment in time.

4   So you can -- somebody can say to you, I am going to

5   throw a ball at you, or one of my pals is going to

6   throw a ball at you sometime during recess that lasts

7   for 15 minutes, or sometime during the week and for

8   however long the threat is still issued here, you could

9   be fearful so that is the context for that.  So it

10  depends.

11         So the context here is going to be over some

12  time.  It's not just the initial impact.  It adds up

13  over time.  So this context that we look at is whether

14  a reasonable person in Dr. Means' position, whether

15  they could feel and fear harm from the defendant,

16  looking for someone acting in association with her.

17  Her or one of her associates.  Doesn't have to be her

18  and you don't have to find that the woman sitting at

19  the defense table was intending to commit an act of

20  violence.  You don't.  We're not asking that.

21         In fact, the Freedom of Access to Clinic

22  Entrances Act, were the instructions, I believe Number

23  20, I believe do talk about that if you violate the

24  Freedom of Access to Clinic Entrances act by

25  intentional injury, intimidating or obstructing --

632

1   we're not talking about any jury, we're not talking

2   about any obstruction, we're talking about just the

3   intimidation.  And then with that, there are different

4   acts that can be actually involved in the case:

5   Force, threat of force, or physical obstruction.

6          We're not talking physical obstruction and,

7   you know, we're not talking about force.  We are not

8   talking about an act of force.  We are talking about a

9   threat of force, regardless of whether anybody was

10  going to act on it, intended to, regardless of whether

11  anybody had the capability of acting on it, it doesn't

12  matter.

13         And it doesn't matter because the fear is the

14  same.  The person who receives the threat of force is

15  going to feel the same fear regardless of whether the

16  person intends to carry out any act in the future if

17  they don't who the writer of the letter is.  That is

18  the fear and that is what it is designed to prevent.

19         And so it doesn't matter and, in fact, the

20  most effective threats never require any action.  If

21  you can get someone to do something with words, enough

22  said.  Nothing further to do.

23         So the context here, we can look at several

24  things:  You know, the actual words of the letter; the

25  time and the place where the letter is received; who

1  wrote the letter; and any public statements that she

2  made; and how people reacted to the letter.  And,

3  again, you'll notice the one that thing that is not

4  there is anything about what the defendant intended at

5  all.  There is nothing right there right now of that.

6          So the actual words, you have read the letter,

7  you've seen it up on your screen.  Not yet but perhaps

8  soon, you may be able to quote it verbatim, I'm hoping

9  it doesn't come to that.  But you've read the letter

10 and the words that are used are, in fact, designed to

11 intimidate.  They're designed to scare Dr. Means, to

12 make her afraid, to make her afraid of violence, to

13 make her afraid of violence at the hands of the

14 defendant or her associates.  That was the expression.

15 Again, not the actual intent, but that was the

16 expression that came across.

17         And she sets the stage right away by stating

18 in the fourth sentence down, Maybe you don't realize

19 the consequences of killing the innocent.  If Tiller

20 could speak from hell -- consequences, so close to

21 Tiller, this is just over a year and a half after

22 Dr. Tiller's murder.  Dr. Tiller was murdered May 31st,

23 2009 and this is in January of 2011.  It hasn't even be

24 two years.  It's fresh, it's real, it's raw.

25         And that is why Dr. Means decided not to

634

1   fulfill this void, because Dr. Tiller was murdered.

2   Just in case someone in Dr. Means position wouldn't

3   understand that, wouldn't know that and wouldn't

4   realize that.  There is no need to educate someone like

5   that.  She's from Wichita.  She's been here.  She lived

6   through it.  She knows.

7          She talks about these unnamed others, these

8   "they" people who are looking at things.  These

9   thousands of people from across the country, not just

10  from Wichita, but across the country looking in to her

11  background.  She sprinkles in her references to I, we,

12  our, she intermixes them.

13         And she also has these "they" people.  And

14  consider what's scarier?  One person I'm going to do

15  something, one person says something you can send the

16  authorities to check out the person out or, you know,

17  stop their plans or, you know, bring an action or

18  arrest whoever made the threat, whatever, you can take

19  care of one person.  You can deal with one person.  You

20  can neutralize it if it is one person, however that may

21  be.

22         But when you're talking about thousands of

23  people, who are these people?  Where are they?  They're

24  not just in Wichita, they're all over the country.  Who

25  are these people?  They are nameless, they're faceless.

1          Dr. Means doesn't know.  Are they men?  Are

2    they women?  Young?  Old?  Nothing.  She knows nothing

3    other than thousands of people out there, they're all

4    against her, they're all watching her, they're all

5    looking at her, and they're all in the context of

6    Dr. Tiller just sprinkled in about three lines up.

7          And it's kind of ironic because the -- the

8    defendant knows how frightening it can be if someone

9    you don't even know what they look like is threatening

10   you, because it happened to her.  She knows what that

11   feels like.  She knows the fear.

12         Someone that the defendant had never even met

13   conveyed some form of threat to her and whatever it

14   was, one thing it did not say -- it did not say, I will

15   harm you.  It did not say, I will harm your family,

16   your girls.  It did not say that.

17         And, yet, the defendant was afraid of what

18   that person wrote.  So she went to court to get a

19   protective order, say why she was afraid, and then the

20   court form that she filled out, question number five,

21   plaintiff needs to list the reasons why you need this

22   protective order, there is just three full lines there

23   to write -- hand write, and in one of those lines the

24   defendant said that the reason that she would need a

25   protective order is because she didn't know what he

```
 1  looked likes and she was afraid.  She didn't know what

 2  he looked like.

 3          And this person knew personal things about

 4  her, things that the defendant hadn't told them.  She

 5  told him some stuff, apparently, but she didn't tell

 6  him everything.  He knew things about her, including

 7  where she lives, including personal details about her

 8  family.  Not quite as much as she talked about in

 9  particular with Dr. Means, but things to make her

10  afraid.  Rightfully so.  That's scary.  The defendant

11  knows, that's scary.

12          So the people that Defendant Dillard wrote to

13  Dr. Means about, they're not just going to know these

14  facts that you can look up in the phone book or even go

15  online and find out, although, Mrs. Dillard doesn't

16  like the internet and doesn't ever go online.  So keep

17  that in mind if you wonder how she could get her

18  information.  She doesn't go online, is not looking.

19          The things that these people are going to know

20  is not just where she lives or where she went to school

21  or some quote that she made in the paper sometime ago

22  but they are going to be paying attention and they're

23  going to be paying attention over time, they're going

24  to know habits, what she does repeatedly, routines,

25  things she does on weekends, weekdays.  Wherever she
```

637

1   goes, they're going to know it.  Habits and routines.

2   And they know her, she doesn't know them.

3           So, where can she go to feel safe?  Pretty

4   much nowhere.  The letter covered it all.  She can't go

5   to her office.  She can't go home.  She can't take a

6   road trip because they know her car.  She can't go to

7   any of her friends to feel safe.  She can't go pick up

8   some toothpaste at Walgreens or some salad at Dillons.

9   She can't go shopping because they know her habits,

10  they know what store she shops, they know her, she is

11  not safe in Wichita, that's clear, and she is not safe

12  across the country because the thousands of people she

13  doesn't know are there.  They're nameless, they're

14  faceless, they're everywhere, and they're watching her.

15  And it's personal.

16          Dr. Means was getting ready to do something

17  that had gotten a man killed.  Something that nobody

18  else had stepped up to do since Dr. Tiller was

19  murdered.  And it's something legal, regardless of

20  whether people agree or disagree, or what have you.

21          It was intimidating and it was scary

22  and -- and it was intentional.  I'm talking about her

23  intent next, but even though the words "I" and "we"

24  were interspersed with they, and someone, looking at

25  the letter you can see that the defendant has included

```
 1  some facts that show that she has some knowledge about
 2  Dr. Means.  She knows about the ethical issues.  The
 3  discipline thing, she doesn't have a computer, she
 4  doesn't look that up on line, I don't know if she went
 5  to the courthouse, pulled it up.
 6          She knew -- well, she made mention to the
 7  Kansas City clinic where Dr. Means  had been getting
 8  her training.  That kind of hits home.  That's where
 9  she goes.  I guess they know, because they followed
10  her.  They know everywhere she goes.
11          It's her habit to go up there.  Every other
12  Saturday.  They know it.  Kansas City.  And they say it
13  to her.
14          The letter makes a distinction between the
15  early abortions at six weeks and the later term
16  abortions at 26 or whatever weeks, and they make a
17  distinction between that.  And that was an important
18  distinction to Dr. Means.  She was just doing that
19  earlier, another personal detail that's in the letter
20  and what a person receives that letter, just the words
21  alone, all these things, that's context.
22          Also context, of course, is that this is
23  Wichita.  I don't need to go through everything that
24  that means.
25          One thing to look at is the reaction of
```

1  anybody who looked at responded and heard and received

2  this letter and the first person who got it,  of

3  course, was Andrea Hamill, the office manager, and you

4  heard Dr. Means talk about what Andrea Hamill did and

5  what she did was unusual.

6          She had gotten letters before and had turned

7  them over to the police or FBI as she had been

8  instructed and she told Dr. Means about them at the end

9  of the day.  But this one was different and this one

10 when Dr. Means came out from seeing one of her

11 patients, there was her office manager standing in the

12 little main room, off of which there were three little

13 patient rooms, in the middle of her work with the

14 Wichita Police Department.  Come here, Doctor, you've

15 got to take a look at this.  This is -- this is

16 something that needs your attention right now.  It's

17 important.

18         So Andrea Hamill reacted, she called the

19 Wichita Police.  In fact, she also called the FBI, as

20 well.  She knew it was important and she reacted.

21         Dr. Means also had a very immediate reaction

22 to the words.  And you heard her testify about -- about

23 how it made her feel.  She had a reaction, also,

24 that -- that lasted past that day and into the weeks

25 and even the months that followed.  That fear stayed

640

1   with her and it made her do things she wouldn't

2   normally do.

3          She altered her route to and from work.

4   Before she left her office, she would look out the

5   windows, see if her car looked like the same as it had

6   been, as if you would know.  She got a little concerned

7   when she heard the noises in her own car.  Took it in.

8   She took it very seriously.

9          The Wichita Police Department, of course, took

10  the letter seriously.  They came out, talked to Dr.

11  Means, talked with the FBI, as well and then, finally,

12  the FBI came, as well, giving her the picture and the

13  FBI is a -- also having a reaction to this.

14         And the FBI, Agent Fitzgerald, Special Agent

15  Fitzgerald, they're all special, he testified that he's

16  a criminal guy, that's his background.  That's what he

17  does.  That's investigation -- he investigates crimes.

18  And he is with the Domestic Terrorism Division of the

19  Federal Bureau of Investigations and he testified that

20  his number one priority is to prevent acts of domestic

21  terrorism.  To prevent violence from actually

22  happening.  To look to see if they are going to act on

23  things going forward that he needs to prevent and,

24  unfortunately, of course, when things happen he has to

25  go back and see, you know, who did this act of violence

641

1  and how did they figure out who it was.

2          But when he gets wind of something that might

3  be going on, his initial thing where he is coming from

4  is the criminal world.  Is something going to happen?

5  Do I need to take any steps?

6          Ultimately, he concluded that Mrs. Dillard was

7  not going to commit an act of violence.  And we're not

8  here because we think she was or is.  That's not at

9  issue today.  Whether or not Mrs. Dillard was ever

10  going to commit an act of violence is not why we're

11  here.

12          We're here because she sent a letter that made

13  someone think she would.  She sent a letter that made

14  someone think that she or her associates would commit

15  an act of violence, regardless of whether she knows how

16  to make explosives, or has a car or is not paralyzed

17  from the neck down, it doesn't matter.

18          What she wrote conveyed that either her or her

19  associates might do this, that is the threat.  That's

20  what we are looking at.  Not looking to see whether she

21  took any steps, whether anybody she knows took any

22  steps.  We're not here for that.  That's a different

23  story and that's not even alleged.

24          By saying story, I don't want you to get the

25  wrong idea, that is simply just not the reality.  The

642

1    reality is she sent a letter.

2         So, in that context comes the FBI Special

3    Agent Fitzgerald and what he perceives is, he's not

4    heard of Angel Dillard before this time.  He sees the

5    letter, he reads the language, he sees the reference to

6    Dr. Tiller, reads that and he takes that letter and is

7    like, you know what?  This -- this is something.

8         He decides to interview Angel Dillard.

9    Decides to interview her to make sure she's not going

10   to act on any violence.  So in order to make that leap,

11   why would he want to interview her?  It's because her

12   letter conveyed an expression of intent that was so

13   serious that it caused a federal agent with years of

14   training in terrorism to act.

15        In fact, can you imagine if he didn't act?

16   Can you imagine any law enforcement officer not doing

17   something about this letter?  Not going to see who

18   wrote this letter?  In 2010 in Wichita?

19        And so, of course, Agent Fitzgerald did.  He

20   took the letter and he went back to his office.  Based

21   on the words alone he knew nothing about the defendant

22   when he looked at the letter, he took the letter, he

23   has the words, he knows nothing more than the doctor.

24   Nothing more than the office manager.  That's what he

25   knows.  The letter.  A one page letter.  That's what he

643

1   knows.  That's what makes him act.  Simply the words.

2          So when he gets back to his office, he runs a

3   computer secret FBI program and he finds out that they

4   do have some information about Mrs. Dillard and he

5   finds out that she had been interviewed before in the

6   context of her letters with Scott Roeder and he finds

7   out that, in fact, because she had started writing to

8   Scott Roeder, some of his colleagues and various

9   federal agencies and bureaus, criminal fellows, went

10  out to talk to her to she if she is going to commit an

11  act of violence.  And the reason they did that is not

12  because Mrs. Dillard ever did anything.  She never did

13  anything, she never took any steps to -- to commit

14  violence, she never did.

15         What she did, is she wrote a letter to

16  Scott Roeder.  Why that's significant is because who

17  Scott Roeder was and what he did and the connection

18  between people that go and visit anti-abortion

19  extremists who have committed crimes and been locked

20  up.  You heard Agent Fitzgerald tell you about that.

21         The FBI doesn't go out and talk to everybody

22  who visits a murderer.  Nothing else would ever get

23  done.  People go visit murderers all the time.  They

24  should.  It's great to reach out to people.  Prison

25  ministries are phenomenal, any ministry is.  Any help

1    you can provide to the inmates and prisoners, that's

2    fantastic.  What is at issue here and what made the FBI

3    act is that this person was anti-abortion extremist,

4    Scott Roeder.

5           You heard what the others said about the links

6    between Shelley Shannon, the folks in that letter, that

7    they, before they committed their acts, they had gone

8    and spoken to somebody else who had already done it.

9    And, again, let me be very clear.  There is no

10   allegation, I don't want to give you the slightest

11   inkling that anyone thought Mrs. Dillard would -- would

12   even act after talking to her, interviewing her, no

13   problem.  But just looking at what we knew, what they

14   knew at the time and said, well, wait a minute, this is

15   significant.

16          The only other thing the FBI agent, Special

17   Agent Fitzgerald knew was what was in the What's the

18   Matter With Kansas movie and it is generally a movie

19   and he didn't even see the newspaper article that we

20   have over here.  He would have acted on the plain

21   language of this letter.  The FBI would have acted on

22   the plain language of the letter that the defendant

23   sent to Dr. Means.

24          And, oh, by the way, she is also writing to

25   Scott Roeder.  She's not just writing to Scott Roeder.

645

1  It's great to write him letters and there's nothing

2  wrong with writing letters, and it's a wonderful thing

3  and nobody is saying that Mrs. Dillard did anything

4  wrong by writing any letters to Scott Roeder or any

5  other inmate.  It's not a crime and the FBI found

6  there's no crime.  She's not doing anything wrong and

7  she wasn't, she wasn't doing anything wrong in writing

8  these letters, she wasn't.

9          But it gives you some context, though, and it

10  really brings home when you look at the context of the

11  statements that she made about Scott Roeder.  The

12  statements in those articles -- take them back there

13  where you, you know, you'll have them in the jury room,

14  I urge you to read them closely and look for where it

15  says that Mrs. Dillard clearly stated that in the

16  context of her established prison ministry she went and

17  talked to Mr. Roeder.

18          It's not there.  It's not there because it

19  didn't exist.  She had not started a prison ministry

20  when she struck up her friendship with Scott Roeder.

21  Eventually it turned in to a prison ministry, and

22  probably a very successful one.  The inmates, I am

23  sure, enjoyed here ministry, and her fellowship, and

24  her teaching, and her singing.  So did the women did

25  that she talked about, I'm sure they did.

646

1          What the article tells somebody who Mrs.

2   Dillard about is -- is -- is chilling.  And Dr. Means,

3   found that out, found out what was in the news article

4   this very evening, sometime after her first patient,

5   either she or her office manager had done the esteemed

6   FBI technique of Googling somebody and what she found

7   was she found an article and the article dealt with

8   Scott Roeder, Angel Dillard, and all this context and

9   it informed how she felt.

10          It informed how you feel.  You get a letter

11  you're like, Well, who is this from?  What's it say?

12  Who is this?  I have to find out.  And what you -- what

13  you find out can be reassuring or it can be terrifying.

14  And in this case, Dr. Means was already afraid, was

15  already in fear of harm from the defendant or somebody

16  she associates with, somebody may place an explosive

17  under her car, which she found out about Mrs. Dillard,

18  is in the letter that we've been talking about.

19          And it comes right here to life at first when

20  you notice the by line that this was

21  published -- Associated Press published it.  And it was

22  published on July 3rd, 2009, 33 days after Dr. Tiller's

23  murder.  Just over a month after this -- this murder.

24  Talks about how these killings are justified.

25          He's not sorry he did it.  That suspect says

647

1    the killing was justified.  So then how does the

2    article actually portray Scott Roeder in case you

3    haven't been around.  You'll see what it says, what the

4    article says.  Who is Scott Roeder?  And they'll list

5    the things that it says about Scott Roeder.

6            So this gives you a context of this guy who

7    still advocates justifiable homicide from his

8    prison -- jail cell, still in the jail and this article

9    also talks about several people -- and we'll talk about

10   each of the people that this article talks about.

11   There's not a whole lot.

12           The one thing in common, Paul Hill, of course,

13   was executed in Florida, is what I was going to say but

14   he was convicted of murdering the doctor, the doctor's

15   bodyguard and the guy was already convicted in Florida

16   and a convicted murderer.

17           Then we could throw the Reverend Donald Spits

18   and what it says about him.  References are Army of

19   God, and it talks about his views.  Now these are all

20   people that are dealing with Scott Roeder and reaching

21   out to Scott Roeder, talking to Scott Roeder.

22           And then we have Linda Wolfe, and it goes on

23   to talk about Linda.  And it talks about her

24   friendships and who she knew and finally we get to

25   Angel Dillard.

648

1          Those are all the people that this article

2     discussed.  All those people, some of them aren't quite

3     notorious, especially the people who are involved in

4     the Right to Life abortion services, certainly those

5     names are well-known, and now we get to Angel Dillard.

6          So regardless of whether or not anything in

7     here is -- that is said is accurate, regardless, this

8     is the context that's coming in.  And so this is what

9     Dr. Means finds out about Mrs. Dillard.

10          It doesn't talk about establishing a prison

11    ministry and reaching out.  It talks about striking up

12    a friendship 33 days after he committed murder.  He

13    shot Dr. Tiller in his head.  Doctor Tiller was acting

14    as an usher in his church, the Reformation Lutheran

15    Church.  He killed him during the congregation on

16    Sunday morning services and 33 days later, she has

17    already befriended him and she's already talking about

18    it.

19          She has already exchanged several letters.

20    She's already talked to him by phone.  She gave him her

21    phone number.  And she plans to visit him.  That's the

22    context.

23          One of the things it says in this article as

24    well, is that she'd been questioned several times

25    already about her -- because she wrote letters to

649

1  Scott Roeder.  You know, makes sense.  They want to see

2  who is writing to this guy, especially considering the

3  pattern and they check her out, though, no big deal and

4  that's fine but it is a question when you go back in

5  the jury room you read about Reverend Spitz, he says he

6  hasn't been questioned.  So even this notorious person

7  who has the Army of God website, advocates for

8  justifiable homicide, he hasn't been questioned but

9  Mrs. Dillard already has been questioned twice.

10          So that's the context.  So regardless of

11  whether the defendant was misquoted, or whether she

12  believes this or that, that's the context.  Would a

13  reasonable person receiving all these inputs, all of

14  these stones falling from great heights, landing in the

15  same one, same place, the same place of context, the

16  same place of Wichita, the same place as an abortion

17  provider, a family doctor who's going to start adding

18  early term abortions to her practice, that's where --

19  the context, that is where all this lands.

20          There are other quotes from Mrs. Dillard out

21  there, as well.  About what Scott Roeder would have

22  been able to accomplish.  And all those legal things

23  that never really seemed to work, but this one thing

24  worked and then she talks about this one move.  And

25  regardless of whether the first part of the statement

1  should have been joined to the second part or whether

2  there is some sort of a -- whatever, the first part of

3  the statement is true and so is the second part of the

4  statement, and the first part of the statement refers

5  to the one move, and that one move was murder.

6  This -- with two trigger pulls, I believe.  But that

7  move was murder.  That's what she's talking about in

8  these interviews that she's giving to the press that

9  are being reported.

10       And this article came out -- came out later,

11  she didn't see this immediately when she -- when she

12  received the letter, but she never was told the result

13  of any investigation.  The FBI never came back and

14  said, Oh, hey, Doc, you know, rest easy, I don't think

15  this one's going to be one of the ones that is going to

16  act on anything.  He never did that, he never told her,

17  he never followed up.  He didn't.  So she didn't know.

18  That was her input, she didn't know.

19       And even when Agent Fitzgerald knew in his FBI

20  law enforcement heart that -- that this woman -- that

21  Mrs. Dillard was not going to commit an act of

22  violence, it doesn't negate the fact that when he

23  looked at the words of that letter, he thought that

24  it -- it conveyed a serious expression of an intent to

25  do harm, an expression of intent.  He's like, This is

651

```
1  an expression of intent.  I better go over here and see
2  if there's actual intent.  Oh, there's not?
3          Okay, (witness uses onomatopoeia) my work is
4  done.  He didn't go back and follow up with Dr. Means
5  and he didn't go back and follow up and he didn't go
6  back and see how she is doing so just because there
7  isn't going to be future harm, there is still the harm
8  that is going to be done to Dr. Means.
9          She is still looking over her shoulder as she
10 goes to the drug store.  She's still staying at
11 different places every night.  She's altering the way
12 she lives her daily life because of the letter she
13 received and this context because of what the defendant
14 wrote, it affected her life.
15         And the FBI didn't know that.  It's not his
16 job to know that.  He's the criminal guy.  He's the man
17 with the gun and he is going to prevent acts of
18 domestic terror and that is his focus, forward looking.
19 Sees an expression of intent and he goes to see if
20 there is actual intent.  You can't go to see if there
21 is actual intent without a finding of an expression of
22 intent.  An expression of intent that is so serious
23 that it causes federal law enforcement to react.
24         Some people may have implied that she knew
25 what she was getting into, or she should have known, or
```

652

```
 1  the fact that the law enforcement officials had come to
 2  her office to tell her all these things, this is the
 3  same thing as Mrs. Dillard, same thing that Mrs.
 4  Dillard did, you know, they're saying the same things.
 5          Well, you know, Doc, you know, obviously, you
 6  know about Dr. Tiller.  They didn't even feel the need
 7  to say that.  You know you're going on have to start
 8  taking some precautions.  You might be getting things
 9  in the mail.  You might be getting followed.  You need
10  to beef up your security.  There's some things you need
11  to know because you are starting to do this and
12  Dr. Means admits, you know, that kind of hit her hard
13  because she hadn't realized that, oh, hey, I am not
14  going to be Doctor Tiller, I'm just going to perform
15  the services, that doctor has patients coming in, they
16  need it and some of these women can't go three hours,
17  two-and-a-half three hours north to get an abortion.
18  They can't.  They don't have a car.  They can't explain
19  their absence for a day.  They can't take someone with
20  them for support when they go up there.  It's not often
21  an easy thing, even if it is early term, even if there
22  is some sort of a problem with the fetus, it doesn't
23  matter, what it's not an easy thing.  You want support.
24  You don't want to go to a strange place in a strange
25  doctor, you want to be in your hometown, with your
```

1  people, with your doctor, with your family, with your

2  partner, with whoever, and some people couldn't do this

3  and some people wanted that.

4          And she wanted to step in and just like when

5  she performs mole removals or whatever the

6  technological term is for mole removals, she charges

7  for those services.  She's not providing free things

8  and she is not going to start doing something that

9  costs her her business that is a huge drain.  So, yeah,

10 there is a financial component, of course.  If there

11 was no financial component to our lives, I'm sure many

12 people would be doing things a little bit differently.

13         So, the FBI and the Wichita Police Department

14 told her these things and somehow that's supposed to

15 have had the same effect.  That should have conveyed

16 this apprehension of bodily harm, this apprehension of

17 physical harm and -- and it may have.

18         She might have been like, yikes, I hope nobody

19 gets me but one thing she would not have thought is,

20 gosh, I hope the FBI doesn't sneak up behind me some

21 day and hurt me.  Gee, I hope that Wichita Police

22 Department car behind me isn't following me to know my

23 practices and routines because they're going to do

24 something to me.  No.  These are law enforcement

25 people.  This is the context.  They came to her.

654

1          And she called them and they had a

2   relationship and they were law enforcement officials

3   and they come in their marked cars sometimes and

4   sometimes they wear the uniforms, and I'm sure the

5   first time they'd flash their badge so she'd know who

6   they are.  She knows their intent, she knows the

7   context of the law enforcement are coming to talk to me

8   about safety and security.  That happens all the time.

9   Many contacts, including this one.

10          They told her, Call us for help any time.

11  We're here for you.  And they said that it's a

12  dangerous life for someone who is going to step in at

13  this time.  It's a dangerous life.  You've got to be

14  careful.  Watch yourself.  Take care.  It's dangerous.

15  We're here for you.  We got your back.  Call us any

16  time.  You get any letter, you get any package, just

17  call us, you don't have to worry, you don't have to

18  decide if this a good one or a bad one, let us decide,

19  we're the professionals, just call us.  We're here for

20  you.  That's different.

21          And, so, the defendant would have you think

22  that Dr. Means should have known what she was getting

23  into.  She should have known.  This is Wichita.  This

24  is Kansas.  What is she thinking?  Of course.  She was

25  here during the Summer of Mercy, she knows full well

1  what happened to Dr. Tiller.  She knows all this, what

2  did she expect?  What was she thinking?  And all of

3  that, all of that type of thinking, you know what that

4  is?  That's context.  That is context.

5         And you're right, she did know these things

6  because she's going to step up and provide abortions in

7  Wichita in early 2010.  That's the context.  Of course

8  she knows it, and it doesn't excuse them from coming in

9  and lighting that fuse, of sparking that spark

10 with -- it doesn't excuse them.  It's in your box, this

11 is going to blow.  Everybody knows it doesn't give you

12 an excuse to light it.  It doesn't.

13        Of course the letter meant something different

14 here in Wichita.  Of course it did.  And that's why

15 this letter, this context, is a threat of force.

16 That's why a reasonable person in that position, here

17 in Wichita, January of 2010, that's why a reasonable

18 person would perceive an actual -- a serious expression

19 of an intent to commit harm by the defendant or

20 somebody she associates with, an expression of intent.

21        Oh, my gosh, this might happen.  She knows

22 stuff.  This might happen.  This is serious.  And this

23 has to be acted on.  So she knows.

24        The second element that you heard about, and

25 that is in your jury instructions is to intentionally

```
 1  intimidate.  And now, here, after we've talked all
 2  about all of the other people, everybody else except
 3  for the defendant -- when we are talking about context,
 4  it doesn't really matter.  What the defendant intended
 5  doesn't matter, it's all about the recipient.
 6          So now, finally, we're looking at what did the
 7  defendant intend?  What was in her mind?  What was she
 8  thinking?  Did she really mean this?  This is when we
 9  get to look at the intent.
10          And while everything we just talked about in
11  terms, in the context of context, all that stuff about
12  context, that was all about what Dr. Means knew and
13  what a reasonable person could have known as well in
14  that position, and so this stuff that we're looking at
15  just doesn't matter whether or not Dr. Means knew it.
16  Doesn't matter.  This is all about what was in the
17  defendant's head.
18          How can we figure that out?  We can ask her
19  and she can tell us and we'll see what she said and
20  we'll evaluate that but this is just looking at the
21  defendant's head.  What's in her head?  What's in her
22  heart?  What's in her mind?  What did she mean?  Why
23  did she send this?
24          Let's see what we know about.  We're switching
25  from a reasonable person, now we're looking at what the
```

657

1  defendant could have meant.

2          Did the defendant intentionally attempt to

3  place Dr. Means in reasonable apprehension of bodily

4  harm to herself?  Did the defendant intend to

5  intimidate?

6          Not did she intend to threaten, not did she

7  intend to issue a threat of force, not did she intend

8  to act on that threat of force, not did she intend to

9  shoot or explode or anything.  But, simply, did she

10 intend to intimidate?

11         Did she intend to make Dr. Means afraid of

12 bodily harm by herself or someone she's acting with?

13 And so when we're looking at intent, the judge has

14 provided you some guidance.  Because it's tough.  How

15 do you know what somebody is thinking?

16         So this is logical:  If something happens, it

17 has an obvious consequence, you can assume that the

18 person meant it.  It makes sense and you may use that

19 reasoning if you want to and, so translating that into

20 the -- the names of the players here said if an

21 ordinary person in defendant -- defendant Dillard's

22 situation would have naturally realized that Dr. Means

23 would be intimidated by the letter, that Dr. Means

24 would be in reasonable apprehension of bodily harm to

25 herself, if you find that, then you may find that the

1  defendant did know and did intend for Dr. Means to be

2  in reasonable apprehension of bodily harm to herself.

3  Resulting from the defendant's letter.  The defendant's

4  letter that discusses things that I, we, they, and

5  someone -- the explosive, placing someone in fear.  All

6  that these people want to do.

7         So, if an ordinary person in defendant

8  Dillard's situation -- what is defendant Dillard's

9  situation at the time she's writing this letter?  Well,

10 she knows that Dr. Means has planned to step in to

11 Dr. Tiller's shoes here in Wichita.  She knows that.

12        She knows an awful lot about doctors who

13 provide abortions.  She said she does a lot of

14 research, not over -- not on the internet, no, but she

15 says she knows a lot of these things and not from

16 talking to people here in Wichita, her husband, but

17 other than that, she's not really talking to very many

18 people, but she knows an awful lot.

19        She's testified about a lot that she knows.

20 She knows about violence against other abortion

21 providers.  She knows that.  She thinks it's so obvious

22 that she's just stating the obvious when she writes the

23 letter.  That's what she knows.  She knows.

24        She, the defendant, was intimately aware that

25 Dr. Tiller had been murdered because the defendant had

659

1  befriended the man who gunned him down.  That was her

2  situation.  She knew that when she wrote this letter.

3  She knew that.

4        She knew that Dr. Means had just announced her

5  plans and that these issues, these safety concerns

6  would be new to somebody who's never done this before.

7  She's just a family practitioner, solo family

8  practitioner, it's just her.  It's just Dr. Means.

9  She's not a super doctor; she's not infallible.  She

10  has got problems and issues and troubles and heartaches

11  like everybody else does.  She's not perfect.  She's

12  just Dr. Means and she's just trying to do something

13  and the defendant knew this was happening.

14        The defendant knew this was not some big

15  corporate agency.  It's not some national chain with

16  security counsel and whatnot, this is just Dr. Means

17  who's been sitting here this whole trial.  It's just

18  her.  Just Mila Means.

19        So that was defendant Dillard's situation.

20  That's the situation.  So from that situation, from

21  that basis of knowledge, and now the defendant's mind,

22  from that basis of knowledge she sends a letter to

23  Dr. Means referencing explosives under a car.

24  Dr. Tiller is murdered.  People know who murdered him.

25  We know your every move.

1         We -- may not be okay with it, but she told

2  her, we will not let this abomination stop without

3  everything -- without doing everything we can to stop

4  it.  We won't.  We will stop it.  We won't let it.  We

5  will stop it.  Again, it's not too late.  She wants her

6  to stop it.

7         It's conditional:  This might not happen to

8  you.  In fact, it won't happen to you.  It's only going

9  to happen to you if you perform abortions.  That just

10 makes sense.  Of course.  That's what she wants.  She

11 wants Dr. Means to not provide abortions.  She wants

12 nobody to provide abortions.

13        She's thrilled that Dr. Tiller is dead.  She's

14 overjoyed.  She told the FBI, that Dr. Tiller is dead?

15 Overjoyed.  And it's true that because Dr. Tiller's no

16 longer in Wichita, for whatever reason, many abortions

17 have not occurred and perhaps many births have happened

18 because Dr. Tiller is not around.

19        And perhaps that thought, that babies have

20 come to life, that would probably make people who

21 are -- are -- are very right to life or anti-abortion,

22 that might make them happy.  They might be like, you

23 know what?  That's good, some babies were saved or

24 whatever their focus may be, and that's fine.

25        But even the largest groups, Operation Rescue

1  and the National Right to Life movement and your very

2  own Kansans for Life, the very day of Dr. Tiller's

3  murder, they came right out and, you know, they don't

4  mind that babies aren't being aborted, they don't mind.

5  That's not the issue here.

6        You know that they're coming from the same

7  place of pro-life in terms of -- of people not having

8  abortions and they know that because Dr. Tiller is dead

9  abortions won't happen at least for a little while and

10 yet and they still all issued national statements

11 deploring that action.  And it is deplorable.  And it's

12 that type of action that brings disrepute to the entire

13 respectable Right to Life movement.

14        And that valid, legitimate movement is

15 compromised when any extremist acts like that.  That's

16 not fair.  Nobody wants to be associated with an

17 extremist like that.  That's why they put those

18 messages out.  They don't condone it.  It's deplorable.

19        They send messages of hope to his family, of

20 condolences to Dr. Tiller's family.  They're strong

21 statements, they're public, and they are that day.

22        But what the defendant does that day or

23 shortly thereafter, is she's already sending off

24 letters.  33 days later, she's already exchanged

25 several letters.  She's already talked to this guy on

662

```
 1  the phone.  She's already saying she admires him.  She
 2  said all that.
 3          That's really different from any of these
 4  people, from the Right to Life people, from the
 5  Operation Rescue people, or from the Kansans for Life,
 6  it's different.  That's evidence of intent.
 7          Would an ordinary person in the defendant's
 8  situation at that time know, would they naturally
 9  realize that Dr. Means would be afraid about getting
10  this letter?  Yeah, you can find that.  You may find
11  that.  The instruction says you may.
12          And you don't -- you don't have to.  You don't
13  have to rely on that inference in obtaining the natural
14  consequences of your action, however much sense it
15  makes you should because it does make sense.  There's
16  evidence that you ought to, there's evidence that she
17  knew.  But you don't have to, you can do something
18  else, as well.  The judge gave you something else to
19  evaluate.
20          Again, because you can't look in on someone's
21  brain, what they're thinking, you can look at the facts
22  and circumstances.  Shown by all the evidence.  What's
23  the defendant say?  The results of law enforcement.
24  All those exhibits -- that's not all of them, there is
25  probably less than eight, those exhibits and then you
```

663

1  can look at those and see what you think her -- her

2  intent was.

3       You can evaluate her statements, the

4  statements she made on the stand.  You can evaluate her

5  demeanor.  Was she telling the truth?  You can evaluate

6  what she said to the press, and you know what she said

7  to the press.  You can evaluate what she said to the

8  FBI about being overjoyed.  You can evaluate what she

9  says about people following their convictions.  Anybody

10  following their convictions.

11       And you can evaluate things that she said

12  about people who provide abortions.  She rarely, if at

13  all calls them doctor, although they all have medical

14  degrees, she calls them abortionists.  She treats them

15  disparagingly, again, no problem -- there's no problem

16  with that.  It goes to show her intent.

17       Right?  She can say whatever she wants, that's

18  not -- we're not taking issue with anything she said

19  but rather looking at how what she said reflects on her

20  intent because if she acted with intent to intimidate,

21  and a reasonable person would have perceived it as a

22  threat of force, then there's a problem here and that's

23  why we are here.

24       So that's why we look at her words, not to

25  vilify her words, not to silence her, not to condone

664

1  her for the words she may have said but merely to use

2  her words as somewhat of an eye train to what she's

3  thinking.  You know how she feels, you know how she

4  described Dr. Tiller.

5          You heard her have disregard for Dr. Means'

6  feelings.  She's not responsible for how she feels.

7  She didn't think about what a person in Dr. Means'

8  position would think or feel.  I think in the letter,

9  the letter of Dr. Tiller, nope, not my problem.  She's

10 not acting out of care and concern.

11         Mrs. Dillard would have liked to seen

12 Scott Roeder not convicted.  Justifies it by saying,

13 well, you know, he didn't act for any personal gain, in

14 fact, it was a great personal sacrifice that he acted.

15 That's admirable.  He shouldn't be convicted for that.

16         And maybe there is a court or a law someplace

17 who -- God's law or God's court where that may be true,

18 again, that may in fact be true.  She may think that,

19 and that's fine.

20         Where we are right now, we're -- right now

21 we're in our court, mankind, humankind, man's court,

22 man's law, that's where we live.  And those are the

23 laws that rule, those are the laws of the land.

24 Everyone has free choice.  Everyone has free will.  And

25 you can follow your convictions, and you can act on

665

1  your convictions.

2       If you act on convictions that violate the

3  law, then you should be held accountable.  It's that

4  last part that kind of falls off the defendant's radar.

5       Defendant also gives great weight to the fact

6  that Scott Roeder was inspired by God to kill

7  Dr. Tiller.  And her perception that he was inspired by

8  God and, in fact, she thinks it may actually have been

9  God himself acting through Dr. Tiller -- through Scott

10  Roeder when he murdered Dr. Tiller.  That may have been

11  God acting.  So that's the kind of -- uh, those are

12  what is in her mind as she is writing those words out.

13       And if you look at the letter, the use of

14  "we", "they" and she talks about herself from the very

15  beginning, the first sentence, you know, "it has come

16  to our attention" and so she speaking not just for

17  herself but herself and some others, she says, the

18  second sentence, I am stunned.  And then she -- she

19  chooses to set the stage for fear in the fourth

20  sentence by invoking the consequences of killing the

21  innocent.

22       Tiller.  Consequences, Tiller.  Murder.

23  Consequences.  Dr. Means?  Murder?  Explosives under

24  the car?  Maybe today.  Some one.  Our.  I.  Someone,

25  and they, the faceless, they.

666

```
 1        She -- the defendant tried to establish some
 2   distance by talking about some people who will be
 3   watching her, about some person who was going to use
 4   the knowledge gleaned from watching her so intently
 5   that they know her habit and routines day after day,
 6   weekdays, weekends, they are going to use some of that
 7   knowledge to know where her car is so they can know
 8   when is a great time to plant this explosive.
 9        But that distance that she attempts to put in,
10   that distance quickly disappears when she reveals that
11   she does have some knowledge about Dr. Means.  The
12   knowledge that we talked about.
13        And she closes the same way that she opens:
14   She is all in.  She starts all in, and she ends all in.
15   Mrs. Dillard, got to go big, or you've got to go home.
16   She's in at the beginning, she's in at the end.
17        I urge you to think carefully.  We will not
18   let this abomination continue.  We pray.  We don't want
19   you doing this in our community.  And she writes
20   this -- she puts herself back, again, in the center of
21   the action, she puts herself in there.  She's there.
22   And certainly there are some clauses and components and
23   maybe a whole sentence or two, or little paragraph
24   printed here or there that are fairly innocuous and may
25   be a prediction of nightmares, that's not going to
```

1  scare anybody.  Say, well, you're going to have a

2  nightmare, don't watch that movie, it's going to keep

3  you up, don't watch that movie, you'll have nightmares.

4         So just because you drop a patch of garbage in

5  a field of sunflowers, doesn't make it smell any better

6  when you are close to it, it's still there.  Doesn't

7  make it lose its character.  Something ugly doesn't

8  lose its character just because it is by something that

9  is not so ugly.  The ugly thing is still there and the

10 ugly thing in this letter is the sentiment, it's the

11 fear that it is invoking, and it's the blood of

12 Dr. Tiller that's really on the page of this letter,

13 that the defendant sent to Dr. Means.

14        And any minor pleasantries that may exist in

15 no way diminish its impact.  She says, We pray that you

16 will not do this, God's going to bring some judgment on

17 you.  The likes of which you've never seen.  And that's

18 kind of scary.  And who is the "we" that defendant

19 prays with?  I think it's safe to assume that she prays

20 all the time, she said so, assume with her husband, so

21 that's a given, but who else?

22        Dr. Dillard is not involved in this

23 anti-abortion movement or right to life movement, or

24 any movement.  He is just a doctor doing his business.

25        We pray.  It's not the three churches.  One of

668

1  those churches asked her and her husband to leave

2  because of this letter.  She's not praying with those

3  folks.

4         You know who she's praying with.  She's

5  praying with Scott Roeder.  We've got a bit more

6  context, we've got a bit more understanding of exactly

7  what might be in the defendant's head.  And, again, all

8  of this doesn't matter whether or not Dr. Means knows

9  it, she doesn't, she couldn't.  How could she?  That

10 was all about context.  This is all about intent.

11 About the defendant and what she knew.

12        And she doesn't know a whole lot of folks in

13 Wichita, doesn't have time for it, and that's fine,

14 that's not a problem, no harm in that.  She does know

15 other people, though.  She knows other people from

16 around the country.  She knows their names.

17        The names she knows in Wichita surrounding

18 anti-abortion activities, or right to life or pro-life

19 activities is Mr. David Gittrich from Kansans for Life,

20 she knows him.  She can't name a single other person in

21 that organization where she is a member and stuffs

22 envelopes and does those things periodically from time

23 to time, she doesn't know those people, she can't tell

24 you their names but she does recognize some names, she

25 recognizes the name of Michael Spitz, Army of God.

1          She recognizes the name of Michael Bray.  She

2    met him.  She may have met them by happenstance but she

3    intentionally called him afterward.  He is the guy that

4    wrote that book, A Time to Kill which she knew about

5    that book.  She forgot when she got to the stand here

6    but she knew about it back in 2013 when she was giving

7    her deposition.  She knew that book.

8          She knew people from Mr. Roeder's trial,

9    talked to those people.  Talked about their support

10   of -- of Scott Roeder.  She didn't talk to the people

11   when she protested or prayed or anything when she was

12   in front of the various clinics.

13         She claims that, you know, the "we" -- and the

14   we will not allow this abomination to occur, she claims

15   that "we" reflects the people in Wichita, these good

16   people in Wichita and these church people.  It is right

17   there by the -- you know, the we, the church is right

18   there.

19         But we know that she never spoke to those

20   churches.  She never discussed lobbying, or letter

21   writing, or protesting, or demonstrating, or

22   legislation, or anything.  And I mean I guess it makes

23   sense why she wouldn't talk about those things because

24   that quote that she gave in that 2009 interview about

25   but, quite honestly, as soon as I heard about how

1  Roeder killed Dr. Tiller I realized he was able to do

2  what we had not been able to do, millions of hours and

3  protesting, and attempts at legislation and all that,

4  she knows that's worthless.  She's not trying do that.

5         What's the thing that gets results?  In the

6  defendant's world, one move.  That's what gets results

7  in her world.  So who is she talking about in this

8  letter?  Who is this "we"?

9         It's not the Kansans for Life.  They don't

10 support this.  It's not anybody in Wichita.  It's not

11 anybody she could identify, except her husband.

12        She really intended to write this letter.  She

13 really meant what she said.  She thought about it.

14 She's not backing down from it.  She is a strong woman

15 of conviction, a strong woman with strong faith, strong

16 faith in her family and strong faith in her religion

17 and she's a strong woman, and she's not backing down.

18        And so just in case it's not clear, if we do

19 get to the third element of the judge's instructions,

20 whether she conveyed this threat of force to

21 intentionally intimidate, she did those two things.

22 Why did she do it?  We really know the reason why she

23 did it, other than to intimidate this doctor from

24 providing abortion services.

25        And I guess, you know, why did she write this

1  letter? She wrote this letter because she wanted to

2  write this letter. She wrote this letter because she

3  wanted to stop Dr. Means from offering abortions. She

4  didn't really care how she did it.

5         She wanted to make Dr. Means afraid to extend

6  her family practice, her solo family practice to offer

7  abortions a couple days a week. She felt justified in

8  what she did. She doesn't care how it made Dr. Means

9  feel. She's not sorry. Even knowing now what she

10  knows, she would write it again, except maybe she would

11  consult a lawyer.

12         She wrote this because she wanted to and

13  that's why she signed her name. She signed her name

14  because that's who she is. She signed her name because

15  she wanted to.

16         She wanted to follow her convictions. She

17  felt inspired by God, called by God to do this. And

18  she wanted to do it. And because she wanted to do it,

19  she needs to be held accountable in this court of law,

20  in this court, of man's law, she needs to be held

21  accountable for what happened and that's what we're

22  asking you to do today is to hold her accountable for

23  the threat of force that she conveyed to Dr. Means that

24  any reasonable person under those circumstances would

25  have felt was a threat of force. And she meant to

1  intimidate her.  She did intimidate Dr. Means.  And she

2  did so because she didn't want her to provide abortions

3  in Wichita.

4          THE COURT:  Well, folks, I had anticipated

5  that we would hear both closings before we took a break

6  but I think we'll take a five-minute comfort break

7  right now and if you would head on back to the jury

8  room, as soon as you finish, or at least stay in there,

9  we'll bring you back in in five or ten minutes for the

10  other closing and to get the case to you.

11          By the way, the admonition still holds for all

12  of you.  Thank you.

13          (The jury leaves the courtroom.)

14          THE COURT:  Well, have a seat, folks.

15          You're welcome to take a comfort break

16  yourself if you -- if you wish to.

17          How long do you think your closing is going to

18  be --

19          MR. SHULTZ:  A lot shorter.

20          THE COURT:  -- Mr. Shultz?

21          Okay.  Well, just for the record, that was an

22  hour and 20 minutes.

23          And how do you -- how much time do you think

24  you'll need on rebuttal?

25          MS. ABBATE:  Much less -- much less.

673

```
 1              THE COURT:  Well, I'll just tell you that I am
 2   going to limit you to ten minutes in rebuttal.
 3              MS. ABBATE:  We'll make it appropriate.
 4              THE COURT:  Okay.  Thank you so much.
 5              All right.  See you back in here in a few
 6   minutes.  Thank you.
 7              (Recess was taken from 2:30 p.m. until
 8              2:40 p.m.)
 9              (The jury enters the courtroom.)
10              THE COURT:  Welcome back, folks.
11              You doing okay?  Holding up all right?  Good.
12              Once the jury is seated, you can all go ahead
13   and have a seat.
14              Sorry, Ms. Abbate, I didn't see you there.  I
15   thought we would just hold up until you got back but
16   there you are --
17              MS. ABBATE:  Appreciate that, Your Honor.
18              THE COURT:  -- so thank you.
19              All right.  Mr. Shultz, you may proceed.
20              MR. SHULTZ:  Thank you.  And may it please the
21   Court, counsel, and ladies and gentlemen of the jury.
22              The Department of Justice, an agency of our
23   United States Government, wants to take you to a very
24   dangerous place.  You heard all of the things that she
25   said and what she really -- what was really said was
```

1  basically this, and I wrote some of these things down.

2        Certain kinds of intent are not required, it's

3  just expression.

4        The Government says, violence is not a

5  requirement, it's not involved, just fear.

6        She says -- asks the question, what's scarier?

7        They ultimately twist this evidence down to

8  eliminate nearly all of the communication that they,

9  the listener, don't agree with.  This is not a

10 protective order.  This is the United States District

11 Court where they've come in and alleged that she

12 made -- that she violated the FACE Act.  That she lost,

13 somehow, her First Amendment rights.  And I'm here to

14 talk to you, I hope much more briefly about what that

15 means.

16       Now, I want to make something very clear from

17 the beginning, and I think you all understand it

18 because we talked about it in voir dire.  You may not

19 agree with Angel Dillard.  She may be way beyond where

20 you personally find your own conscience.  There are

21 others who agree with her, there are many who do not,

22 but we are not here because of her belief.  And that is

23 critical.

24       You cannot take this case and think about it

25 in the sense of whether she believes what you believe

1  or that kind of thing.  She's here because of this

2  simple letter.  And that letter is exactly what the

3  First Amendment stands for.

4          You know, the First Amendment comes in and

5  says we have freedom of speech.  It protects emotional

6  speech.  They don't like emotional speech.  It protects

7  the kind of speech that rises up in someone fear, maybe

8  even anger, complete irritation.  It -- that's what

9  free speech is all about.  And in and of itself, it's

10  not dangerous.

11          Nothing that she did was wrong they say.  That

12  was an interesting comment that was made by the

13  Government.

14          With respect to Mr. Roeder, yes, she has an

15  association, ultimately through the prison ministry,

16  but she said herself, nothing she did was wrong.

17          Well, all they've done is take a combination

18  of things that are not wrong, that were shown by

19  investigation of their own people that were not wrong,

20  and they try to combine them and coagulate them into

21  some kind of perceived conduct that they can come here

22  to you and say, Create a wrong out of this.  And that

23  is not right.

24          Our contention is simply this:  The letter was

25  not a threat of force or physical harm.  You can see

676

1  that.  Instruction Number 11 -- you don't have to get

2  those out, but persuasive speech is protected under the

3  First Amendment and that's exactly what it is.

4           You know, when I get ready to do a closing

5  argument, I always try to think of how do you set this

6  up?  How do you -- what do you talk about?  What do you

7  do?  And I'll tell you one thing we're going to talk

8  about in a little bit is what the actual instructions

9  say, okay?

10          You've heard all the evidence, I'll certainly

11 make some comments about it but I don't think there is

12 a lot of point in going through what you have heard in

13 the last two days.  And one of the things I did is I

14 went to look, I was kind of curious, what are some of

15 the comments that people kind of make about free speech

16 and the First Amendment and it is really interesting.

17          Harry Truman, who of course was a President

18 however many years ago, 65, 70 years ago, said once the

19 Government is committed to the principle of silencing

20 the voice of opposition it is only one way to go and

21 that is down the path of increasingly repressive

22 measures until it becomes a source of terror to its

23 citizens and creates a country where everyone lives in

24 fear.

25          Other people, Winston Churchill had a great

677

1 quote:  Some people's idea of free speech is that

2 they're free to say what they like but if anyone says

3 anything back, well, then that's an outrage.

4       And Alan Dershowitz who is a professor at

5 Harvard University says:  Freedom of speech means

6 freedom of speech from those who you despise and

7 freedom to express the most despicable views.  It means

8 that the Government cannot pick and choose which

9 expressions to authorize and which to prevent.

10       And maybe one of my favorites, Genuine bravery

11 for a writer is speaking the truth when everyone else

12 is silent.  When the truth cannot be expressed, it's

13 about speaking out with a different voice, risking the

14 wrath of the state, and offending everyone for the sake

15 of the truth and that writer's conscience.

16       I won't get too far into it but there is also,

17 there is a great sermon by a preacher named

18 Jonathan Edwards from a long, long time ago called

19 "Sinners In the Hands of an Angry God," and I don't

20 know if you have ever read that or heard it and there's

21 no -- there's a similarity in a sense to some of what

22 Angel Dillard is writing in this case but Mr. Edwards,

23 Pastor Edwards, he talks in very, very violent terms

24 and he expresses how people are doing evil and he's

25 speaking to this congregation about it, and he is

678

1  making them deliberately fearful and fearful, in

2  particular, about the wrath of God because God is going

3  to be angry.

4       Now, we don't need to go in to that kind of

5  depth at this point in time.  My point is that this

6  country has a great tolerance for the kind of speech,

7  the kind of letter writing, if you will, that maybe

8  bothers someone, it maybe makes them a little fearful

9  of something that they don't like, that they disagree

10 with.

11      One of the obligations that we have -- but,

12 actually, I would rather say it the other way.  One of

13 the privileges we have is to say, Okay, that's

14 absolutely their right.  And now you've heard people

15 say, I'll defend -- I may disagree with them but I'll

16 defend them to the death their right to say it and

17 that's kind of where we are at.  So disliking a point

18 of view is not a threat.  It's protected speech under

19 the First Amendment.

20      I think Angel made a comment, I thought it was

21 pretty good:  Warning a blind man that he's walking

22 towards a cliff is not a threat.  When you look at this

23 letter in its true context, you can't find a threat in

24 it.  There is none.

25      It's a discussion of the things that Dr. Means

1  is going to suffer.  It's set up in a pattern, if I

2  were going to write the letter I would organize it just

3  slightly different but I could do that without changing

4  a single word or the order of the word because it has a

5  theme of what's called you will.

6          And if you look at how many times it will say

7  "you will" -- it doesn't say, I will do this to you,

8  or, You need to be threatened with me, it says, here's

9  what you will feel.  Here's what you will experience.

10  And, yes, one or two of those things is pretty tough

11  sounding but, frankly, nothing beyond what Dr. Means

12  already knew or at least should have known.

13          If you think about that, we'll talk maybe a

14  little bit more about it in a second but, a minute --

15  or a few minutes, they have a meeting four days, five

16  days before this letter arrives, where they talk about

17  these various things.  Lieutenant Duff, you've got

18  Sean Fitzgerald who comes and they talk to them about

19  explosives.  ATF is there.  That's actually the ATF

20  people who talk about explosives.  And, you know,

21  interestingly the special agent said, you know, I

22  thought that Dr. Means was kind of naive about the way

23  she was approaching this.

24          Now if you think about that, where does that

25  put Dr. Means?  Dr. Means is -- maybe she's a little

1   scared, maybe she's a little nervous.  She's decided

2   she's going to open this clinic and she's not really

3   expecting -- first thing she gets is word, in essence,

4   that there's some protestors.  Then pretty soon her

5   landlord is not happy because the landlord doesn't want

6   protestors hanging around the other people's offices,

7   that's not going to work.  Nor perhaps do they want to

8   put up with that.

9           And Dr. Means is nervous, perhaps, she's

10  scared, she's anxious but she's all of those things or

11  at least -- she is all of those things not because of

12  what Angel Dillard necessarily wrote to her, because

13  they are facts that are going to occur, that are going

14  to exist if she enters into this abortion clinic that

15  she intends to open, and Angel reenforces those things

16  to her and, at best, that's what her letter does.

17          In fact, there was one or two things I think

18  she said that she hadn't realized until she got the

19  letter from Angel and Angel said, This will happen.

20  You will experience this kind of mental issue.

21          And, yeah, I can actually kind of understand,

22  and I think you can, too, Dr. Means is now -- so here

23  comes this letter, it really says the same thing.  She

24  goes on to handle and work with her patients and leaves

25  it to those people who come out, including

1  Lieutenant Duff, and the letter ultimately goes to the

2  FBI and Dr. Means has to sort of sort out in her head,

3  if she really needs to, she has to sort out in her

4  head, well, how much of my fear is because all of a

5  sudden here's two people telling me, or somebody

6  different telling me these very things that I know to

7  be true.

8          In fact, if she had done her research she

9  would have seen all these things, they're all over.

10  There is no secret that these were all things

11  experienced by Dr. Tiller, among others.  And she's

12  ultimately, I'm going to contend to you, troubled by

13  the concept that maybe, because of her naivety, what

14  have I gotten myself into?  What am I doing?  Are these

15  things really going to happen?

16          And so she hears a noise in her car now,

17  explosive, and a noise in her car, which is kind of a

18  disconnect I would suggest to you, but she hears a

19  noise in her car so she takes it to the mechanic

20  who -- who says, well, it's nothing.

21          And she wants to blame that somehow on what

22  Angel Dillard wrote to her as opposed to what somebody

23  else told her about bullet proof glass and explosives

24  and how to look for suspicious packages and about her

25  car and telling her that she ought to consider driving

682

1 different routes, because she knew Dr. Tiller did that,

2 different routes every day.

3          But all of a sudden those things become, in

4 her mind, this idea that, Well, you know, that's all

5 Angel's fault.  But what Angel writes is simply this:

6 It's a warning.

7          It's not a warning of action.  And I'm going

8 to talk to you about these in a second with the

9 instructions, it's a warning of that these things are

10 commonplace, this is how you will suffer.  Be careful.

11 Don't do this.  Do that.  Don't -- you know, don't let

12 others hurt you this way.  Don't hurt yourself by

13 entering into this.

14          There is no question that Angel would prefer

15 that Dr. Means not open an abortion clinic.  Okay?

16 That she would not do even a single abortion.  Of

17 course she would prefer that.  There are hundreds and

18 thousands and tens of thousands of people who prefer

19 that.

20          And she's telling her that there are certain

21 things that you can set up in your mind and they will

22 never go away.  You will picture the violence that

23 happens to an unborn child when its aborted.

24          Whether you agree with abortion or you don't

25 agree with abortion, the one thing about it is true:

1 There is some life inside, and that life is terminated

2 by an injection, or terminated by some other thing and

3 there is ultimately pain felt.

4        It's interesting, isn't it, that somehow that

5 violence, if you will, is okay but the suggestion by

6 Angel Dillard that if you do these things you'll have

7 violent dreams, you'll have pictures of this seared

8 into your mind that you won't be able to get out of

9 your mind and that's not okay for her to write that.

10        Now, I want to talk a little bit about

11 Dr. Means, and I'm not really -- I'm not very much, I

12 mean she's -- she had some issues.  You heard pieces of

13 what they were.  She was having trouble with her clinic

14 and she decided to open up the abortion clinic at least

15 in part because of financial advantage.

16        Now that's her rights under our Constitution,

17 her right to do that but perhaps that's what

18 contributes to what Agent Fitzgerald said is her

19 naivety because she just kind of has this idea that

20 she's going to open up this clinic, she's going to

21 start producing new patients , they take over for

22 Dr. Tiller but somehow she's not going to have any of

23 the problems.

24        She wants to have blinders on and not

25 recognize any of these problems.  And they're pointed

684

1  out to her on the 14th and then Angle writes to her and

2  confirms them to her.

3          And Angel's letter, her husband looked at it,

4  Rob looked at it, he said, It's okay, it looks all

5  right.  They were not trying to do anything that was

6  inappropriate.

7          Judge tells you that the government has the

8  burden of proof.  I want to go through some of these

9  instructions and talk about a few facts and I hope -- I

10  really truly hope I won't be very long.

11         They have the burden.  You all understood

12  that.  We don't have to disprove anything.  They have

13  got to prove this.  They've got to make you feel like

14  this is more probably true than not true.  That she did

15  what the judge says she can't do to lose -- the judge

16  says she can't do or, if she does, then she loses the

17  protection of the First Amendment.

18         And he lists three things.  I'm going to put

19  them up here but, again, you -- you can -- and I've

20  circled them because I want you to make sure you

21  understand that they have to prove these things by a

22  preponderance of the evidence, first, second, and

23  third.  It's not just one thing, it's

24  not -- don't -- it's not just prove some fear, prove

25  that it was scary, prove that the letter was a little

685

1  harsh.  But it's -- you've got to prove all three of

2  these things.

3          And they're going to fail in all three, but

4  I'm going to take them in reverse order because the one

5  that is the most important from a constitutional point

6  of view, I believe, is number one.  So I'm going to

7  talk a little bit about the others first.

8          Now, this is an instruction, and

9  I've -- obviously, marked these because it defines the

10 word intimidation.

11         When you read this, you're not going to find

12 something that just says, well, intimidation does not

13 involve -- it only involves fear.  That's what she said

14 in her closing.

15         No, the judge tells you that to place a person

16 in reasonable apprehension of bodily harm, to himself

17 or herself or to another, so that's -- that's the

18 definition of intimidation and that will have some

19 application to the things we're talking about.

20         But I want to put up this -- again, if I

21 combine them, remember, we've got the first, second,

22 third element but the second element is the defendant

23 intentionally attempted to intimidate Dr. Means.  So

24 now you go to Instruction Number 21 because it talks

25 about that second element.  Okay?

686

1          And when you look at what it says, it says,

2     Intentionally intimidates -- that's the word we're

3     talking about -- by force or threat of force for

4     someone seeking to provide reproductive health

5     services.

6          They have got to prove that the intimidation

7     is by force or threat of force.  Now nobody is I don't

8     think arguing force so I think we're really arguing

9     threat of force.

10         Where is the threat of force by Angel Dillard?

11    It was the -- the defendant's intention, if she

12    intentionally intimidates by threat of force.  Where is

13    the intention?  That is important when you look at

14    those elements.  If you have any question, go look at

15    that Instruction Number 21 because it's important.

16         Now, they say -- it was actually interesting

17    when she said, She didn't call her church, she didn't

18    talk to anybody.  That's pretty inconsistent with the

19    context that they want to put to you that somehow Angle

20    must be in association with all of these bad people who

21    would do violent acts.  She's not part of a group.

22    Even Dr. Means agreed that she can't be responsible ,

23    and she's not responsible, she should not be

24    responsible for the actions of other people and yet

25    that's what you heard for an hour plus.

687

1          All of this discussion about other people, and

2    Scott Roeder and apparently how wrong they, in essence,

3    think that it must be for Angel to really minister in

4    her way to Scott Roeder.  And they want you to sort of

5    incidentally get, I guess -- I guess of the opinion

6    that because she befriends, if you will, Scott Roeder,

7    that she somehow adopts his attitude and his crime, if

8    you will, and that she somehow is going to do that.

9          There is nothing in the evidence to do that.

10   Nothing -- nothing that allows you to make that leap.

11   There's nothing -- and I can say this.  There is

12   nothing in the evidence to suggest violence, there is

13   no connection to any extremist group, they knew of no

14   connection to any violent groups.  And the first

15   article that's there, the only article that exists

16   before this letter came out that they have put into

17   evidence is the article that says, We're not violent,

18   we would not do violent -- violent things.

19          The second article that they use comes out

20   after the DOJ files this lawsuit , and I'm going to

21   talk about that in a little bit.  But when you look at

22   the second element on this, you -- it's not just scary,

23   it's not just fear, it's that she intentionally, by

24   threat of force, she did it.

25          Now the third element, again, you can look at

1   the listing, the third, that she did it for the purpose

2   of intimidating Dr. Means, that is where you go to the

3   definition of intimidation and you have to see once

4   again that she intended, basically, to place a person

5   in reasonable apprehension of bodily harm to himself or

6   another.  They really don't prove anything there,

7   either.

8          But the most important part, and just to try

9   to get to it, is the First Amendment part of this

10  thing.  And, there again, I won't, hopefully belabor

11  this, but I put this up on the screen, somehow because

12  I have been putting it up and now and comes out, the

13  judge tells you it protects the right to expressive

14  conduct which is protected from legal prohibition by

15  the First Amendment.  That's right in the FACE Act.

16         So they have got this act that says expressive

17  conduct -- you can yell, you can scream, you can say

18  mean things, whatever, the only thing you can't do is

19  something that amounts to a true threat.

20         And so we have got to look at what it means to

21  have a true threat.  And when I think of threat, and

22  whether when you think of threat, you know, if -- if I

23  come right up to you -- and I'm not going to, but if I

24  came up to you and said, I'm going to beat your face

25  that in, that would be a threat.

689

```
 1            But when I write to you and say, Hey -- or
 2   when I tell you, Hey, now be careful, down the road
 3   there, I saw some people that didn't look very
 4   friendly, you might be careful because you're going to
 5   get beat up, that's not a threat, that's a warning.
 6            And, typically, when you write a letter it's
 7   pretty hard to make a threat out of something of the --
 8   I mean, you can -- out of what she wrote here and you
 9   just can't do it.  So the only way that they get to it
10   is by this contextual argument that they make, where
11   they try to feed in all of this other information and
12   say that she is guilty of a true threat.  But let's
13   look at what the judge tells you is a true threat.
14            A true threat is a serious expression of an
15   intent to commit an act of unlawful violence to a
16   particular person.
17            Did Angel Dillard express a -- seriously
18   express an intent to commit an act of unlawful violence
19   to a particular person?  And this is judged by what a
20   reasonable person in the place of the recipient would
21   believe.  It's not based on what Dr. Means, herself,
22   may or may not have feared or thought of or something
23   like that.  It's what would a reasonable person think?
24            But Instruction 19 is particularly informative
25   and it's the one that really solves this problem
```

690

1    promptly.

2            A true threat may be more likely to exist, I'm

3    paraphrasing, when it expresses the sender's personal

4    intent to commit an act of violence.  We don't have

5    that.  There's no personal intent to commit an act of

6    violence.

7            Now, what I want you to do is look below,

8    though, because it tells you that it doesn't mean that

9    the sender has to personally do the violence, but

10   that's only under certain conditions.

11           A warning of violence by third persons may

12   still be a true threat if the recipient could

13   reasonably conclude based on the entire context of the

14   communication that the communication is actually a

15   veiled threat of violence by the sender or by the third

16   person acting under the sender's direction or in

17   conspiracy with others.

18           So you have got two choices here:  To say is

19   there a threat of violence by the sender, no, there's

20   simply nothing in this letter that suggests that;

21           And is -- or is there a threat of violence by

22   a third person?  And this is where the Government tries

23   to make this great leap by a third person under the

24   sender's direction or in conspiracy with her.

25           They have zero evidence.  They admitted they

691

1   had no conspiracy.  They have no indication that she is

2   directing some other person to commit an act of

3   violence, and the judge's instruction pretty much just

4   shuts this down.  And what it does is it says to you,

5   ladies and gentlemen of the jury, and to our country,

6   that the First Amendment protects this letter unless it

7   has that specific in it.  And it simply does not.

8         And let me talk to you a little bit with

9   Instruction 19, it's really the key to the true threat.

10  You have to look at that.  You know, the judge also

11  says that you can consider evidence -- I don't know why

12  that takes so long.  Hmm.

13        Relating -- you know, made -- the statements

14  made by Special Agent Fitzgerald as evidence relating

15  to the reaction or results of a law enforcement

16  investigation, you can consider these statements.

17        Now, why do I talk about that?  Interestingly,

18  what the Government does here is, you know,

19  when -- when you have problems with your case, you try

20  to find sort of somebody else to blame.  You can try to

21  blame someone else, you can do whatever.  I found it

22  kind of interesting this morning that -- or just a

23  little while ago, that they blame

24  Special Agent Fitzgerald for not reporting to Dr. Means

25  but let me point out to you what may be obvious or it

1  will be obvious as soon as I talk about it if you

2  haven't thought about it.  Because I think it's pretty

3  intriguing.

4        Dr. Means knew that the FBI was investigating

5  and did she ever call Agent Fitzgerald to ask?

6  Apparently not, because she didn't know what his

7  conclusions were.  Agent Fitzgerald knew that he had

8  cleared, that he -- he -- he had cleared Angel Dillard

9  and I'll -- and I've got some testimony I'm going to

10 read to you in a second, and he knew that and he told

11 that, and you saw the e-mail and you'll see that

12 redacted e-mail, he told that to the DOJ as this

13 discussion is going on about whether they were going to

14 file a civil suit, so here's what we know.

15       Dr. Means knew that he was investigating; he

16 knew that he had investigated, completed the

17 investigation; he reported it to the DOJ; and the DOJ

18 knew that Dr. Means didn't know.

19       Now, why didn't they call Dr. Means?  Why

20 didn't they tell Dr. Means?  Why did they leave her

21 hanging until perhaps a year or two later when she

22 discovered this?  They didn't.  And they did

23 that -- they didn't do that because they wanted to file

24 a civil lawsuit.

25       They knew there wasn't a criminal threat so

1  they thought, well, we'll file a civil lawsuit alleging

2  a criminal threat, basically, in the context of the

3  civil lawsuit.  And lets not tell Dr. Means.  Because

4  maybe if they tell Dr. Means, maybe Dr. Means says, I

5  don't want anything to do with that.  But it gets filed

6  and then you see this second article.

7          This second article that comes out about the

8  filing, and now they want to use that to try to

9  reenforce what they believe is their context for

10  thinking that this letter was wrong.  That's not fair,

11  that's not right, it's illogical, it's just simply

12  wrong.

13          This agency, at this time in 2011 wanted to

14  pursue a FACE Act claim and they picked out

15  Angel Dillard and this letter to do it.  And they did

16  it because they are, perhaps unintentionally or even

17  unthinkingly, entering into this dangerous place where

18  we -- I talked about those quotes, where they're

19  willing to try to shut down expressive conduct on her

20  part so that they can implement whatever other

21  strategies they want with regard to the FACE Act or

22  whatever .

23          Angel Dillard wasn't at this clinic.  She

24  wasn't at the doctor's office.  She wasn't blockading

25  the clinic.  I got appointed a bunch of years ago to

694

```
 1  some guys that blocked a clinic.  The Court asked if I
 2  would represent them and I did and that's a different
 3  thing.
 4         You think of all the things that Angel could
 5  have theoretically done that might have raised their
 6  ire, but she didn't.  All she did was write a letter
 7  and they don't tell anybody the result of the
 8  investigation.  But don't let that slip past you in the
 9  sense just of what the investigation itself meant.
10         Think of Agent Fitzgerald.  He is the head of
11  the terrorist task force, I mean he's the guy, isn't
12  he, who you would want to say, Hey, take a look at this
13  letter and see if there is anything to worry about.
14  And he goes through and he does the background check,
15  he knew that there had been -- found out very quickly
16  there had been a prior background check where they'd
17  cleared Angel.  They found nothing to connect her with
18  extremists, they looked -- believe him, they looked.
19  They couldn't find any connection to violent groups.
20         The only connection they had was that she had
21  gone to see Scott Roeder.  She was ministering to him.
22  They asked her about that.  She explained it to him.
23  And then a month or two goes by and they call and the
24  agent tells her that he's looked at this, and he
25  doesn't think there's anything to it.
```

1        You're going to see this exhibit, this is

2   Exhibit A, and you read it.  He interviewed her.  He

3   was trying to advise Dr. Means as to how her life was

4   going.  She is well-known and well-respected in the

5   pro-life community.

6        Now, counsel for the Government just a little

7   while ago in her closing argument tried to say that she

8   was all connected to these different people.  She tried

9   to imply that only because there was this article out

10  there where some reporter calls two or three other

11  people and also calls Angel and her name appears in

12  this article, and then makes something out of that to

13  try to say, See, they're all connected.

14        They know that's not accurate because

15  ultimately the evidence, by their own testimony, was

16  that there was no such connection.  And, so this

17  argument sort of inherently implying to you that there

18  was a connection is not right.  That's not how they

19  meet their burden of proof.

20        She has been interviewed twice by several

21  members of law enforcement, and in both instances was

22  determined not to be a threat.  Plus, she would report

23  a possible act of violence if she had information about

24  one and Rob Dillard said he would do the same thing.

25        Now, this e-mail clearly says she was

696

1  determined not to be a threat as a result of the

2  investigation.  Okay?  It's a slightly different issue

3  but it's an important issue because nobody thinks that

4  Angel Dillard is really a threat.

5          But I asked the court reporter to provide me

6  with a transcript of what -- of my -- the end of my

7  cross examination of agent -- Special Agent Fitzgerald

8  yesterday.  And I'm going to read it to you from it.

9          When you had this conversation at some point,

10 whether by phone or in person or whatever with Angel

11 Dillard, you told her that you did not believe that the

12 Department of Justice should pursue this civil lawsuit,

13 didn't you?

14         Answer:  I probably said something to that

15 effect; yes.

16         Question:  You told her that you thought it

17 would be counterproductive?

18         Answer:  Yes.

19         You told her -- this is key -- you told her

20 that there was nothing there; that's not a threat,

21 referring to the letter.

22         Answer:  Probably said to that effect.

23         Question:  You told her that the DOJ is

24 wanting to pursue it any way and I recommended that

25 they not do it but they're going to do it any way.

```
 1          Answer:  Yes.

 2          And were you apologetic to her?

 3          Answer:  Probably, yes.

 4          Told her that's not a threat, referring to the

 5 letter.  She's not a threat as an individual.  The

 6 letter itself doesn't have a threat in it and he tells

 7 her that that ultimately was his conclusion.

 8          I could put the letter up on the screen but I

 9 think for the sake of time I'm going to bypass doing

10 that because you've seen it many, many times.  But when

11 you read it, yes, you'll see where she says, You will

12 be checking under your car everyday because maybe

13 today's the day someone places an explosive under it.

14          Now that's just a descriptive phrase to tell

15 her that that's something that your mind is going to

16 wrestle with each and every day.  Maybe you wouldn't

17 have written it that way.  Maybe I wouldn't have

18 written it that way.  She did write it that way but

19 that is not a threat.  It's a statement of fact.  You

20 can disagree with the fact but it's nonetheless just a

21 statement.

22          And then -- and all of these things were sort

23 of backed up if you -- if you remember as we went

24 through some of the articles and these things that were

25 well-known, and all of them had a basis to them.
```

1            You know, we conduct our everyday affairs as

2  we have typically done so in the past.  A person of

3  good character does not usually suddenly decide, I'm

4  not going to be of good character, I'm going to become

5  a criminal.  I'm going to commit a criminal type of

6  act.  If you have been of good character in the past,

7  you typically are going to remain that way.

8            And the argument that I want to make to you is

9  that Angel Dillard's good character, her

10 well-respectedness in the pro-life community, her

11 ministry, all of those things, and her character, which

12 was not -- not maligned by anyone, is something that

13 she can hold proudly and she holds it as this case

14 ultimately is going to be passed to you.

15           And you have every right to say, you know, in

16 light of that character, if nothing else, I believe her

17 intent when she says she was just trying to strongly

18 advise Dr. Means of these things.  Admittedly, for the

19 purpose of saying, please, don't open a clinic.  Please

20 don't do this.  Please don't kill children.

21           But what good is it, if you write one letter,

22 and your character is just simply disavowed by the

23 Government who, for whatever reason, wants to make you

24 responsible under the FACE Act for writing some letter

25 and they want to take away your First Amendment rights,

699

1  and they want you, as the jury, to interpret this in

2  some kind of a weird, strange context and try to read

3  into it a threat where no threat exists.  They

4  shouldn't be entitled to do that.

5        Now, there's another quote that I found that I

6  think is appropriate.  Actually, two more.  To view the

7  opposition as dangerous is to misunderstand the basic

8  concepts of democracy.  To oppress the opposition is to

9  assault the very foundation of democracy.

10        And then another, It all starts with

11  suppression of a few freedoms and before you know it

12  you can't speak without permission of the authorities.

13  And then you finally wake up and you know what?  It's

14  too late.

15        I don't apologize to you folks for being very

16  serious about this because this is, indeed, dangerous

17  ground to which they want to take you.  They want to be

18  the arbiter of what someone can and can't say in the

19  context of the abortion controversy.  They want to take

20  this letter and twist it and make it sound like

21  something that it isn't.  And I urge you to think that

22  if you do that, what a slippery slope we will now be

23  on.

24        It's not been easy for the Dillards to

25  maintain this stand, to go through, what is now five

700

1   years of litigation, a long, long process to get to
2   this point where they stand up for what they believe,
3   where they say, We strongly believe that.
4           And, believe me, in five years they haven't
5   done a single thing that anybody can ever get mad at
6   them about.  And this is the last time I'll get to talk
7   to you.  Prosecutor's going to get to come back up and
8   give a little rebuttal and they can address these
9   issues but you think about what that law is, as the
10  judge told you because that's what you are committed
11  here as jurors to follow.
12          And when you do that, and when you follow the
13  First Amendment protections that are promised and
14  guaranteed to not only my client but to each of us,
15  including yourselves, when you do that, you will be
16  privileged to answer no.  If you could get there for
17  three questions, you would answer them no to all of
18  them but you're going to get to the first one and go,
19  it does not convey a true threat, and that should end
20  the verdict.
21          On Angel's behalf, truthfully, on behalf of
22  her husband as well, we thank you for your time, thank
23  you for your consideration.  We ask for your verdict in
24  her favor.  Thank you.
25          THE COURT:  Thank you.

1          Ms. Abbate.

2          MS. ABBATE:   Thank you, Your Honor.

3          There's one thing that most attorneys actually

4   agree on and that's a universal -- well, not hatred but

5   none of us really like the instruction that nothing

6   that the lawyers say is evidence, it's pretty much

7   universally held.

8          And I tell you, I've never been happier to

9   have that instruction than I am right now standing

10  before you because I have to tell you that what he said

11  about the Department of Justice intentionally causing

12  Dr. Means to be afraid, that's not evidence.  That's

13  outrageous.

14         There are a couple things that I'm glad that

15  he did bring up.  I'm glad that he brought up this

16  issue about the expression of intent and all this

17  language he says that we've used about expressions and

18  different intents and I wanted to clarify that because

19  that is, in fact, a very important point and it's a

20  point that I tried to convey when I was up here before

21  so I want to make sure that came through.

22         First and foremost, that is an expression of

23  intent, as the judge's words that you'll see in your

24  instructions, and it's important because it is an

25  expression of intent.

1          Does this make someone think that someone

2    intends to do it?  Regardless of whether the person

3    actually intends to do it.  It's an expression of

4    intent and the issue of an expression of intent, if you

5    just remember that, whenever you're thinking about true

6    threat, whenever you're on that prong of that component

7    of your deliberations, whenever you are thinking of

8    true threat you're thinking of the recipient, you're

9    thinking of where those stones land.

10          You're not looking at what is in the

11   defendant's head, what she's doing or who she may be in

12   conspiracy with or may not be in conspiracy with,

13   you're looking at where the words landed and what a

14   reasonable person there could perceive.  That's it.

15          You are not yet looking at the intent and I

16   ask you to pay attention, special attention to separate

17   those two things out because this intent stuff does get

18   confusing.  I know.  It gets very confusing, so just

19   when you are thinking about a threat of force, when you

20   are thinking about the recipient, when you are thinking

21   about where those stones are landing, that is threat of

22   force.

23          Only when you get to the intent prong, the

24   second element, that's when you can look at what the

25   defendant was doing and not to -- not to say that she's

1  entered into a conspiracy but to say, given who she

2  associates with, given what she has said, given the

3  views that you know, given the views that she has

4  expressed approval for, did she intend to intimidate?

5          And then say to yourself, if not that, then

6  what?  If she didn't intend to intimidate, maybe she

7  intended to educate.  Maybe she intended to warn.  And

8  consider whether that's the case, given everything that

9  you know, including what the defendant said.

10          And the expression of intent is not even what

11  Dr. Means herself may have perceived, whether she was

12  scared or worried or comatose or whatever, doesn't

13  matter.  You can -- you can look at what she did and

14  you know what she did, but also consider -- and the

15  only thing you should consider is would a reasonable

16  person in Dr. Means' circumstances, would they have

17  perceived this as an expression of intent?

18          Would they have gotten this letter and gone

19  like, Yikes, this person or someone she is writing

20  about -- is going to cause physical harm to me.  Would

21  they think that?  Is that a threat of force?  Is it

22  reasonable for somebody to think that?

23          Then you go to intent.  And we're not -- we

24  don't have to prove that the defendant did anything

25  criminally wrong in terms of taking steps to do

704

```
 1  anything.  The wrong we're here for, make no mistake,
 2  is the wrong that she did when she sent the letter.
 3  That's the wrong.  That's the thing that she did wrong.
 4  And all these other things provide context for that,
 5  for what she intended to do.
 6          There is one thing that's noticeably absent
 7  from her letter and that's anything that says, Be
 8  careful.  It doesn't say that anywhere.  She'll have
 9  you think it is like telling a blind main to -- who is
10  walking towards a cliff to be careful but really it's
11  like telling a blind man something along the lines of,
12  Hey, you know what happened to the last blind guy that
13  walked around here?  And then going to say some
14  statements, we, they, I.  That's what this letter is.
15  You know what happened to the last guy?
16          You heard some -- some quotes about some very
17  important concepts and -- and they're important and you
18  heard about increasing some repressive measures and you
19  heard about everyone living in fear and how those
20  things could happen and that's true, those things could
21  happen, perhaps sometimes what did happen in this time,
22  is that those repressive measures, she felt like she
23  couldn't do her level business and she lived in fear.
24          And what if we allowed everybody to express
25  their heart-held views, and convey -- by conveying
```

1    threats of force to talk to someone about gun

2    ownership, to try to make someone not own a gun?

3          Or to talk to someone to try to influence

4    their choice of religion, whether to have religion,

5    whether to not have religion?  If we allow people to

6    use words to hurt, to use words to evoke fear, to use

7    words to harm, to use words to make people fear that

8    they're going to be facing physical harm unless they do

9    something that they are allowed to do, that's what

10   we're worried about.  That is what we are talking

11   about.

12         There is no opposition here.  There is no

13   viewpoint being lauded or condemned.  There is no

14   viewpoint at all.  It doesn't matter.  It doesn't

15   matter what side of the argument you're on.  It doesn't

16   matter what side of the argument you could be on for

17   going to a certain church or gun ownership.  It doesn't

18   matter.

19         But on any one of those important issues, you

20   still can't threaten people with force to make them

21   change their ways or their views, or you can't threaten

22   them with physical force to make them act in accordance

23   with your views because that's not what the law says,

24   and the First Amendment is important and it is the

25   First Amendment and it has its limits and those limits

1  were reached here.

2          And the United States does not want to be the

3  arbiter of what is appropriate and what is not.  We

4  want you to be that arbiter.  We want you to go back to

5  that jury deliberations room and we want you to look at

6  the evidence.  We want you to read the instructions.

7  We want you to look at that, we want you to remember

8  everything, and we want you to decide because what we

9  have shown here is that a reasonable person in the

10  position of Dr. Means would have interpreted the letter

11  as conveying a threat of force.

12          She would have been intimidated, she would

13  have been afraid of physical harm.  And to bring this

14  back to something that the judge was talking about at

15  the very, very beginning of all of this, which seems to

16  me like an awful long time ago, hopefully not to you,

17  is we are not saying that the defendant should stop

18  making coffee.  We are saying that she needs to drop

19  the temperature.

20          We're not saying she shouldn't speak, we're

21  not saying she shouldn't speak her truth.  We're saying

22  she can't use that truth in that speech to burn, to

23  hurt, to threaten, to create this apprehension of

24  physical harm in order to make somebody do something

25  else.  That's what we're saying.

1          So we ask you, ladies and gentlemen, to please

2  be the arbiters.

3          And thank you so much for your time.

4          THE COURT:  Thank you.

5          Well, folks, the case is now yours and you

6  will be retiring to the jury room now.  We will send

7  the exhibits back for you.  Please take your

8  instructions with you and you'll have, as I indicated,

9  my original set of instructions with you as well.

10          When you reach a verdict, if you do, notify

11  us.  If you have a question, and these frequently do

12  come up, first of all, there is no transcript, there is

13  some small portion of it that was prepared at the

14  request of counsel, as he indicated, but we don't have

15  a transcript to send in to you, so we're not going to

16  be able to let you sit back there and read what has

17  taken place over the past two-and-a-half days here in

18  the courtroom.

19          But if there is some specific piece of

20  testimony that you need to hear again or you think it

21  would be helpful, describe it as best you can in

22  writing, as you would any other question, and let us

23  know and we'll see what we can do.

24          The reason we ask for you to put your

25  questions in writing is so there's no question about

1  what you're asking about.  We share the questions, when

2  I receive them, with counsel so they have an

3  opportunity to review them and any proposed response I

4  also run by the parties so they have an opportunity to

5  object if they object to what my response is.

6          If we just took an oral question and brought

7  it in, it may be interpreted in half dozen different

8  ways.  So, please, any questions, put them in writing,

9  have your presiding juror date and sign it, and put the

10 time on it, and we will get back to you just as quickly

11 as we can.

12          Thank you so much for your kind attention

13 here.  You are released from the admonition at this

14 point during the time that you're in the jury room and

15 communicating with each other and deliberating.

16          If you do not get a verdict before the day is

17 out, the admonition goes back in place until you're all

18 back again tomorrow morning.

19          Now, we typically close the courthouse at

20 5:00.  If you feel at 5 o'clock that you're close and

21 you would like to keep deliberating longer, we'll do

22 what we need to to keep the courthouse open.

23          If you, on the other hand, feel about that

24 time that a night off would be helpful to you just to

25 get a little more perspective on things, we will recess

1  until tomorrow morning.  I'll allow you to determine

2  what time you would like to come in, whether it's at

3  8:30 or 9 o'clock.  The courthouse opens at 8:00, so if

4  you wanted to start as soon after 8:00 as you could,

5  that would be fine, too.  But we just need to know what

6  time you've agreed to.

7          And probably, if you decide to head home for

8  the evening, I'll come down and just personally give

9  you the admonition again and get word from you about

10 the time that you intend to start tomorrow.

11          So, with that, again, thank you so much.  And

12 we'll just look to hear from you.

13          Appreciate it.

14          (Jury leaves the courtroom.)

15          THE COURT:  Folks, have a seat.

16          Anything anybody wants to take up at this

17 point?

18          You're welcome to stay here in the courtroom

19 if you want to, or if you want to leave, that's fine,

20 too, just let us know where we can reach you in the

21 event that we get a question from the jury.

22          All right.  Very good.  Well, as I say, let

23 Brian or Jana know where we can get you, if you choose

24 not to stay around.

25          MR. GOEMANN:  Your Honor, I'm sorry, actually

```
1   there was one other thing.

2              With the exhibits, did the stipulations go

3   back as well?

4              THE COURT:  Yes.

5              MR. GOEMANN:  They did.  Very well.  Thank

6   you.

7              THE COURT:  They will, any way.

8              MR. WOOD:  Okay, I don't have them.

9              THE COURT:  Okay.  We are going to need a copy

10  of them to send back.

11             MR. GOEMANN:  Very well.

12             THE COURT:  Thank you.

13             MR. GOEMANN:  Thank you, Your Honor.

14             THE COURT:  Certainly.

15             MR. WOOD:  I think they also have blowups that

16  I'll bring back.

17             THE COURT:  Okay.

18             (Deliberations commence at 3:40 p.m.

19             Jury recesses at 5:00 p.m. and reconvenes

20             May 6, which proceedings are contained in

21             Volume 4.)

22

23

24

25
```